AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

<table>
<tr><td>United States of America<br>v.<br><br>JOHN FRANCIS PORTER<br><br><br>_____<br><em>Defendant(s)</em></td><td>)<br>)<br>)<br>)<br>)<br>)<br>)</td><td>Case No.  3-21-mj-70609 MAG</td></tr>
</table>

**FILED**

Apr 13 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __November 2018__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. 666(a)(2)<br>18 U.S.C. 1956(a)(1)(B)(i) | Count 1: Bribery of a Local Official<br>Count 2: Concealment Money Laundering<br><br>Max. Penalties: Count 1: 10 yrs prison; $250,000 fine or not more than the greater of twice the gross gain or twice the gross loss; 3 yrs. supervised release; $100 special assessment. Count 2: 20 yrs. prison; $500,000 fine or twice the value of the property involved in the transaction; 3 yrs. supervised release; $100 special assessment. |

This criminal complaint is based on these facts:

See attached Affidavit in Support of Criminal Complaint.

☑ Continued on the attached sheet.

Approved as to form _____
AUSA Alexandra Shepard

/s/
_____
*Complainant's signature*

Special Agent Mark Twitchell, IRS CI
*Printed name and title*

Sworn to before me by telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d)

Date: __April 13, 2021__

_____
*Judge's signature*

City and state: __San Francisco__

Hon. Jacqueline Scott Corley, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR CRIMINAL COMPLAINT**</u>

I, Mark Twitchell, Special Agent with Internal Revenue Service Criminal Investigations, being duly sworn, state:

**I.      INTRODUCTION AND AGENT QUALIFICATIONS**

1.      I submit this affidavit in support of a two-count Criminal Complaint against JOHN FRANCIS PORTER.  As set forth below, there is probable cause to believe that PORTER bribed Mohammed Nuru, the former Director of the San Francisco Department of Public Works, in violation of 18 United States Code Section 666(a)(2) and 2, and engaged in a financial transaction for the purpose of concealing the proceeds of honest services wire fraud, in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 2.

2.      I am a Special Agent of the United States Department of the Treasury, IRS-Criminal Investigations (IRS-CI), and have been so employed since April 2009.  I am currently assigned to the Oakland Field Office, and I am trained and authorized to investigate the offenses alleged herein.  I completed the required Special Agent Basic Training Program at the Federal Law Enforcement Training Center in Glynco, GA.  This training included courses in conducting criminal investigations, federal criminal statutes, financial analysis and the law of search and seizure under the Fourth Amendment of the United States.  I have also attended specialized seminars with a focus on narcotics and money laundering.

3.      During my employment with IRS-CI, I have personally conducted criminal investigations involving violations of the internal revenue laws, money laundering violations, and related financial crimes.  I have participated in the execution of at least 80 federal search warrants related to the above-mentioned investigations.  Additionally, I have personally been the affiant of over 20 search and seizure warrants in connection with those crimes.

4.      Prior to being a Special Agent, I was a Revenue Agent with the IRS for two and a half years.  As a Revenue Agent, I conducted examinations of tax returns to determine compliance with Internal Revenue laws.

5.       I make this Affidavit based upon personal knowledge derived from my participation in this investigation and upon information I believe to be reliable from the following sources, among others:

      a.   my experience investigating money laundering and other illegal activity relating to public corruption;

      b.   oral and written reports about this investigation that I have received from federal agents, including other agents of IRS-Criminal Investigations and the Federal Bureau of Investigation;

      c.   physical surveillance conducted by the FBI, the results of which have been reported to me either directly or indirectly; and

      d.   recorded conversations.

6.       The conversations I summarize below were largely derived from various meetings and intercepted communications.  Collectively, these meetings, calls, and communications were documented in IRS-CI and FBI reports and summaries.  These reports and summaries describe recorded conversations involving subjects of the investigation, during which the subjects at times use code words and/or cryptic language to disguise conversations about their criminal schemes and related activities.  The reports are summarized based on agents' interpretations of the conversations.  Some of these reports and summaries contain interpretations of coded words, cryptic language, and vague identifiers.  It may be that subsequent review of the recorded conversations and verbatim transcripts may show changes from the summaries initially prepared.  Quotations from the recordings are based on informal transcriptions of portions of certain key recordings, which may not be exactly the same as formal transcriptions that are later prepared.

## II.    APPLICABLE LAW

7.       Title 18, United States Code, Section 666(a)(2), prohibits bribery of local officials who are agents of organizations receiving federal funds.  The elements of the offense include the following:

    a.   A person was an agent of an organization, a state, local or tribal government, or an agency of a state, local, or tribal government;

    b.   The organization, state or local government received federal assistance in excess of $10,000 in a one-year period;

    c.   The one-year period of federal assistance was within twelve months before or after the commission of the offense;

    d.   The defendant gave, offered, or agreed to give a thing of value to any person;

    e.   The defendant intended to influence or reward the agent of the organization or agency in connection with a transaction or series of transactions of the organization or agency that involved $5,000 or more; and

    f.   The defendant acted corruptly.

8.    Title 18, United States Code, Section 1956(a)(1)(B)(i) prohibits concealment money laundering.  The elements of the offense include the following:

    a.   The defendant conducted a financial transaction involving property that represented the proceeds of prior, separate criminal activity (namely, honest services wire fraud);

    b.   The defendant knew that the property represented the proceeds of some form of unlawful activity; and

    c.   The defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.

9.    Under Title 18, United States Code Sections 1956 and 1961(1), "specified unlawful activity" includes any act which is indictable under Title 18, United States Code Section 1343 (wire fraud).

III.     **FACTS ESTABLISHING PROBABLE CAUSE**

A.     Individuals and Entities

10.     Recology Inc. is a waste management company headquartered in San Francisco which services hundreds of thousands of residential and commercial customers in multiple states through various operating companies.  At all times material to this Complaint, Recology Inc. provided refuse collection and disposal services for residential and commercial customers in the City and County of San Francisco (the "City"),[1] as well as for the City itself, through the three subsidiaries which comprise its San Francisco Group:  Recology Sunset Scavenger; Recology Golden Gate; and Recology San Francisco.  As used in this Complaint, "Recology" refers collectively to Recology Inc.'s San Francisco Group and the three companies which make up the San Francisco Group.

11.     PORTER was Vice President and Group Manager of Recology's San Francisco Group from no later than January 2018 until January 2021.  In that capacity, PORTER had management responsibility for all three San Francisco Group companies.  PORTER was San Francisco Group Controller from approximately January 2015 through approximately December 2017.  In both positions, he reported to Recology Executive 2.  PORTER was Assistant Controller for corporate parent Recology Inc. from approximately June 2013 to approximately January 2015.  PORTER is a licensed Certified Professional Accountant.

12.     Paul Giusti was the Group Government and Community Relations Manager for Recology's San Francisco Group from 2012 until June 2020.  From approximately 2014 to December 2017, Giusti reported to Recology Executive 2.  From January 2018 until Giusti's departure from Recology, Giusti reported to PORTER.  As the Group Government and

---

[1] The City and County of San Francisco is a local government that received federal assistance in excess of $10,000 during a one-year period within twelve months before or after November 2018.  According to the Budget and Appropriations Ordinance passed by the San Francisco Board of Supervisors on August 1, 2018, for the Fiscal Year ended June 30, 2019, 4.4% of all funds appropriated for use by City departments came from federal funding, over $483 million.  Federal funding also constituted 5.1% of the City's general fund, a total in excess of $278 million. See File No. 180574, Ordinance No. 0181-18 (Budget and Appropriation Ordinance) (available at https://sfbos.org/ordinances).

Community Relations Manager, Giusti served as the San Francisco Group's liaison to elected officials and City departments such as the Department of Public Works, as well as to community organizations.  On November 18, 2020, Giusti was charged by Criminal Complaint with bribery (18 U.S.C. § 666) and laundering the proceeds of honest services wire fraud (18 U.S.C. § 1956(a)(1)(B)(i)), for his role in the same conduct alleged in this Complaint.

13.     Recology Executive 2 was the Vice President and Group Manager of Recology's San Francisco Group prior to PORTER.  Following a promotion, he was Chief Operating Officer of Recology Inc. until in or around July 2020.

14.     At all times material to this Complaint, Mohammed Nuru was the Director of Public Works (DPW) for the City and County of San Francisco.[2]

**B.  Overview**

15.     In the summer of 2018, Recology attempted, unsuccessfully, to raise the fees, known as "tipping fees," that it charged the City of San Francisco for dumping certain materials. Throughout the summer and fall of 2018, PORTER sought Nuru's assistance with Recology's efforts to implement the tipping fee increase.  To facilitate that effort, PORTER and one of his direct reports, San Francisco Group General Manager A ("Recology SF General Manager A") enlisted the help of Giusti, who had a close relationship with Nuru.

16.     In November 2018, in a recorded phone call, Giusti agreed that Recology would give $20,000 to Nuru.  As the facts described below demonstrate, the purpose of the payment was to influence Nuru's actions in connection with the tipping fee increase sought by Recology. More specifically, Giusti agreed to give Nuru the money for Nuru's use in throwing the annual DPW holiday party.  Giusti then arranged, at Nuru's direction and with the written approval of PORTER, for Recology to issue a $20,000 check for a "holiday donation" to the Lefty O'Doul's Foundation, a non-profit organization for underprivileged children.  After Recology issued the

---

[2] While still serving as Director of DPW, Nuru was charged by Criminal Complaint with Honest Services Wire Fraud (18 U.S.C. §§ 1343, 1346) on January 15, 2020 and by a separate Criminal Complaint with False Statements in violation of 18 U.S.C. §1001 on January 28, 2020.

check, Giusti mailed the check to Nuru at Nuru's direction.  Nuru gave the check to Nick Bovis, the head of the Foundation.  Bovis used the money to pay for expenses associated with Nuru's holiday party and not for underprivileged children.

17.     As described below, this conduct was part of a much larger pattern and course of conduct in which Recology's San Francisco Group, through executives including PORTER and Giusti, directed a stream of benefits to Nuru worth over $1 million, intending to influence and reward Nuru in connection with his role as Recology's regulator in the City.  Recology had a regular, ongoing need for Nuru's assistance and approval.  In particular, Recology wanted to ensure Nuru's cooperation in connection with his role in approving Recology's requests for rate increases for residential garbage collection.  Recology also wanted to ensure that Nuru approved Recology's other requests for funding and otherwise resolved issues Recology encountered in connection with City contracts and approvals, such as the "tipping fee" price increase described above.  As PORTER explained in an email: "Mohammed is the Director of the DPW who ultimately signs off on our rates.  Needless to say, keeping him happy is important."

18.     To ensure that Nuru would act in Recology's favor, Giusti, with the approval of PORTER or PORTER's predecessor, Recology Executive 2, arranged for Recology to provide Nuru with a continuous stream of additional money and benefits over a period of several years, including 1) annual contributions from 2016 to 2019 to pay for the DPW holiday party, disguised as charitable donations to the Lefty O'Doul's Foundation, and 2) approximately $1,000,000, funneled from one non-profit organization to another at Nuru's direction and deposited into funds which Nuru controlled.  PORTER, as the Vice President and Group Manager of the San Francisco Group and Giusti's supervisor from 2018 to 2020, approved many of these payments.

19.     These payments were in contrast to other donations by Recology for another DPW program, which were not funneled through multiple non-profits to conceal their source. And as described in further detail below, the payments and benefits were, repeatedly, closely tied in time to significant events in Recology's ongoing need for Nuru's assistance and approval in San Francisco.

20.     The benefits that Giusti, with PORTER's approval, arranged for Recology to provide to Nuru were valuable to Nuru in a variety of ways.  The increasingly elaborate DPW holiday party showcased Nuru's stature in the City and the community.  Nuru used the regular flow of money to keep his employees happy by providing them with benefits such as holiday events, big Public Works Week picnics, a health fair with acupuncture and massages, staff lunches, awards, Public Works gear, and even a treadmill for the DPW yard.  Nuru relied on the steady flow of money from Recology and others to project the image that he was, as his Twitter handle suggested, "Mr. Clean SF"—the man who got things done in San Francisco.  By ensuring that he was perceived this way by people who wanted to do business with DPW, and by ensuring that his employees were happy and would, indeed, get things done, Nuru facilitated the bribery and kickback schemes which enriched him personally.[3]

21.     San Francisco Campaign and Government Code Section 3.216 specifically prohibits any officer or employee of the City from soliciting or accepting a gift from a person or company "doing business with or seeking to do business with the department of the officer or employee," such as Recology.  Similarly, I have reviewed a March 2019 Recology employee handbook which explicitly prohibits employees from giving any loan, money or other valuable good or service to any public or private official to influence any official act.

**C.  Nuru's Influence Over Recology's Business in the City of San Francisco**

22.     As Director of Public Works, Nuru had great influence over the City's relationship with Recology.  In particular, Nuru had substantial influence over Recology's ability to increase yearly revenue and access millions of dollars for capital improvements.  As described further herein, Nuru played a very significant role in the process by which Recology periodically

---

[3] In addition to Paul Giusti of Recology, a number of individuals have been charged in connection with bribes paid to Nuru; several have already pleaded guilty.  See *United States v. Nick Bovis* (guilty plea to honest services fraud, May 2020); *United States v. Walter Wong* (guilty plea to conspiring to commit honest services fraud and money laundering, June 2020); *United States v. Balmore Hernandez* (guilty plea to bribery, September 2020); *United States v. Florence Kong* (guilty plea to bribery and false statements, September 2020); *United States v. Alan Varela and William Gilmartin III* (charged with bribery, September 2020); *United States v. Sandra Zuniga* (guilty plea to money laundering conspiracy, March 2021).

sought to increase the rates paid by the citizens of San Francisco for garbage collection. Understanding the rate increase process and other ways in which Nuru exercised influence over Recology is key to understanding why Recology, through PORTER, Giusti, and others, directed a regular stream of benefits to Nuru over a period of years—and also why the company arranged to hide much of these payments in the form of donations to non-profit organizations at Nuru's direction.

23.     Recology has a monopoly on residential garbage collection services in the City under the Refuse Collection and Disposal Initiative Ordinance ("1932 Ordinance"), which was approved by San Francisco voters in 1932.[4]  Pursuant to the 1932 Ordinance, Recology must seek approval from the City of San Francisco to raise the rates it charges residential customers in San Francisco.  The Director of Public Works is in charge of that process, under the auspices of the City's Refuse Collection and Disposal Rate Board ("Rate Board").  DPW Order No. 185078, signed by Nuru on July 11, 2016, lays out the Rules of Procedure concerning the rate increase application process and details the importance the Director of Public Works has over the process.[5]

24.     A review of the significant events in the process is helpful to understanding the events described in this affidavit.  Prior to initiating a rate increase, Recology engages in meetings and communications with DPW for a period of weeks and months about the substance and timing of its anticipated application.  The formal process is initiated when Recology files a 120-Day Notice of Intent to File Application ("Notice of Intent"), in the form of a letter to the Director of DPW from the Vice President and Group Manager of the San Francisco Group. Recology then submits a draft application, which is reviewed and evaluated by DPW.

---

[4] The 1932 Ordinance created a regulatory scheme for residential garbage collection and approved 97 separate permits for residential collection in the City.  Over time, the company that is now Recology acquired all of those permits.
[5] DPW's website also explains how the formal public process works, and provides copies of key documents and testimony in connection with Recology's rate increase applications in 2013 and 2017.  *See* https://sfpublicworks.org/refuserates.

Ultimately, Recology submits a final application.  DPW and other stakeholders evaluate the report, and the Director of DPW holds public hearings, at which Recology executives and others, including DPW staff, testify.  The Director of DPW then issues a Report and Recommended order on adjusting rates.  If there are objections by members of the public, the Rate Board will hold additional hearings and then make the final decision, based on the recommendation of the Director of Public Works.  If the Rate Board does not make a decision within 60 days after the Director has filed his Report and Recommended Order, the Recommended Order takes effect.

25.     The Director of Public Works holds enormous power over this process.  The Director reviews Recology's applications, accepts or rejects modifications to the rate increase application, holds public hearings, responds to any objections to the report by the public, and makes a final recommendation to the Rate Board on Recology's requested rate increases.  Nuru's approval was therefore essential to any request for a rate increase by Recology.

26.     Recology applied for a rate increase in San Francisco every few years.  Most recently, Recology went through a rate increase application process from September 2016 to June 2017 ("2017 rate increase application"), culminating in an average 20.98 percent increase in rates charged for refuse collection from residential and apartment buildings.[6]  Prior to that, Recology went through a similar process in the 2012-2013 time frame, culminating in approval of an average increase of 19.89 percent for residential and apartment building collection, effective August 2013.

27.     Based on figures reported by Recology in their yearly reporting of revenues and expenses to the City of San Francisco, the following table summarizes the significance of the 2017 rate increase to Recology's revenues subject to rates:

---

[6] On March 4, 2021, the San Francisco City Attorney and Recology announced that Recology would repay San Francisco customers a total of $94.5 million for the period July 1, 2017 to March 2021, due to what was described as an error in Recology's 2017 rate increase application.  The settlement required Recology to lower its rates to customers in San Francisco effective April 1, 2021 and also included injunctive terms and an additional $7 million in penalties for violations of California's Unfair Competition Act and San Francisco Campaign and Governmental Conduct Code.

| RECOLOGY - SAN FRANCISCO ANNUAL RATE REPORT | | | | | | | |
|---|---|---|---|---|---|---|---|
| Summary of Revenues Subject to Rates | | | | | | | |
| Fiscal Year Ending June 30th | | | | | | | |
| Dollar Amount Rounded in Millions | | | | | | | |
| 2015 | | 2016 | | 2017 | | 2018 | |
| Rate Revenue | YOY % increase | Rate Revenue | YOY % increase | Rate Revenue | YOY % increase | Rate Revenue | YOY % increase |
| $  275 | N/A | $  279 | 1% | $  289 | 4% | $  351 | 21% |

28.     The 2017 rate increase also benefited DPW.  For example, Recology's rate increase application provided for about $8.5 million in annual funding to be deposited into an impound account, which DPW could access for refuse-related services such as $840,000 annually for trash can replacement.

29.     In his capacity as Controller for Recology's San Francisco Group from 2015 to 2017, PORTER was deeply involved in the rate increase application.  In PORTER's first yearly performance review after becoming the Controller of the San Francisco Group, he was praised for his work on the rate increase application process. Specifically, his 2015 yearly review stated, in part, "John jumped into the very complex SF rate application, taking ownership over the models and providing ideas to the Group Manager," who at the time was Recology Executive 2.

30.     After the rate increase was approved, PORTER was praised again in his 2017 annual review for his essential role in the process: "John was instrumental in the rate increase process in San Francisco.  This included leading the drafting and preparation of the 2017 rate application and corresponding support, responding to City and City consultant questions and requests related to rate application, preparing numerous exhibits (~100) and testifying for over 10 [hours] during rate hearing process, and implementing the rate increases."  Approximately one month after the rate increase was approved in June 2017, Recology announced that PORTER was being promoted to Vice President and San Francisco Group Manager.  In that capacity, PORTER continued to work with DPW staff and others on issues related to Recology's rates in San Francisco.

31.     The residential rate increase process was very important for Recology not just because residential garbage collection was a significant revenue stream for the San Francisco

Group, but also because other significant revenue streams were tied to residential collection rates: specifically, rates for commercial garbage collection and City of San Francisco municipal garbage collection. Although these rates were not regulated in the same way as residential rates, I have reviewed information which indicates that both sets of rates historically increased at the same percentage as residential rates. Therefore, when Recology increased its residential collection rates in San Francisco, commercial and City rates also went up.

32. In addition to having a monopoly position on residential garbage collection, Recology's subsidiaries have separate contracts with the City of San Francisco for other services. For example, Recology Golden Gate has a contract with the City to collect garbage from the City itself, including City buildings, streets, and parks.[7] Recology also has two smaller contracts with the City. One of those contracts, Recology San Francisco's contract with the City for dumping materials at Recology's Sustainable Crushing facility (Term Contract 75961), is the subject of the charged conduct.

33. Additionally, Recology needed Nuru's approval to access millions of dollars located in incentive accounts funded by refuse collection revenues, commonly called the Zero Waste Incentive Funds, if Recology did not meet specific waste diversion goals. Beginning in July of 2013, the Director of Public Works ultimately approved or denied Recology's request to access these funds. Between December 2015 and February 2017, Nuru approved Recology's requests for over $10 million dollars of the Zero Waste Incentive Funds for capital improvements.

---

[7] The most recent contract between Recology and the City of San Francisco had a "not to exceed" value of $48 million approved by the Board of Supervisors on November 19, 2019, up from $40 million when it was first approved by the Board of Supervisors on November 25, 2014. On December 1, 2020, the San Francisco Board of Supervisors was scheduled to vote to approve a new, six-year $62.5 million not-to-exceed contract with Recology for municipal garbage collection. The Board voted 10 to 1 to return the contract to the Budget and Finance Committee rather than approve it.

D. **Recology Pays for DPW Holiday Parties, Disguised as Charitable Donations to the Lefty O'Doul's Foundation for Kids**

34.     From 2016 to 2019, Recology made increasingly large "holiday donations" to the Lefty O'Doul's Foundation for Kids, which were orchestrated by Giusti, and approved by PORTER (with the exception of the first year's payment, approved by Recology Executive 2). These were not holiday donations, but instead payments to Mohammed Nuru.

35.     The Lefty O'Doul's Foundation is a non-profit organization led by Nick Bovis.[8] Its stated purpose is to provide underprivileged children the opportunity to experience baseball by providing them with bats, gloves, equipment, and tickets to baseball games.  However, the purpose of Recology's yearly contributions to the Lefty O'Doul's Foundation was not to introduce underprivileged kids to baseball.  Instead, the money went to fund an increasingly extravagant holiday party that Nuru organized for certain DPW employees and other San Francisco city officials and invited guests.

36.     The holiday party was originally a more casual affair for DPW employees. Beginning with the 2016 party, Nuru requested that Bovis use the Lefty O'Doul's Foundation to organize and help pay for the DPW holiday party.  The party grew larger and more elaborate over time, moving first to the Green Room at the San Francisco War Memorial, and then to the dramatic hall in the James R. Herman Cruise Terminal at Pier 27.  Nuru selected the guest list, which expanded to include various San Francisco dignitaries and other VIPs, including Recology executives, but only certain DPW employees.  At some point the party also expanded to include the San Francisco General Services Agency, a collection of various departments under the City Administrator's Office.

37.     In 2017, Nuru tasked a DPW public relations employee with planning the holiday party with Bovis and other vendors.  The importance of the parties to Nuru is demonstrated by the fact that he was deeply involved in the planning.  I interviewed a DPW employee who helped

---

[8] Bovis was charged with honest services fraud along with Nuru in the January 15, 2020 Criminal Complaint.  Bovis pled guilty on May 21, 2020 pursuant to a cooperation plea agreement.

plan several of the parties in the 2016 to 2019 timeframe.  The employee informed me that Nuru

selected who would be invited by DPW and even instructed the employee on how to invite

guests (by phone or by email).  I also reviewed a November 14, 2019 email which demonstrates

the level of Nuru's involvement in the planning.  The DPW employee wrote to a chef who was

supplying some of the food, "Here are a few takeaways from my second meeting with

Mohammed yesterday afternoon:  He wants to see a complete list of menu options to choose

from…Mohammed also wants to make sure that Nick hires someone to bring in African food in

addition to these items and sushi….He is still unsure if he wants to bring in sushi from

Tomokazu or use your guys….Ultimately, he is going to request a complete breakdown of all the

costs for the event."

38.     As stated by multiple witnesses involved in planning the holiday party at Nuru's

direction, the party grew in size and costs each year after 2016.  Based on my review of records,

below are the approximate costs of the yearly holiday party:

| Holiday Party Costs Per Year | | | | |
|---|---|---|---|---|
| Party Date | 12/20/2016 | 12/19/2017 | 12/18/2018 | 12/20/2019 |
| Approximate Costs | $12,290.00 | $31,510.00 | $34,738.75 | $52,638.42 |

39.     In order to pay for the parties, Nuru and individuals associated with him solicited

money from City contractors such as Recology.  Nuru directed that the payments be made to

non-profit organizations including the Lefty O'Doul's Foundation.  The money would then be

used by the Foundation to pay for party expenses as approved by Nuru.  Based on my

knowledge, training and experience, I believe Nuru purposefully used the Lefty O'Doul's

Foundation to facilitate the receipt of contributions from various contractors, in an effort to

conceal source of the funding for his holiday party and disguise the payments as charitable

donations.

40.     Recology was the largest contributor to these DPW holiday parties, giving a total

of $60,000 from 2016 to 2019.  Recology made its first contribution to the Lefty O'Doul's

Foundation for the holiday party during its 2017 rate increase application process, shortly before

a key event in the process.  On December 5, 2016, Giusti and Recology Executive 2 met with Nuru at Nuru's office in City Hall.  That same day, Recology Assistant A, the executive assistant for Recology Executive 2 and the San Francisco Group, prepared a check request for $5,000 for a "Holiday Donation" to the Lefty O'Doul's Foundation.  The check request did not mention the DPW holiday party.  Recology Executive 2 approved the payment by signing the form.  On December 12, 2016, Recology issued a check for $5,000 to the Lefty O'Doul's Foundation.  The next day, December 13, 2016, Recology formally submitted its draft 2017 rate increase application to Nuru, which requested a 21.43 percent increase in residential collection rates.

41.     Recology continued to contribute to the DPW holiday party by making "holiday donations" to the Lefty O'Doul's Foundation, and the payments increased each year.  In October 2017, Recology contributed $15,000.  PORTER approved the payment by signing the check request form.  In November 2018, as discussed in detail below, Recology increased its "holiday donation" to $20,000.  PORTER, by now the head of the San Francisco Group, approved this payment by signing the check request form.  In November 2019, Recology contributed another $20,000.  PORTER approved this payment as well, also by signing the check request form.  In total, PORTER approved $55,000 in payments by Recology to the Lefty O'Doul's Foundation to fund Nuru's holiday party.  None of the internal check requests mentioned the DPW holiday party; all described the payment as a holiday donation to the Lefty O'Doul's Foundation.

### E.   **The Offense Conduct:  Recology Agrees to Increase Its 2018 DPW Holiday Party Contribution in Return for Nuru's Efforts to Get Recology an Increase in Tipping Fees**

42.     In November 2018, Giusti, with PORTER's approval, arranged for Recology to increase its contribution to Nuru's holiday party from $15,000 to $20,000.  The increased contribution was tied to Recology's request for Nuru's assistance in obtaining a price increase on the tipping fees that Recology charged the City.  Recology, through PORTER, Giusti and others who reported to PORTER, sought Nuru's assistance when City employees would not accept the increase without the required documentation, and would not agree to pay invoices that reflected the increased prices.

43.     In 2015, Recology San Francisco entered into Term Contract 75961 (TC#75961) with the City.  The three-year contract, which began on August 1, 2015, had a not-to-exceed value of $6.3 million for "Asphalt, Grindings, Concrete Dumping."  Pursuant to TC#75961, City facilities would pay a certain amount per unit, known as "tipping fees," to dump a variety of materials such as asphalt and concrete at a Recology facility in San Francisco called Sustainable Crushing.

44.     Recology planned to increase the amount of the City's tipping fees on August 1, 2018.  More specifically, according to an email from Recology SF General Manager A to PORTER, Recology intended to increase its tipping fees by approximately 30 percent "or market conditions," which in some cases was double the original price.

45.     In June of 2018, SF City Purchaser A, who was assigned to DPW, requested certain changes to TC#75961, including a 12-month extension of the contract.  Recology SF General Manager A then emailed PORTER, "This was the email we have been waiting for….Do we decline the extension."  PORTER responded, "Let me call Mohammed."  I believe, based on the evidence gathered in this investigation, that "Mohammed" was Mohammed Nuru.

46.     PORTER and Recology SF General Manager A then sought Giusti's assistance with the price increase, telling him, "We are going to have to have a conversation with DPW to put our current pricing into perspective with our business objectives."  Giusti responded, "I think we can get Mohammed to yes, it just has to make sense to him quickly and look like a win for all parties….If Mohammed sees we are in step with [a potential third party purchaser[9]] on pricing and timeline it will translate to him knowing he has a place to continue dumping his trucks and at a price, albeit a justifiable higher one, he can budget for."  Based on my knowledge, training, and experience, I believe PORTER and Recology SF General Manager A wanted Giusti's help because he was Recology's primary contact with Nuru.

---

[9] In the same time frame, Recology was in discussions to sell the Sustainable Crushing operation to a third party.

47.     PORTER, Giusti, and Recology SF General Manager A then met with Nuru on June 28, 2018.  On July 2, PORTER emailed Nuru, "Great to see you last week.  As discussed, please see the update pricing for Sustainable Crushing based on the market analysis we completed…."

48.     A few days later, Recology SF General Manager A forwarded PORTER's July 2 email to SF City Purchaser A.  He wrote that he and PORTER "had a meeting with Director Nuru to discuss SF Public Works tipping fees at Sustainable Crushing.  Attached, please find a price sheet that was presented to the Director last week.  Recology SF would like to have the tipping fees associated with our PO adjusted to reflect the price structure attached."  I believe, based on my training and experience and the context of the document, that he forwarded the email to Nuru's subordinate to make it clear to her that he had gone over her head and expected that she would do as he said and accept Recology's price increase.  Ten minutes later, Recology SF General Manager A emailed two other Recology employees, "The ball is in motion with the PI.  I think it's going to take a few more volleys to get it over the net."

49.     PORTER emailed Nuru again on July 20, 2018 to say that he had not heard from SF City Purchaser A about the contract extension and that Recology would simply send an invoice with the new prices.  I believe, based on documents I have reviewed, that Recology later sent August and September invoices with the new prices to the City for payment, although the City had not yet agreed to those new prices.

50.     On October 5, 2018, an Assistant Purchaser in the City's Office of Contract Administration requested a one-year extension on TC#75961.  Recology SF General Manager A signed the contract extension on October 22, 2018.  I have reviewed the extension and it makes no mention of a price increase.

51.     Approximately three weeks later, on November 12, 2018, Recology sent its October 2018 invoice under TC#75961 to a junior administrative analyst in the City Contract Administrator's office.  The invoice reflected the increased pricing which PORTER previously discussed with Nuru.  The City analyst pushed back, noting that Recology's contract with the

City did not contain increased prices and requesting revised invoices for August, September, and October 2018.  I have reviewed copies of those invoices; they reflect Recology's desired price increases, and totaled approximately $130,000.[10]  Recology responded to the analyst by sending her a copy of the letter they sent to DPW in summer 2018 with their new prices.

52.     On November 15, 2018, the City's analyst emailed Recology a copy of the contract modification that Recology SF General Manager A had signed three weeks earlier, noting, "There is no price change."  Recology SF General Manager A then emailed PORTER and Giusti to tell them that Recology had a problem:  "It looks like the purchaser who was assigned to process our price increase for the DPW street repair dumping, returned an executed agreement back to us without the price increase despite our efforts to get the increase.  This means that the city is not willing to acknowledge the PI we gave them back in July and has requested that we modify all of the invoices to reflect the old contract pricing.  Obviously we need to push the increase through and we are not going to get anything done with the purchaser."  I understand and believe that "PI" is a reference to their desired price increase.  He requested a meeting with PORTER and Giusti.  Recology SF General Manager A then texted Giusti: "Sent you an email this morning about the DPW disposal contract for innards they don't want to honor the price increase that we negotiated with Muhammad."  Giusti responded, "Ok let me look at it."  I believe, based on my knowledge, training, and experience, that Recology SF General Manager A was once again reaching out to Giusti for assistance with the price increase because of his relationship with Nuru.

53.     On November 20, 2018, while the issue of a price increase was still pending between Recology and the City, Giusti emailed Recology Assistant A and asked, "Can you please tell me what we spent last year around this time for Lefty O'Doul [sic] Foundation?"  I

---

[10] By way of example, the August 2018 invoice included a line item for the commodity code "Asphalt Grindings, 10 Wheeler," which totaled $32,100.  The amount was billed at Recology's desired price of $300 per unit.  Had Recology invoiced the City under the contract price of $200 per unit, the bill for that line item would have been $21,400—a difference of $16,000.

believe, based on the context and my review of the evidence, that Giusti was trying to find out how much Recology had paid Nuru the previous year for the DPW holiday party in advance of a regular monthly breakfast coordination meeting with Nuru scheduled for the next day.  Also on November 20, 2018, the City's analyst again requested that Recology work on revising their prior invoices, presumably to reflect the original prices, so that the City could pay them.  The Recology employee responded by advising the analyst, "My boss is meeting with your Director tomorrow on this very issue.  I will get back to you as soon as I here [sic] of the resolution."  I understand and believe that the employee's boss was PORTER.  I have reviewed documents which confirm that the meeting happened as scheduled on November 21, 2018, at Stacks Restaurant, and that PORTER used his Recology purchase card to pay $155.95 for breakfast.

54.     On the morning of November 26, 2018, PORTER forwarded Nuru the November 15, 2020 email from Recology SF General Manager A alleging that the City was "not willing to acknowledge" their price increase.  He wrote to Nuru, "As discussed, any help you could provide getting the new purchaser aware of our price change would be appreciated."  Nuru wrote back about 90 minutes later, "Working on situation."  Nuru then forwarded PORTER's email to SF City Purchaser A and her supervisor, DPW Deputy Director A, and wrote, "Can you let me know what's happening.  Thanks."

55.     That same day, November 26, 2018, Nuru spoke to Nick Bovis on two intercepted phone calls about Recology's payment for the DPW holiday party.  Nuru told Bovis, "Yeah, call me right back because they are asking….I told them to send you a check…. They are asking how much….I told them to do me a, you know, uh to do a new amount for me and I don't, I can't remember what to tell them….Why don't you let me know and they'll send you a check for sure….Yeah, I just need to call them and let them know."

56.     Later that evening, at approximately 10:14 PM, Giusti called Nuru on an intercepted call.  First, they spoke about a "contribution," which I believe, based on the evidence I have reviewed, refers to Recology's contribution to the DPW holiday party:

Nuru:      Good. I got a call, uh, about the contribution.

Giusti:    Okay.

Nuru:      Yeah, so last year was fifteen thousand you guys gave us.

Giusti:    Yeah.

Nuru:      Yeah, so anything you can do, either match it or give me a little more that would help.

Giusti:    Okay, all right.

Nuru:      Because I always have to go get more, I have to get, I think about another twelve thousand or so more.

Giusti:    Wow, oh, okay.

Nuru:      [Unintelligible] Yeah, so if you could, if you could give me twenty, that would be nice.

Giusti:    All right, okay.

57.     Nuru then immediately pivoted to issues affecting Recology, specifically, how

Nuru was advocating on Recology's behalf in his official capacity as Director of Public Works:

Nuru:      And then I'm working on the other thing for John, so…

Giusti:    Okay, perfect.

Nuru:      I sent him the freeway people, I sent him that and then I'm trying to get him the price increase for the…

Giusti:    Tipping.

Nuru:      For the specialty, yeah.

Giusti:    Yeah.

Nuru:      The problem there is [Recology SF General Manager A] signed an agreement in, uh, October that he was okay with an extension, and he never brought up the issue of the price change.

Giusti:    Yeah, yeah, because I think there was gonna be that deal with [Third Party Purchaser] and then it didn't, it didn't happen, so…

Nuru:      Yeah, I'll try and make it happen, but he should have brought it up at that time, that's what the attorneys are saying that...

Giusti:    Yeah.

Nuru:      If they had a price increase, why didn't that say it at that time so that we could

19

just adjust it before they find it.

Giusti:      Yeah.

Nuru:        Yeah, but I'll get it, yeah just…

Giusti:      Okay, yeah cuz....

Nuru:        [Unintelligible] Just send me the bills with the new price and we'll deal with it, yeah.

Giusti:      Okay, all right, thank you.

Nuru:        I'm working on it, I'm working on it on our side, yeah.

Giusti:      Okay.

Nuru:        We'll get it.

Giusti:      Okay, all right.

58.     Based on my training and experience, and the evidence I have reviewed in this investigation, Nuru solicited contributions from Giusti and Recology for the DPW holiday party in exchange for official acts by Nuru in his capacity as Director of DPW.  As detailed in the intercepted phone call, Nuru began the call with a request that Recology increase its contribution to the DPW holiday party to $20,000.  After Giusti agreed, Nuru then told Giusti he was, "working on the other thing for John."  Based on context and on documents described above, I believe Nuru was referring to John PORTER.  Nuru told Giusti he was, "trying to get the price increase."  Nuru assured Giusti, "I'm working on it on our side….We'll get it."  Nuru's promise that he was working on it is consistent with the promise he made by email earlier that day to PORTER that he was working on Recology's request.  I believe, based on the evidence in the investigation, that when Nuru told Giusti to send him "the bills with the new price," he was referring to the Recology invoices reflecting the higher prices that they had been trying unsuccessfully to get the City to pay.

59.     The next morning, at approximately 7:34 a.m. on November 27, 2018, Nuru spoke with an individual on an intercepted phone call.  Nuru put the call on hold, and when he came back he told the DPW employee, "That was uh Recology, I have a whole 'nother problem

with them…."

60.     Shortly afterwards, at 8:04 a.m., Giusti sent an email to Recology Assistant A enclosing a check request for a "holiday donation" of $20,000 to the Lefty O'Doul's Foundation. Giusti wrote, "Can you please process. John P. will sign.  Also see how quickly we can get the check cut and let me know.  I will deliver."  I believe, based on context and the image below, that "John P." was PORTER.  As noted in the image below, Giusti prepared the check request form, and PORTER signed it:

61.     At virtually the same time that Giusti emailed the check request internally at Recology, Nuru called Nick Bovis on an intercepted call and told him that "Recology is going to send you twenty grand."  I believe, based on the context and prior intercepted calls, that Nuru was telling Bovis that Recology would send the Lefty O'Doul's Foundation $20,000 to fund the DPW holiday party.

62.     Two days later, on November 29, 2018, Recology Inc. issued a check for $20,000 for "Holiday Donation – 18" to the Lefty O'Doul's Foundation.

63.     The next day, November 30, 2018, Giusti called Nuru on an intercepted call and said, "Hey, I have the, uh, donations check for Lefty O'Douls."  He asked NURU about the address for the foundation, and NURU told GIUSTI to give him the check and said that he would get it a person whom I believe, based on context, was Nick Bovis.  GIUSTI mailed the check to NURU.  The check was then deposited into the Lefty O'Doul's Foundation bank account, and used to pay expenses for the DPW holiday party.

64.     In another intercepted phone call on December 7, 2018, Nuru confirmed that the purpose of Recology's "holiday donation" to the Lefty O'Doul's Foundation was to pay for the DPW holiday party and not to help underprivileged children experience baseball.  Giusti told Nuru that he and Recology Executive 2 wanted to schedule a holiday dinner with Nuru.  Giusti suggested December 18 and Nuru reminded him, "Tuesday night is the big party you helped me pay for, so that's not a good night," and then laughed.  December 18, 2018, was the date of the 2018 DPW holiday party.  They settled on December 20, 2018, for dinner.  Giusti asked Nuru whether there was a special place he wanted to go, or whether he could just "pick a nice place."  Nuru told him, "you work it out, just a place we can drink, man."  Giusti promised to "pick us a good place."  I have reviewed evidence which shows that PORTER used his Recology purchase card to pay $1,182.23 on December 20, 2018 for "Holiday Dinner with Mohammed Nuru" and others, including Recology Executive 2, Giusti, and DPW Deputy Director A, at Harris' Restaurant.

65.     The Recology money that GIUSTI, with PORTER's approval, paid to the Lefty O'Doul's Foundation had no charitable purpose.  I believe, based on my training and experience and my review of the evidence, that the payment was instead intended to conceal the proceeds of a bribe.  Specifically, the evidence indicates that the $20,000 that Recology paid the Lefty O'Doul's Foundation in November 2018 was money intended for Nuru's benefit, to influence him to intercede on Recology's behalf to help Recology get their desired tipping fee price increase.  To conceal the payment, Giusti orchestrated, and PORTER approved, a "holiday donation" to the Lefty O'Doul's Foundation.

66.     Recology continued to pursue a price increase with the City through the spring of 2019.  PORTER repeatedly emailed SF City Purchaser A requesting a revised contract with new pricing.  For example, he claimed on March 18, 2019, "[W]e signed a contract with the revised pricing.  Subsequently, someone from City Purchasing changed the price sheet back to the old prices, which we cannot accept and then executed the extension (inappropriately).  Please let me know if I should reach back out to Mohammed on this.  It has taken far too long to get a resolution."  When PORTER didn't get a satisfactory response, he emailed SF City Purchaser A on April 1, 2019, "If I don't have an updated contract tomorrow before noon, I have to call Mohammed.  I am getting questions from our finance group about the long outstanding invoices.  They have accumulated to over $500,000."  The back and forth with SF City Purchaser A continued, and on April 18, 2019, PORTER emailed two Recology employees, "I am giving [SF City Purchaser A] one last chance to fix this, then I will call Mohammed."  I believe, based on the context, that "Mohammed" referred to Nuru.  I further believe, based on the context and my training and experience, that PORTER threatened to call Nuru because he expected that Nuru would act in his favor in return for the money and other benefits that Recology provided to Nuru.

67.     I understand and believe that Recology did not obtain its desired price increase before the City rebid the contract in late 2019.  However, Recology was awarded a portion of the new contract.

### F.  **Additional Evidence of Corrupt Intent and** *Modus Operandi*

68.     This was not the only instance in which PORTER approved Recology payments to non-profit organizations for the purpose of benefitting Nuru.  Based on my knowledge, training, and experience, I believe the continued use of non-profits by Giusti, with the approval of PORTER and Recology Executive 2, was deliberate, as it concealed the fact that the "donations" that Recology made were actually payments intended to benefit Nuru in return for his influence.

69.     Between February 2013 and November 2019, Recology made 35 payments, totaling $1,030,000, to Non-Profit Organization A ("Non-Profit A") in the form of "donations" for a DPW program called Giant Sweep.  Giusti, in his role as Recology's Group Government and Community Relations Manager, arranged for these payments at the direction of Nuru and the Executive Director of Non-Profit A.  First Recology Executive 2, and then PORTER in his capacity as Controller and then Vice President and Group Manager of Recology's San Francisco Group, knew about and signed off on these payments.

70.     Based on my training and experience, I believe that Recology, with the knowledge and approval of PORTER and others, directed this regular flow of money to Nuru over a period of years to influence Nuru's official actions in his capacity as Recology's regulator.  Non-Profit A's principal or only function in this arrangement was to serve as a pass-through entity to conceal the source of the money.  Nuru and Non-Profit A's Executive Director arranged for the money contributed by Recology to be immediately passed on to another non-profit, Non-Profit Organization B ("Non-Profit B"), where it was deposited into accounts that Nuru used as a slush fund for his professional benefit.  While it appeared that the accounts at Non-Profit B, which were routinely used by Nuru and other DPW staff, were primarily funded by donations from San Francisco Non-Profit A, they were actually funded by Recology.

a)   Entities

71.      Non-Profit A is a 501(c)(3) non-profit organization in San Francisco.  Records show that from 2014 to 2018, approximately 80 percent of Non-Profit A's funding came from grants from the City and County of San Francisco, including grants from DPW and the Community Challenge Grant Program.  The majority of the rest of its funding, particularly in the period from 2016 through 2018, came from Recology.  Most of that money consisted of the $1,030,000 in purported donations for Giant Sweep—money which Non-Profit A immediately turned around and "donated" to Non-Profit B after taking a 5 percent cut.  The remainder of the money consisted largely of payments by Recology for another DPW community program administered by Non-Profit A.  I have reviewed evidence which indicates that Non-Profit A was the fiscal sponsor (a concept described further below) for Giant Sweep from 2012 to approximately 2013, and no later than March 2014.

72.      Non-Profit B is a separate 501(c)(3) non-profit organization in San Francisco which, among other functions, serves as a fiscal sponsor, or fiscal agent, for organizations or groups that do not have non-profit status and/or don't have the resources to take donations or administer funds themselves.  A fiscal sponsor provides administrative functions and oversight on behalf of a sponsored organization or program, including accepting donations.  Non-Profit B is or was the fiscal sponsor for DPW on a number of projects, including Giant Sweep beginning no later than March 2014.  Recology made regular monthly donations directly to Non-Profit B for another DPW "cleaning and greening"-type program.  Based on my training and experience and my review of the evidence, these payments were different than the Giant Sweep payments.  They were not funneled through another organization.  Recology would simply send a monthly check for approximately $2,083 directly to Non-Profit B.  Non-Profit B would then deposit the check into an account set up specifically for that program.

73.      Giant Sweep was a DPW-sponsored anti-litter volunteer program initiated by then-Mayor Ed Lee after the San Francisco Giants swept the Detroit Tigers in the 2012 World Series.  DPW created and implemented the program, and the Giants lent their name and provided

support in the form of promotional appearances at Giant Sweep events.  I am informed that the Giants stopped participating in Giant Sweep around August of 2015.  Based on my review of documents and publicly available information, DPW hosted a number of Giant Sweep events from 2013 until in or around 2018, including cleanups and school assemblies, but it appears that over time the program was subsumed into other DPW programs.

> b) <u>Origins and Overview of the Giant Sweep Payments</u>

74.     The origins of Recology's donations for Giant Sweep appear to be closely tied to the company's 2013 rate increase application to the City of San Francisco.

75.     I have reviewed documents indicating that Recology agreed to give $100,000 per year to Nuru for Giant Sweep in January 2013, right in the middle of its 2013 rate application process.  The 2013 rate application process resulted in a rate increase, among other significant changes to the rate structure.  As previously noted, beginning with the 2013 rate increase, the DPW Director received final approval authority over Recology's requested use of Zero Waste Funds if Recology did not meet certain waste diversion goals, thereby granting Nuru more control over Recology's operations.

76.     Recology made the first payment of $40,000 to Non-Profit A for Giant Sweep on or around February 14, 2013, approximately three days after a key event in the process:  DPW's notification to Recology that their draft application was complete.  In total, Recology contributed $80,000 to Non-Profit A for Giant Sweep in the months before Nuru issued his final report in June 2013 approving their requested rate increase.  Recology then gave an additional $20,000 to Non-Profit A for Giant Sweep on or around the day the rate increase went into effect in August 2013, and another $30,000 approximately one week later.  Records indicate that the donations then appeared to stop for approximately one year.[11]

---

[11] During this timeframe, prior to August 2014, the payments from Recology to Non-Profit A, and from Non-Profit A to Non-Profit B, were irregular in amount and frequency.

77.     Beginning in August 2014, the payments began again, and through December 2019 followed a consistent pattern.  Approximately once a year, Non-Profit A's Executive Director would email a letter to Giusti, addressed to Giusti's supervisor at the time—first Recology Executive 2, and then PORTER.  The letters thanked Recology in advance for their tax-deductible donation of $150,000 to Giant Sweep, to be paid in bi-monthly installments of $30,000.  By this time, Non-Profit A was no longer the fiscal sponsor for Giant Sweep. Nevertheless, Giusti and Recology Assistant A would arrange for Recology to send the requested payments to Non-Profit A.  Non-Profit A's Executive Director would confirm with Nuru that Recology's money should be sent to Non-Profit B.  Non-Profit A would typically then hold the money for one to two weeks, take a 5 percent cut, and then write a check for $28,500 to Non-Profit B.  The check was styled as a "restricted grant" from Non-Profit A to Non-Profit B.  The money was to be deposited into one of two Nuru-controlled accounts at Non-Profit B, one for Giant Sweep and one called "Special Projects."  Nuru then used the money as he saw fit— occasionally for DPW events which benefitted taxpayers, but often for items which benefitted Nuru in some way.

78.     In my training and experience, this fact pattern—a) the short period of time between when Non-Profit A received the money from Recology and the time when it sent checks to Non-Profit B, and b) the five percent "cut" that Non-Profit A would take from Recology's checks—is consistent with a pattern of money laundering and the fees charged for the service. Based on my review of the evidence, there does not appear to be a reason for Non-Profit A to take a cut of the money they received from Recology.  They held the money for one or two weeks, not long enough to incur any legitimate overhead costs.  Nor did they appear to use the money for any purpose.  They simply passed the money on to Non-Profit B, which administered and processed any costs associated with the Giant Sweep program.[12]

---

[12] I am informed and believe that Non-Profit B also did not take any administrative fee for the work it performed in connection with administering the DPW accounts.  I understand that this is contrary to its practice with other groups and organizations for which it serves as a fiscal sponsor.

79.     When Recology initiated its next rate increase process in September 2016, the nature of the Giant Sweep payments changed.  Nuru's calendar for August 18, 2016 contained a meeting entitled "[Non-Profit A Executive Director]-Giant Sweep Funding."  Less than a week later, on August 24, 2016, Non-Profit A's Executive Director sent an email to Giusti and Recology Assistant A enclosing the annual Giant Sweep solicitation letter addressed to Recology Executive 2.  She wrote, "Mohammed asked me to email you another donation letter for the Giant Sweep, similar to last year."  The request was, in fact, similar to the prior years, but it was not the same:  the solicitation letter now thanked Recology for supporting not just the Giant Sweep program, but "SF DPW staff enrichment and community events."

80.     On September 2, 2016, Recology wired $30,000 to Non-Profit A.  That same day, the company submitted its formal Notice of Intent to Nuru, notifying him that Recology intended to submit a rate increase application.

81.     On September 9, 2016, Non-Profit A sent the Recology money to Non-Profit B, minus its 5 percent cut.  In the cover letter, Non-Profit A noted for the first time that the money was not just for Giant Sweep, but also for "DPW's staff enrichment and community events."  I have reviewed evidence which indicates that the Recology money was then split fifty-fifty between the Giant Sweep account at Non-Profit B and Nuru's "Special Projects" account.  Based on my knowledge, training and experience, I believe it was not a coincidence that Recology's money was directed for the first time to the Nuru-controlled Special Projects fund at exactly the same time that Recology initiated its 2017 rate increase application.  I believe that this was another way to 'keep Mohammed happy.'

82.     I interviewed several current and former DPW employees who told me that the DPW funds held at Non-Profit B were controlled by Nuru and viewed as his money.  While all of the DPW funds at Non-Profit B were closely controlled by Nuru, the Special Projects fund was, in particular, truly a fund that Nuru used as he saw fit.  Nuru or his close associates, rather than Non-Profit B, approved all of the expenditures from the Special Projects account (as well as the other Non-Profit B accounts).  I believe this explains why charitable funds were used to pay

for deejay services, hats, t-shirts and other merchandise, Bay to Breakers entry fees for DPW employees, funeral-related expenses, and thousands of dollars to cover the costs of food and other vendors for DPW events, including photo booths, a chocolate dessert fountain, holiday quartets, and specialty lighting for the annual DPW holiday parties.  Nuru also used the Special Projects fund to cover last-minute, additional costs incurred by the Lefty O'Doul's Foundation when throwing the DPW holiday party.

c)  PORTER's Knowledge of and Involvement in Giant Sweep Payments

83.    PORTER appears to have learned about the Giant Sweep payments to Non-Profit A from Giusti shortly after PORTER became the Controller of the San Francisco Group.  In February 2015, a question surrounding the amount and source of funds donated to Non-Profit A was elevated to PORTER.  During this discussion, PORTER was instructed by another Recology employee to speak with Giusti as Giusti had "a good bit of history with [Non-Profit A]."

84.    In the spring of 2015, Recology began preparing its next rate increase application. At the time, Recology's plan was to file a Notice of Intent on July 2, 2015.[13]  As noted previously, PORTER spearheaded Recology's rate increase application in his role as Controller.

85.    According to Nuru's calendar, Nuru was scheduled to meet with Giusti and Recology Executive 2 on March 25, 2015 to discuss "Updates re: Rate Application/New Facilities."  I believe that this calendar notation indicates that Nuru was aware of Recology's intended rate increase application at least as early as this date.

86.    On May 20, 2015, Non-Profit A's Executive Director wrote to Giusti and Recology Assistant A, "We did not receive the Giant Sweep donation for May?  Please advise."

87.    The email set off a flurry of activity inside Recology.  I have reviewed documents which show that within minutes, PORTER and Giusti were emailing each other and others within Recology, urgently trying to find out what happened to the payment and arranging for a

---

[13] Recology ultimately postponed the start of its rate increase process by approximately one year, submitting the Notice of Intent in September 2016 instead of July 2015.  In the interim, it sought Nuru's approval to access Zero Waste funds described earlier in this affidavit.

check to be cut and mailed as soon as possible. Giusti wrote to PORTER and others, "Can you let us know when the check will be cut. This is embarrassing and is the second check just today alone that has come to the DPW Directors attention where we have failed to meet our payment commitment."

88.   About fifteen minutes later, at approximately 12:26 p.m., Giusti wrote only to PORTER, "I got my ass chewed out this morning from Mohammed and actually had to promise to write a personal check to a non-profit that has been waiting months to get paid!" PORTER wrote back to Giusti about ten minutes later, "We should sit down and discuss all the politically sensitive payments that we make on a recurring basis so that we can check to ensure that those are paid regularly. Giusti replied, "Not paying our commitments timely negates all the good will we build by making the donation/sponsorship in the first place."

89.   While PORTER and Giusti were exchanging these emails, PORTER sent Giusti a calendar invitation for a meeting two days later. The subject of the meeting was "Important payment discussion."

90.   Approximately one hour later, PORTER himself prepared, signed and emailed a check request form for the $30,000 payment to Non-Profit A, with a note indicating, "Please pay as soon as possible." He sent it to the accounts payable supervisor, asking her, "Can you pay off of this? If so, when can you pay? If not, let me know what we need to do. Our office is closed, [Recology Executive 2] is on vacation and this needs to be paid as soon as possible." The accounts payable supervisor sent the email to the Corporate Controller of Recology Inc., cc'ing PORTER, and wrote, "Can you please approve the attached for payment. [Recology Executive 2] is gone and John only has 25K. John needs this paid right away." Recology ultimately issued a check for $30,000 to Non-Profit A on May 20, 2015.

91.   PORTER also forwarded Giusti's 12:26 p.m. email about his encounter with Nuru to the Assistant Corporate Controller of parent company Recology Inc. He wrote, as previously described above in this affidavit, "FYI – Mohammed is the Director of the DPW who ultimately signs off on our rates. Needless to say, keeping him happy is important."

92.     I believe, based on my training and experience and my review of the evidence, that this sequence of events demonstrates that PORTER knew the purpose of the Giant Sweep payments:  to keep Nuru happy, because Nuru was responsible for approving Recology's rate increase requests, including the rate increase request that Recology planned to initiate a few weeks later.

          d)  <u>Giant Sweep Payments End After Nuru's Arrest</u>

93.     Recology continued to send the $30,000 payments to Nuru, through Non-Profit A and Non-Profit B, through the end of 2019.

94.     On January 28, 2020, the day that news of Nuru's arrest was publicly reported for the first time, Recology accounts payable staff began the process of approving the next round of recurring $30,000 Giant Sweep payments.  PORTER initially instructed Recology staff to set up this next round of recurring payments, but later changed his mind.  He directed Recology San Francisco Group General Manager B to "hold off on approving this for now."  I understand and believe that Recology then stopped its donations to the Giant Sweep program.

95.     The unsealed criminal complaint against Nuru described the role of the Lefty O'Doul's Foundation in the DPW Holiday Parties but did not mention Non-Profit A or Non-Profit B.  Nevertheless, on or around February 4, 2020, PORTER appears to have directed the Controller of Recology's San Francisco Group to pull documents relating to Recology donations not just to the DPW holiday party, but also to Non-Profit A and Non-Profit B.  As noted, the criminal complaint against Nuru did not mention any misconduct relating to Non-Profit A or Non-Profit B.

96.     Based on my knowledge, training and experience, and evidence gathered during the course of this investigation, I believe that this sequence of events indicates that PORTER knew the "charitable donations" he approved to the Lefty O'Doul's Foundation, Non-Profit A, and Non-Profit B—in contrast to the many other charitable donations made by Recology—were actually payments intended to benefit Nuru.

## **CONCLUSION**

97.     Based on the foregoing and my training and experience, I respectfully submit that there is probable cause to believe that JOHN FRANCIS PORTER violated Title 18, United States Code Section 666(a)(2) and 2, and Title 18, United States Code, Section 1956(a)(1)(B)(i) and 2.

_____/S/_____
MARK TWITCHELL
Special Agent
IRS Criminal Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this  13th day of April 2021.

_____
HONORABLE JACQUELINE SCOTT CORLEY
United States Magistrate Judge