UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>JOHN FRANCIS PORTER,<br>Defendant. | Case No. 22-cr-00270-WHO-1<br><br>**ORDER DENYING MOTION TO DISMISS**<br>Re: Dkt. No. 60 |

Defendant John Francis Porter moves to dismiss bribery and honest services fraud charges against him for his alleged role in a public corruption scandal involving the Department of Public Works of the City and County of San Francisco ("DPW") and Recology, Inc. ("Recology"), a waste management company that provides collection services for the City. Alternatively, Porter seeks a bill of particulars. His motion is DENIED. The Superseding Indictment sufficiently alleges the elements of each offense, including a bribe amounting to more than $5,000 and corrupt intent (as needed for the bribery charges), materiality, specific intent, and an implied quid pro quo (for the honest services fraud charges). It adequately sets forth the government's theory of the case with sufficient detail so that Porter may prepare a defense, avoid surprise at trial, and avoid future prosecution of the same offenses; a bill of particulars is not needed. And he has not shown that the government must allege that he received property and/or money in connection with any of the charged offenses in order for the forfeiture allegations to proceed. Federal Rule of Criminal Procedure 32.2 indicates that the government must only provide notice that it will seek forfeiture, which it has done.

## BACKGROUND

On July 21, 2022, a grand jury charged Porter with two counts: bribery of a local official in violation of 18 U.S.C. §§ 666(a)(2) (along with aiding and abetting under 18 U.S.C. § 2), and

conspiracy to commit bribery of a local official in violation of 18 U.S.C. § 371. Dkt. No. 40. On November 29, 2022—after Porter filed this motion to dismiss—the grand jury returned a Superseding Indictment adding four counts: two counts of honest services wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; one count of honest services mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; and one count of conspiracy to commit honest services wire and mail fraud in violation of 18 U.S.C. § 1349. Dkt. Nos. 60, 67. The honest services mail and wire fraud charges are also accompanied by allegations of aiding and abetting under section 2.

The Superseding Indictment describes Porter as a "high-ranking executive at Recology," who worked as a controller at the company from January 2015 to December 2017, and then as vice president and group manager from January 2018 until January 2021. Superseding Indictment ("SI") [Dkt. No. 67] ¶ 2. It alleges that no later than October 2017, Porter joined a "conspiracy and a scheme and artifice to defraud the public of its right to honest services of a public official"—Mohammed Nuru, the DPW director—"through bribery and kickbacks in breach of the official's fiduciary duty." *Id*. ¶¶ 3-4, 6. As part of that scheme, the Superseding Indictment alleges that Porter, Giusti, and others "helped direct a stream of benefits from Recology to Nuru or his designees, including payments for parties Nuru organized, along with meals, drinks, and other things of value to Nuru." *Id*. ¶ 7. The goal, it alleges, "was to influence Nuru to act in Recology's favor as opportunities arose, and to have Nuru take official action and exercise official influence in Recology's favor in exchange for such payments and benefits." *Id*.

More specifically, the Superseding Indictment alleges that in 2016, Recology "notified Nuru and DPW of its intent to submit an application to raise the rates it charged residents and businesses in San Francisco for waste removal and disposal." *Id.* ¶ 8. It further alleges that Nuru reviewed and signed off on Recology's application, issued a report finding the proposal reasonable, and recommended that the increases be approved. *Id*. ¶ 9. According to the Superseding Indictment, in June 2017, the San Francisco Rate Board adopted Nuru's recommendations and approved the rate increases. *Id*.

The Superseding Indictment also alleges that from about June 2018 to about July 2019, Porter and others, "on behalf of Recology, sought Nuru's approval to raise a payment" that

Recology charged DPW for truckloads of asphalt and cement waste brought to a Recology recycling facility. *Id*. ¶ 10. This charge is known as a "tipping fee." *Id*. Porter allegedly "led Recology's effort to influence Nuru to increase the fees, emailing him and meeting with him in person." *Id*. According to the Superseding Indictment, Recology submitted a bid for a new contract with the City later in 2019 that sought to increase its tipping fees along with other charges and fees that DPW and the City paid Recology. *Id*.

The Superseding Indictment alleges that in furtherance of the conspiracy and scheme to defraud, "Porter, Giusti and others directed $60,000 in payments from Recology to Nuru to fund increasingly elaborate and expensive holiday parties Nuru hosted for friends, political supporters, and select DPW employees." *Id*. ¶ 11. Those payments were allegedly made through the Lefty O'Doul's Foundation for Kids and its founder, Nick Bovis, who agreed to use the non-profit organization "to accept corporate donations from Recology and others to pay for Nuru's holiday parties and to conceal their source." *See id*. ¶¶ 5, 12.

The Superseding Indictment describes a series of payments from Recology to Nuru, funneled through the non-profit: a $5,000 check issued on or about December 12, 2016; a $15,000 payment on or about October 17, 2017; a $20,000 payment on or about November 27, 2018; and another $20,000 payment on or about November 12, 2019. *Id*. ¶¶ 13-18. The Superseding Indictment alleges that Porter approved $55,000 of those payments (the ones made in October 2017, November 2018, and November 2019) labeled as "holiday donations" to the Lefty O'Doul's Foundation for Kids, despite knowing that they were to Nuru to fund his holiday party. *See id*. ¶¶ 15-18.

In addition, the Superseding Indictment alleges that Porter and other Recology executives "regularly paid for meals and drinks for Nuru and other high-ranking DPW employees," including breakfasts at Stacks Restaurant and a $1,182-dinner at a steakhouse that Porter paid for using his Recology corporate credit card. *Id*. ¶ 19.

## LEGAL STANDARD

Under Federal Rule of Criminal Procedure 7(c), an "indictment or information must be a plain, concise, and definite written statement of the essential facts constituting the offense

3

charged." Fed. R. Crim. P. 7(c)(1). In judging the sufficiency of an indictment, the question is whether it "adequately alleges the elements of the offense and fairly informs the defendant of the charge, not whether the government can prove its case." *United States v. Buckley*, 689 F.2d 893, 897 (9th Cir. 1982). "An indictment is sufficient if it (1) contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend and (2) enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *United States v. Lazarenko*, 564 F.3d 1026, 1033 (9th Cir. 2009) (citation and quotation marks omitted).

A defendant may move to dismiss an indictment for failure to state an offense under Rule 12. Fed. R. Crim. P. 12(b)(3)(B)(v). In deciding such a motion, the court is "bound by the four corners of the indictment" and must accept the truth of the allegations within. *United States v. Boren*, 278 F.3d 911, 914 (9th Cir. 2002). It does not take evidence or make factual determinations. *See id.*; *see also United States v. Jensen*, 93 F.3d 667, 669 (9th Cir 1996) ("A motion to dismiss the indictment cannot be used as a device for a summary trial of the evidence. The court should not consider evidence not appearing on the face of the indictment.") (citation and internal modifications omitted). Put simply: "The indictment either states an offense or it doesn't." *Boren*, 278 F.3d at 914.

## DISCUSSION

The core arguments that Porter makes in his motion to dismiss remained relevant even after the Superseding Indictment was filed, as they challenge the sufficiency of the bribery allegations. *See* Mot. to Dismiss ("MTD") [Dkt. No. 60] 1:5-2:13. His reply brief reiterates those points and attacks the honest services fraud counts added in the Superseding Indictment. *See generally* Reply [Dkt. No. 71]. I will address each set of arguments in turn.

### I.    Bribery

"Section 666 concerns bribery in connection with state and local entities receiving federal funds" and is intended to "protect federal funds by preserving the integrity of the entities that receive the federal funds." *United States v. Garrido*, 713 F.3d 985, 999 (9th Cir. 2013) (citations omitted). Relevant to this case, section 666(a)(2) makes it unlawful for a person to

> corruptly give[], offer[], or agree[] to give anything of value to any person, with

4

intent to influence or reward an agent of an organization or of a state, local, or Indian tribal government, or any agency thereof, in connection with any business, transaction, or series of transactions of such organization, government, or agency involving anything of value of $5,000 or more.

18 U.S.C. § 666(a)(2). The entity must also receive federal funds "in excess of $10,000" within the relevant time period to fall within the ambit of section 666(a)(2). *See id*. § 666(b). The section "does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business." *Id*. § 666(c).

Porter's arguments against the bribery counts raise three issues: (1) whether the Superseding Indictment adequately alleges a bribe amounting to $5,000 or more; (2) whether it adequately alleges that Porter acted with corrupt intent; and (3) whether the alleged conduct is shielded from prosecution under section 666(c). *See* MTD at 10:1-18:6; Reply at 2:6-5:7.

### a. A Bribe

Relying on cases from the Third and Seventh Circuits, Porter first argues that section 666(a)(2) requires "the swap of an official act for a private payment"—in other words, a private gain—and that the government failed to allege any such gain by Nuru. MTD at 10:14-11:17. Next, he contends that the indictment did not allege that Porter gave "anything of value" to Nuru, as required by the language of section 666(a)(2). *Id*. at 11:18-12:18. Porter raises a third argument in his reply: that the Superseding Indictment does not allege any bribes exceeding $5,000. *See* Reply at 2:11-3:20.

The government responds that the Superseding Indictment "clearly alleges that the payments to Nuru's holiday parties were made to benefit Nuru, personally and politically." Oppo. [Dkt. No. 69] 5:8-9. It points to Paragraphs 11 and 17, which allege that Porter and others directed the payments from Recology to Nuru "to fund increasingly elaborate and expensive holiday parties Nuru hosted for friends, political supporters, and select DPW employees" and that in November 2018, Nuru told Giusti "I always have to get more . . . so if you could give me twenty, that would be nice" and "referred to the payments as being for 'the big party that you helped me pay for.'" *Id*. at 5:8-17 (citing SI ¶¶ 11, 17). This, the government argues, shows that "Nuru saw these payments as benefits to him," as the money allegedly "went to fund parties Nuru

held for *his* friends, *his* political supporters, and select DPW employees who reported to him." *Id*. (emphasis in original). The government also points to allegations that Nuru received meals and drinks, which it describes as "benefits personally conferred upon Nuru by Porter and others at Recology." *Id*. at 5:18-23 (citing SI ¶ 19).

The government has the better argument. First, Porter has not convinced me that 666(a)(2) requires a private gain, at least in the Ninth Circuit. The cases that he relies upon come from outside this circuit and, as far as I can tell, have not been favorably cited by the Ninth Circuit regarding private gain. *See United States v. Blagojevich*, 794 F.3d 729, 734 (7th Cir. 2015); *United States v. Sorich*, 523 F.3d 702, 710 (7th Cir. 2008); *United States v. Davis*, 183 F.3d 231, 245 (3d Cir. 1999) *amended by* 197 F.3d 662 (3d Cir. 1999). Indeed, the Ninth Circuit *rejected* the Seventh Circuit's decision in *Sorich* requiring a private gain in the context of honest services fraud. *See United States v. Inzunza*, 638 F.3d 1006, 1017 (9th Cir. 2011).

Even if section 666(a)(2) does require a private gain—a question I do not decide at this moment—the Superseding Indictment sufficiently alleges not just one, but several. It alleges that Porter approved three payments—one for $15,000 in October 2017, and two others for $20,000 each in November 2018 and November 2019—described as "holiday donations" but that instead went to Nuru to pay for "*his* holiday party." *See* SI ¶¶ 15-18 (emphasis added). The SI further alleges that on at least one occasion, Nuru asked Giusti to "give *me* twenty" and "referred to the payments as being for 'the big party that you helped *me* pay for." *Id*. ¶ 17 (emphasis added). And the SI alleges that Nuru hosted these "increasingly elaborate and expensive holiday parties" for "friends, political supporters, and select DPW employees." *Id*. ¶ 11.

This falls within the definition that Porter provides: that a bribe "is something more than the personal satisfaction arising from the gratification of a wish" and "must consist of something real, substantial, and of value to the receiver, as distinguished from something imaginary, illusive, or amounting to nothing more than the gratification of a wish or hope on his part." MTD at 10:22-11:2 (citing *Davis*, 183 F.3d at 245). As alleged in the Superseding Indictment, Nuru sought these payments and used them "to pay expenses for Nuru's holiday parties, and not to benefit underprivileged children." *See* SI ¶¶ 12, 15-18. Those parties were for his "friends, political

6

supporters, and select DPW employees." *See id.* ¶ 11. Accepting the truth of those allegations, the government has adequately alleged that Nuru received "something real, substantial, and of value": the party expenses that were paid for. *See Davis*, 183 F.3d at 245; *see also* SI ¶¶ 11-12. This also satisfies the plain language of section 666(a)(2), which prohibits corruptly giving, offering, or agreeing to give "anything of value to any person." *See* 18 U.S.C. § 666(a)(2).

Moreover, the Superseding Indictment alleges that as part of the stream of benefits to Nuru, Porter "regularly paid for meals and drinks for Nuru and other high-ranking DPW employees," including a December 20, 2018, steakhouse dinner for which Porter paid $1,182 using his corporate credit card. SI ¶ 19. Free meals and drinks would certainly be real, substantial, and of value to Nuru. *See Davis*, 183 F.3d at 245; *see also* 18 U.S.C. § 666(a)(2).

The next question is whether the Superseding Indictment sufficiently alleges a bribe exceeding $5,000. Porter contends that it falls short, again arguing that the payments to Nuru did not go to him personally "but rather to the costs of the annual department-wide holiday party," and that the only benefit to Nuru would have been the food and drink that he consumed there—"coming nowhere close" to $5,000. *See* Reply at 3:1-20. Porter further argues that based on the number of people who attended the dinners and breakfasts, those meals also did not benefit Nuru in excess of $5,000. *Id.* at 2:19-25.

The Ninth Circuit has confirmed that section 666(a) requires that the bribe "must exceed $5,000." *See, e.g., United States v. Cabrera*, 328 F.3d 506, 509 (9th Cir. 2003) (citation omitted); *see also United States v. Vo*, 766 Fed. App'x 547, 550 (9th Cir. 2019) ("Precedent in this circuit interprets § 666(a) to require the bribe to exceed $5,000, not the business or transaction exchanged.") (citations and quotation marks omitted). The Superseding Indictment sufficiently alleges this, as the bribery count itself specifically references the $20,000 payment that Porter approved on or about November 27, 2018, which was "intended as an illegal gift to Nuru in order to induce his official actions on Recology's behalf." SI ¶ 32. It also alleges the Nuru asked Giusti to "give *me* twenty" and said that the payments were for "the big party that you helped *me* pay for." *Id.* ¶ 17 (emphasis added). Accepting these allegations as true, the $20,000 went to Nuru himself, not the party attendees. The Superseding Indictment has thus adequately alleged this

element of the bribery charge.

### b. Corrupt Intent

The Ninth Circuit has held that "§ 666 contains . . . a corrupt intent requirement," and that in this context, "[a]n act is done 'corruptly' if it is performed voluntarily, deliberately, and dishonestly, for the purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise lawful end or lawful result by an unlawful method or means." *Martinez-de Ryan v. Whitaker*, 909 F.3d 247, 250 (9th Cir. 2018) (citing in part *Garrido*, 713 F.3d at 1001).

Many of Porter's arguments are mooted by the Superseding Indictment, which either omits allegations that he took issue with or adds allegations that resolve other issues. *See* MTD at 13:11-15:18. For example, Porter argues that the indictment "says nothing about Mr. Porter's role with respect to" the "stream of benefits" allegedly directed to Nuru via Giusti "and which of these gifts Mr. Giusti directed to Nuru while Mr. Porter was Mr. Giusti's supervisor." *Id*. at 14:23-26. The Superseding Indictment connects these dots by alleging that Porter and others "helped direct a stream of benefits from Recology to Nuru or his designees"—including the payments for the parties along with the meals and drinks—and that the "purpose of this stream of payments and benefits was to influence Nuru to act in Recology's favor as opportunities arose, and to have Nuru take official action and exercise official influence in Recology's favor in exchange for such payments and benefits." SI ¶ 7; *see also id*. ¶ 20 ("These stream of payments and benefits from Porter and Recology were paid with the purpose of influencing or attempting to influence and reward Nuru with regard to his official position with the DPW."). It further alleges that Porter "led Recology's efforts to influence Nuru" to increase the tipping fees. *Id*. ¶ 10. The SI also details the purported payments at issue, providing key dates and expressly alleging that Porter knew they were to fund Nuru's annual holiday parties. *See id*. ¶¶ 15-18.

Porter cites a number of cases where corrupt intent *was* properly alleged to assert that the Superseding Indictment does not adequately allege corrupt intent by Porter. *See* MTD at 13:2-22; *see also* Reply at 4:7-16. But corrupt intent is not limited to destroying evidence or meeting in secret. *See* MTD at 13:2-22. As the Ninth Circuit has stated, in the context of section 666(a)(2), "[a]n act is done 'corruptly' if it is performed voluntarily, deliberately, and dishonestly, for the

8

1  purpose of either accomplishing an unlawful end or result or of accomplishing some otherwise
2  lawful end or lawful result by an unlawful method or means." *Martinez-de Ryan*, 909 F.3d at 250.
3        The Superseding Indictment alleges voluntary, deliberate, and dishonest acts by Porter
4  (including approving the payments for Nuru's parties under the guise of holiday donations to a
5  non-profit) for the purpose of accomplishing either an unlawful result or some otherwise lawful
6  result by an unlawful method or means (i.e., influencing Nuru "to act in Recology's favor,"
7  including by increasing the tipping fees). *See* SI ¶¶ 7, 10, 20. Accepting these allegations as true,
8  the Superseding Indictment has adequately alleged corrupt intent.

      **c. Section 666(c)**

      Finally, the government and Porter dispute whether the alleged bribery falls within the safe harbor provision of section 666, found at subsection (c). *See* 18 U.S.C. § 666(c) ("This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.").

      Porter contends that the payments from Recology to the Lefty O'Doul's foundation are "behested payments or 'friends of' payments" that "had been a widely acceptable, common practice with the City for many years" and thus constituted expenses paid "in the usual course of business." *See* MTD at 15:20-28, 17:10-18:6. He points to efforts made after Nuru's indictment to amend City rules concerning such payments, including proposed edits to a City ordinance and a local proposition that appeared on a 2022 ballot. *See id*. at 17:10-25. This, he contends, shows that "at the time the donations to Lefty O'Doul's were made, the practice of making payments through non-city organizations were pervasive, generally accepted, and not prohibited," constituting an acceptable business practice excluded under section 666(c). *Id*. at 17:23-18:6.

      But any argument regarding whether the payments were made in the usual course of business (or, for that matter, were indeed "bona fide") go "beyond the four corners" of the Superseding Indictment and are not properly adjudicated on this motion. *See Boren*, 278 F.3d at 914. Porter effectively asks me to consider evidence and make factual determinations, which I cannot do at this stage of the case. The factual arguments he makes should go to the jury, not me. *See United States v. Tadios*, 650 Fed. App'x 394, 397 (9th Cir. 2016) (finding no error in the

9

1  district court's denial of a motion to dismiss a section 666(a) charge because whether the

2  defendant's conduct fell within section 666(c) was a "question of fact for the jury to decide").

3  Whether the payments are covered by section 666(c) will depend on the evidence presented at

4  trial. The Superseding Indictment alleges enough for the bribery charge to proceed.

5  Porter's motion to dismiss the bribery counts is DENIED.[1]

## II. Honest Services Fraud

"Honest services fraud entails a scheme or artifice to 'deprive another,' by mail or wire, 'of the intangible right of honest services.'" *United States v. Christensen*, 828 F.3d 763, 784 (9th Cir. 2015) (citing 18 U.S.C. § 1346). "Section 1346, which defines honest services fraud, is not a standalone criminal offense, but must be charged in conjunction with 18 U.S.C. §§ 1341 or 1343 as the means or theory by which the fraud was committed." *United States v. Avery*, 719 F.3d 1080, 1083 (9th Cir. 2013).

The Supreme Court narrowed the scope of section 1346 in *Skilling v. United States*, 561 U.S. 358, 408-09 (2010), limiting it only to schemes to defraud involving bribes or kickbacks. "[W]hen the government seeks to prove honest services fraud in the form of bribery, it must prove a quid pro quo." *Inzunza*, 638 F.3d at 1013 (citing *United States v. Kincaid-Chauncey*, 556 F.3d 923, 943 (9th Cir. 2009)). That quid pro quo "need not be explicit," nor does an implicit quid pro quo need to "concern a specific official act." *Kincaid-Chauncey*, 556 F.3d at 943. Instead, "[t]he quid pro quo requirement is satisfied so long as the evidence shows a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor." *Id.* (citations omitted); *see also* 9th Cir. Model Jury Instr. 15.34. Honest services fraud also requires a specific intent to defraud and a showing of materiality. *Kincaid-Chauncey*, 556 F.3d at 941; *United States v. Milovanovic*, 678 F.3d 713, 726-27 (9th Cir. 2012) (en banc); *see*

---

[1] Porter briefly challenges the conspiracy to commit bribery charge as well. *See* MTD at 18:7-22. "To prove a conspiracy under 18 U.S.C. § 371, the government must establish three elements: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United States v. Kaplan*, 836 F.3d 1199, 1212 (9th Cir. 2016) (citations omitted). Porter argues that because the indictment "fails to adequately allege the substantive crime" it "thus fails to allege conspiracy to commit that crime." MTD at 18:9-12. Having found that the Superseding Indictment adequately alleges bribery in violation of section 666(a)(2), this argument carries no weight.

10

*also* 9th Cir. Model Jury Instr. 15.34.

Porter challenges the honest services fraud charges on three grounds. He argues that the Superseding Indictment does not sufficiently allege materiality, an implied quid pro quo, or a specific intent to defraud. *See* Reply at 7:17-11:22.

### a. Materiality

According to the Ninth Circuit's model jury instruction for honest services mail fraud, to show that a defendant's act was material, the government must show that "it had a natural tendency to influence, or was capable of influencing" a person or an entity's acts. *See* 9th Cir. Model Jury Instr. 15.34. The comment to the instruction states that "[t]he common law test for materiality in the false statement statutes, as reflected in the fifth element of this instruction, is the preferred formulation," citing to *United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008). *Id*. *Peterson*, in turn, stated that "the customary common law test for materiality in false statement statues . . . is whether the statement has a natural tendency to influence, or was capable of influencing, the decision of the decision-making body to which it was addressed." 538 F.3d at 1072 (citation and quotation marks omitted). Under the federal mail and wire fraud statutes, the government need not prove that a specific statement or omission was false. *United States v. Woods*, 335 F.3d 993, 998-99 (9th Cir. 2003). Rather, "[i]t is the materiality of the scheme or artifice that must be alleged; the materiality of a specific statement need not be pleaded." *United States v. Omer*, 395 F.3d 1087, 1089 (9th Cir. 2005).

Porter contends that the government has failed to allege that the scheme was "reasonably calculated to deceive" because the Superseding Indictment does not allege that he "acted dishonestly to accomplish anything unlawful." Reply at 7:28-8:5. He asserts that the "holiday party donations were not secretly misappropriated by Mr. Nuru for his personal enrichment and Mr. Porter did not direct anyone to lie about the payments nor did he deceive anyone concerning the donations." *Id*. at 8:5-7.

I have already addressed the latter point: The Superseding Indictment sufficiently alleges that Nuru personally benefited from the payments, which were misleadingly labeled as "holiday donations." *See* SI ¶¶ 11-18. Moreover, it alleges that as part of the scheme to defraud, Porter

11

"helped direct a stream of benefits from Recology to Nuru or his designees," including the payments, to "influence Nuru to act in Recology's favor as opportunities arose, and to have Nuru take official action and exercise official influence in Recology's favor in exchange for such payment and benefits." SI ¶ 7. This sufficiently alleges that the scheme was material—i.e., that it "had a natural tendency to influence, or was capable of influencing" Nuru's acts. *See* 9th Cir. Model Jury Instr. 15.34. The Superseding Indictment sufficiently alleges materiality.

### b. Quid Pro Quo

Porter also argues that the Superseding Indictment fails to allege an implied quid pro quo. Reply at 9:20-11:9. He identifies two "quos" in the Superseding Indictment: "(1) Recology's 2017 rate increase, and (2) an attempt to increase fees that Recology charged the City to dump material at a Recology recycling facility." *Id*. at 10:6-12 (citing SI ¶¶ 8-10). But, he states, the 2017 rate increase was finalized before Porter allegedly joined the conspiracy. *See id*.; *see also* SI ¶ 6 ("Porter joined the conspiracy no later than October 2017."); SI ¶ 9 (alleging that the San Francisco Rate Board approved the increase in June 2017). He asserts that the indictment "never actually alleges any direct knowledge" by Porter that the payments to Lefty O'Doul's were intended to influence the tipping fee contract. *See* Reply at 10:13-11:9. And he contends that although the Superseding Indictment alleges that Giusti may have known this, it "fails to allege facts showing that Mr. Porter even knew Mr. Giusti intended the payments for that purpose." *See id*.

An implied quid pro quo does not need to "concern a specific official act"; rather, "a course of conduct of favors and gifts flowing to a public official in exchange for a pattern of official actions favorable to the donor" is enough. *See Kincaid-Chauncey*, 556 F.3d at 943; *see also* 9th Cir. Model Jury Instr. 15.34. That is precisely what the Superseding Indictment alleges, that Porter and others "helped direct a stream of benefits from Recology to Nuru or his designees, including payments for parties Nuru organized, along with meals, drinks, and other things of value to Nuru," and that the "purpose of this stream of payments and benefits was to influence Nuru to act in Recology's favor as opportunities arose, and to have Nuru take official action and exercise official influence in Recology's favor in exchange for such payments and benefits." *See* SI ¶ 7.

12

As the government notes in its surreply, the alleged stream of benefits included tens of thousands of dollars of payments to Nuru to pay for his holiday parties, along with drinks and meals, "in return for intended official acts that Nuru could and did take on Recology's behalf." Surreply [Dkt. No. 74] 8:21-26; 9:12-14. As alleged, this is a classic implied quid pro quo.

The Superseding Indictment also includes allegations specific to the tipping fee contract that further undercut Porter's argument. It alleges that during a November 26, 2018, phone call between Nuru and Giusti, Nuru "told Giusti that Recology should pay more money than last year for Nuru's upcoming holiday party, and requested $20,000," and that Giusti agreed to pay this amount. SI ¶ 29. It further alleges that "[o]n the same call, Nuru told Giusti that Nuru was working on getting Porter the increase in tipping fees paid to Recology that Porter and Recology were seeking." *Id*. The next day, Giusti and Porter allegedly spoke by telephone, during which "Giusti discussed his conversation with Nuru and informed Porter that Nuru wanted $20,000 to pay for his upcoming holiday party." *Id*. Porter allegedly approved the $20,000 payment the next day. *Id*. Accepting these allegations as true, Giusti told Porter about his conversation with Nuru—a conversation in which Nuru not only requested $20,000, but said he was "working on getting Porter" the tipping fee increase that he sought. *See id*. Coupled with the broader allegations in the Superseding Indictment, this further supports allegations of a quid pro quo, with the specific link between Porter and Nuru that Porter argues is lacking.

Accordingly, the Superseding Indictment adequately alleges an implied quid pro quo.

### c. Specific Intent

Porter's final argument with respect to the honest services fraud counts is that the Superseding Indictment fails to allege a specific intent to defraud, namely "that Mr. Porter intended to deprive the victim of his right of honest services and that he made a bribe in exchange for services." *See* Reply at 11:10-22. Porter cites the points he made regarding the bribe and quid pro quo in support without offering any additional argument. *See id*. at 11:20-22.

As I have already explained, the Superseding Indictment adequately alleges bribery and a quid pro quo. To the extent that Porter's specific intent argument rests on the lack of either, it fails. Regardless, the Superseding Indictment alleges that Porter acted with "the purpose . . . to

13

influence Nuru . . . and to have Nuru take official action and exercise official influence in Recology's favor in exchange for such payments and benefits"; "the purpose of influencing or attempting to influence and reward Nuru with regard to his official position with the DPW"; and "the purpose of executing the aforementioned scheme and artifice to defraud the public of its right to the honest services of public officials." *See* SI ¶¶ 7, 20, 25. This is enough to show specific intent, at least to survive this motion.

In sum, the motion to dismiss the counts in the Superseding Indictment is DENIED.

### III.     Bill of Particulars

Alternatively, Porter seeks a bill of particulars under Federal Rule of Criminal Procedure 7(f). MTD at 19:23-28. He reiterated this request after the Superseding Indictment was filed. Reply at 12:5-12.

A bill of particulars serves three functions:

> to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare for trial, to avoid or minimize the danger of surprise at the time of trial, and to enable him to plead his acquittal or conviction in bar of another prosecution for the same offense when the indictment itself is too vague, and indefinite for such purposes.

*United States v. Giese*, 597 F.2d 1170, 1180 (9th Cir. 1979) (citations omitted). "A defendant is not entitled to know all the *evidence* the government intends to produce but only the *theory* of the government's case." *United States v. Ryland*, 806 F.2d 941, 942 (9th Cir. 1986) (citation omitted) (emphasis in original). In determining whether a bill of particulars is warranted, "a court should consider whether the defendant has been advised adequately of the charges through the indictment and all other disclosures made by the government." *United States v. Long*, 706 F.2d 1044, 1054 (9th Cir. 1983) (citation omitted). "Full discovery also obviates the need for a bill of particulars." *Giese*, 597 F.2d at 1180 (citations omitted).

Porter requests a laundry list of information, including: (1) the identities of "all alleged co-conspirators and the time periods of their participation" in the charged conspiracies; the bases for the materiality and specific intent elements of the honest services fraud counts; "all things of value that were knowingly and corruptly given to Mr. Nuru or any other person, intending to influence

14

his official actions"; "all of the official actions that the government alleges were influenced or intended to be influenced as part of the charged conspiracy"; and to confirm that certain paragraphs of the Superseding Indictment, incorporated by reference in some counts, are intended as supporting allegations for others. *See* Reply at 13:18-15:10.

The government offers some clarification in its surreply, confirming that the unnamed and unindicted "Recology Executive A" identified in the original indictment remains an alleged co-conspirator; that Recology itself is a co-conspirator; and that the alleged co-conspirators are Giusti, Porter, Nuru, and Recology Executive A. *See* Surreply at 12:6-28. At oral argument, the government also clarified that the Superseding Indictment alleges a scheme to defraud rather than a theory of misrepresentations by false or fraudulent pretenses. *See* Reply at 13:28-14:1. The government further argues that it adequately described some of the information Porter seeks (including the benefits allegedly provided to Nuru and some of the evidence of Porter's corrupt intent), and that he has been given "extensive discovery" that negates the need for a bill of particulars. *See* Oppo. at 15:18-16:2; Surreply at 13:1-4.

Porter's request for a bill of particulars is DENIED. Much of the information that Porter seeks is evidentiary, which is not the proper focus of a bill of particulars. *See Ryland*, 806 F.2d at 942. In addition, the government provided some clarity in its surreply and at oral argument to address some of his concerns. And fundamentally, the Superseding Indictment adequately informs Porter of the charges against him. *See Long*, 706 F.2d at 1054. It presents the government's theory of the case, along with specific acts underlying the charges. It names specific people that Porter allegedly conspired with and the alleged intent of their actions. This is enough to enable Porter to prepare for trial, to avoid or minimize the danger of surprise at trial, and allow him to avoid another prosecution for the same offenses. *See Giese*, 587 F.2d at 1180. There is no need for a bill of particulars.

### IV. Forfeiture Allegations

"Criminal forfeitures are imposed upon conviction to confiscate assets used in or gained from certain serious crimes." *Kaley v. United States*, 571 U.S. 320, 323 (2014). "Forfeitures help to ensure that crime does not pay." *Id*. A forfeiture is "not a substantive element of an offense but

15

1   rather 'is an element of the sentence imposed following conviction.'" *United States v. Razo-*
2   *Quiroz*, No. 19-CR-00015, 2019 WL 1517571, at *2 (E.D. Cal. Apr. 8, 2019) (citing *Libretti v.*
3   *United States*, 516 U.S. 29, 38-39 (1995)).

4   The Superseding Indictment contains a forfeiture allegation under 18 U.S.C. §
5   981(a)(1)(C) and 28 U.S.C. § 2461(c), stating that "[u]pon conviction for any of the offenses set
6   forth in this Superseding Indictment," Porter "shall forfeit to the United States . . . all property,
7   real or personal, constituting, or derived from proceeds the defendant obtained directly and
8   indirectly, as the result of those violations, including but not limited to a forfeiture money
9   judgment." SI ¶ 34.

10  Federal Rule of Criminal Procedure 32.2 speaks to criminal forfeiture.  Relevant to this
11  motion, it states:

> A court must not enter a judgment of forfeiture in a criminal proceeding unless the indictment or information contains notice to the defendant that the government will seek the forfeiture of property as part of any sentence in accordance with the applicable statute. . . . The indictment or information need not identify the property subject to forfeiture or specify the amount of any forfeiture money judgment that the government seeks.

Fed. R. Crim. P. 32.2(a).  The Rule further provides that

> [a]s soon as practical after a verdict or finding of guilty, or after a plea of guilty or nolo contendere is accepted, on any count in an indictment or information regarding which criminal forfeiture is sought, the court must determine what property is subject to forfeiture under the applicable statute.  If the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense.  If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay.

Fed. R. Crim. P. 32.2(b)(1)(A).

Porter argues that the forfeiture allegations should be dismissed, as the Superseding Indictment "contains no allegation that Mr. Porter benefitted personally in any way, much less that he received" property as a result of the alleged crimes.  Reply at 11:24-12:1.  The government responds that forfeiture "will be addressed only 'upon conviction,' at which point the court [would] consider evidence as to whether Porter obtained" any property directly or indirectly as a result of any crimes for which he was convicted.  *See* Surreply at 11:12-20.  As a result, the

1   government argues, Porter's effort to dismiss the forfeiture allegations is "premature and should be
2   denied." *Id*. at 11:21.
3          The Superseding Indictment does not expressly allege that Porter received any property in
4   connection with the alleged crimes. *See generally* SI. But Rule 32.2 and relevant case law
5   indicate that this is not necessary. Rule 32.2 states that although the government must provide
6   notice in an indictment that it will seek forfeiture as part of any sentence imposed, the indictment
7   "need not identify the property subject to forfeiture or specify the amount of any forfeiture money
8   judgment that the government seeks." Fed. R. Crim. P. 32.2(a). Forfeiture is dependent upon
9   conviction, and Rule 32.2 makes clear that any determination of property subject to forfeiture is
10  made *after* a verdict or finding of guilt. *See Kaley*, 571 U.S. at 323; *see also* Fed. R. Crim. P.
11  32.2(b)(1)(A). Only then must the court "determine whether the government has established the
12  requisite nexus between the property and the offense" or the amount of money that must be paid.
13  *See* Fed. R. Crim. P. 32.2(b)(1)(A). All the government must do at this point is provide Porter
14  notice that it will seek the forfeiture of property and/or money. Whether any property or money
15  must be forfeited will be determined separately, and only if he is convicted.
16         Other courts have denied motions to dismiss forfeiture allegations in the indictment as
17  premature. *See, e.g., Razo-Quiroz*, 2019 WL 1517571, at *3 (denying request to dismiss forfeiture
18  allegations because the defendant had not been convicted, so her argument that the attempted
19  forfeiture of her house was grossly disproportionate to the offense charged was premature); *United*
20  *States v. Montour*, No. CR-09-0214, 2010 WL 1417797, at *2 (W.D. Wash. Apr. 6, 2010)
21  (denying a motion to strike forfeiture allegations in part because "the facts underlying the
22  forfeiture liability have not been established"); *United States v. Palfrey*, 499 F. Supp. 2d 34, 48-49
23  (D.D.C. 2007) (rejecting the defendant's argument that a criminal forfeiture allegation was
24  deficient because it failed to allege a nexus between the unlawful activity alleged and the property
25  allegedly subject to forfeiture) ("If an indictment is not required to name specific property for later
26  forfeiture, it would be manifestly illogical to require its allegations to specify the factual nexus
27  between the unlawful conduct and the as-yet-unspecified property."). These cases support the
28  proposition that all an indictment must do is provide a defendant notice of forfeiture, with the facts

17

supporting it—including the nexus between the charged conduct and sought-after property—established after any conviction.  The plain language of Rule 32.2 states this as well.  Porter has not identified any case law that requires the government to allege in the indictment that he received property in connection with the charged crimes.  Without that, and given the language of Rule 32.2 and case law cited above, he has not shown that the forfeiture allegation warrants dismissal.

## CONCLUSION

Porter's motion to dismiss the indictment or for a bill of particulars is DENIED.

**IT IS SO ORDERED.**

Dated: January 13, 2023



William H. Orrick
United States District Judge

United States District Court
Northern District of California