# EXHIBIT L

STEPHANIE M. HINDS (CABN 154284)
Acting United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

SCOTT D. JOINER (CABN 223313)
Assistant United States Attorney

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-7200
FAX: (415) 436-7234
scott.joiner@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>PAUL FREDRICK GIUSTI,<br><br>Defendant. | NO. CR 21-00294<br><br>PLEA AGREEMENT |

I, Paul Fredrick Giusti, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

The Defendant's Promises

1. I agree to plead guilty to the captioned Information charging me with Conspiracy to Bribe a Local Official and Commit Honest Services Fraud in violation of 18 U.S.C. § 371. I agree that the elements of conspiracy to bribe a local official and commit honest services fraud are: (1) beginning in at least 2014, and ending in or about January 2020, there was an agreement between two or more persons to bribe a San Francisco public official and deprive the people of San Francisco of the honest services of

a San Francisco public official; (2) I became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

I agree that the elements of bribery, in violation of 18 U.S.C. § 666, are as follows: (1) A person was an agent of an organization, a state, local or tribal government, or an agency of a state, local, or tribal government; (2) the organization, state or local government received federal assistance in excess of $10,000 in a one-year period; (3) the one-year period of federal assistance was within twelve months before or after the commission of the offense; (4) I gave, offered, or agreed to give a thing of value to any person; (5) I intended to influence or reward the agent of the organization or agency in connection with a transaction or series of transactions of the organization or agency that involved $5,000 or more; and (6) I acted corruptly.

I agree that the elements of honest services wire fraud, in violation of 18 U.S.C. §§ 1343 and 1346, are as follows: (1) I devised or knowingly participated in a scheme or plan to deprive the people of San Francisco of their right of honest services; (2) the scheme or plan consisted of bribes in exchange for the services of a public official; (3) Nuru owed a fiduciary duty to the people of San Francisco; (4) I acted with the intent to defraud by depriving the people of San Francisco of their right of honest services; (5) my acts were material; and (6) I used, or caused someone to use, an interstate or foreign wire communication to carry out or to attempt to carry out the scheme or plan.

I agree that the maximum penalties are as follows:

| | |
|---|---|
| a. Maximum prison term | 5 years |
| b. Maximum fine | $250,000 or twice the gross gain or gross loss, whichever is greater |
| c. Maximum supervised release term | 3 years |
| d. Restitution | |
| e. Mandatory special assessment | $100 |
| f. Forfeiture | |

Case 3:21-cr-00294-WHO Document 40 Filed 04/12/23 Page 3 of 18

2. I agree that I am guilty of the offense to which I am pleading guilty, and I agree that the following facts are true:

[SEE EXHIBIT A FILED UNDER SEAL]

3. I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

4. I agree to give up my right to appeal my conviction, including constitutional challenges to the statute of conviction. I agree to give up my right to appeal the judgment and all orders of the Court. I also agree to give up my right to appeal any aspect of my sentence, including any orders relating to forfeiture and/or restitution, reserving only my right to claim that my sentence violated this plea agreement, applicable law, or the Constitution. I reserve my right to claim that my counsel was ineffective. I understand that this waiver includes, but is not limited to, any and all constitutional or legal challenges to my conviction and guilty plea, including arguments that the statute to which I am pleading guilty is unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support my plea of guilty.

5. I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was ineffective.

6. I agree not to ask the Court to withdraw my guilty plea at any time after it is entered. In the event I violate any of the terms of the Agreement, I agree that the facts set forth in Paragraph 2 of this Agreement and, if applicable, the fact that I made a sworn admission to them in a previous court proceeding, shall be admissible against me in any subsequent proceeding, including at trial. In any subsequent proceeding conducted after I violate any of the terms of the Agreement, I expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 2 of the Agreement and, if applicable, the fact that I made a sworn admission to them at a previous court proceeding.

7. I understand that the Court must consult the United States Sentencing Guidelines and take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I also agree that the sentencing range will be calculated by the Court and that other than joining in a possible government downward departure pursuant to U.S.S.G. § 5K1.1 and/or 18 U.S.C. § 3553(e), I will not ask for any other adjustment to or reduction in the offense level or for a downward departure from the Guidelines range as determined by the Court. I reserve my right to argue for a variance from the Guidelines range determined by the Court based on 18 U.S.C. § 3553(a) factors. I understand that the government is free to oppose any such request. I understand that regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to withdraw my guilty plea.

8. I agree that regardless of any other provision of this Agreement, the government may and will provide the Court and the Probation Office with all information relevant to the charged offense and the sentencing decision, including any victim impact statements and letters from the victim(s), and/or their friends and family. I agree that, based on the nature of the offense, the Court should impose the following special condition of supervised release which is reasonably related to deterrence and rehabilitation:

Special Condition (Searches)

> The defendant shall submit his person, residence, office, vehicle, electronic devices and their data (including cell phones, computers, and electronic storage media), and any property under defendant's control to a search. Such a search shall be conducted by a United States Probation Officer or any federal, state, or local law enforcement officer at any time, with or without suspicion. Failure to submit to such a search may be grounds for revocation; the defendant shall warn any residents that the premises may be subject to searches.

9. I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am ordered to pay. I agree to pay the special assessment at the time of sentencing.

I agree to pay full restitution for all losses caused by all the schemes or offenses with which I was charged in this case, and I understand that the amount of restitution will not be limited to the loss attributable to the count to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I understand that the court will not consider my economic circumstances in determining the restitution amount. I agree to pay restitution in an amount to be set by the Court at the time of sentencing.

Any restitution payments shall be paid through the office of the clerk of the District Court by

bank or cashier's check or money order made payable to the "Clerk, United States District Court."

I understand that the restitution described above creates a lien in favor of the United States on all property and rights to property I may possess upon entry of judgment and continues for the later of 20 years from the entry of judgment or 20 years after release from imprisonment or until the debt is paid in full. I further understand the government will record a notice of the lien in any county where I reside or have property. I further understand that this order of restitution cannot be discharged in bankruptcy and that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of supervised release, modify the terms or conditions of probation or supervised release, resentence me, hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any other action necessary to obtain compliance.

At least sixty days prior to sentencing, I agree to complete, under penalty of perjury, a financial statement provided by the U.S. Attorney's Office and to update that statement with material changes within seven days of the change. I understand that I must identify all assets and financial interests valued at more than $1,000. I further understand that these assets and financial interests include all assets and financial interests in which I have an interest, direct or indirect, whether held in my own name or in the name of another, in any property, real or personal.

I agree to surrender assets I obtained as a result of my crimes, and release funds and property under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the Financial Litigation Unit, United States Attorney's Office ("FLU") before transferring any interest in property owned directly or indirectly by me, including any interest held or owned under any other name or entity, including trusts, partnerships, and/or corporations. I also agree to notify the FLU of any interest in property I may obtain, directly or indirectly, including any interest obtained under any other name, or entity, including a trust, partnership, or corporation, after the execution of this plea agreement until the fine or restitution is paid in full.

I agree that any fine, forfeiture, or restitution imposed by the court against me will be due immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C. § 3613. I further understand that the government may seek immediate collection of the entire fine, forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the

court or established by the Probation Office and that monetary penalties imposed by the court will be submitted to the Treasury Offset program so that any federal payment or transfer of returned property I receive may be offset and applied to federal debts.

10. I agree to cooperate with the U.S. Attorney's Office before and after I am sentenced. My cooperation will include, but will not be limited to, the following:

    a. I will meet with the government when requested;

    b. I will respond truthfully and completely to any and all questions put to me, whether in interviews, before a grand jury, or at any trial or other proceeding;

    c. I will provide all documents and other material asked for by the government;

    d. I will testify truthfully at any grand jury, court, or other proceeding as requested by the government;

    e. I will surrender any and all assets acquired or obtained directly or indirectly as a result of my illegal conduct;

    f. I will request continuances of my sentencing date, as necessary, until my cooperation is completed;

11. I agree that the government's decision whether to file a motion pursuant to U.S.S.G. § 5K1.1 or 18 U.S.C. § 3553(e), as described in the government promises section below, is based on its sole and exclusive decision of whether I have provided substantial assistance and that decision will be binding on me. I understand that the government's decision whether to file such a motion, or the extent of the departure recommended by any motion, will not depend on whether convictions are obtained in any case. I also understand that the Court will not be bound by any recommendation made by the government.

12. I agree not to commit or attempt to commit any crimes before sentence is imposed or before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the government; and not to fail to comply with any of the other promises I have made in this Agreement. I agree that if I fail to comply with any promises I have made in this Agreement, then the government will be released from all of its promises in this Agreement, including those set forth in the Government's Promises Section below, but I will not be released from my guilty plea.

13. If I am prosecuted after failing to comply with any promises I made in this Agreement,

then (a) I agree that any statements I made to any law enforcement or other government agency or in Court, whether or not made pursuant to the cooperation provisions of this Agreement, may be used in any way; (b) I waive any and all claims under the United States Constitution, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, to suppress or restrict the use of my statements, or any leads derived from those statements; and (c) I waive any defense to any prosecution that it is barred by a statute of limitations, if the limitations period has run between the date of this Agreement and the date I am indicted.

14. I agree that this Agreement contains all of the promises and agreements between the government and me, that this Agreement supersedes all previous agreements that I had with the government (including any "proffer" agreement), and I will not claim otherwise in the future. No modification of this Agreement shall be effective unless it is in writing and signed by all parties.

15. I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of California only, and does not bind any other federal, state, or local agency.

<u>The Government's Promises</u>

16. The government agrees not to file any additional charges against the defendant that could be filed as a result of the investigation that led to the captioned Information, so long as the defendant has fully disclosed such conduct to the government and otherwise complied fully with this Agreement.

17. If, in its sole and exclusive judgment, the government decides that the defendant has cooperated fully and truthfully, provided substantial assistance to law enforcement authorities within the meaning of U.S.S.G. § 5K1.1, and otherwise complied fully with this Agreement, it will file with the Court a motion under § 5K1.1 and/or 18 U.S.C. § 3553 that explains the nature and extent of the defendant's cooperation and recommends a downward departure.

<u>The Defendant's Affirmations</u>

18. I confirm that I have had adequate time to discuss this case, the evidence, and the Agreement with my attorney and that my attorney has provided me with all the legal advice that I requested.

19. I confirm that while I considered signing this Agreement, and at the time I signed it, I was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand

Case 3:21-cr-00294-WHO Document 40 Filed 08/12/21 Page 8 of 8

the Agreement.

20. I confirm that my decision to enter a guilty plea is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement.

Dated: July 27, 2021

PAUL FREDRICK GIUSTI
Defendant

STEPHANIE M. HINDS
Acting United States Attorney

Dated: July 27, 2021

SCOTT D. JOINER
Assistant United States Attorney

21. I have fully explained to my client all the rights that a criminal defendant has and all the terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all the rights my client is giving up by pleading guilty, and, based on the information now known to me, my client's decision to plead guilty is knowing and voluntary.

Dated: July 27, 2021

HARTLEY M.K. WEST
Kobre & Kim LLP
Attorneys for Defendant

**EXHIBIT A**

**[FILED UNDER SEAL]**

1. I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true.

2. Beginning in at least 2014, and continuing through in or about January 2020, in the Northern District of California and elsewhere, I agreed with Mohammed NURU, John Porter, Mark Arsenault, and others, to provide payments and other benefits at the request of NURU on behalf of the San Francisco Group of Recology Inc., a waste management company responsible for solid waste collection services in the City and County of San Francisco (the "City").

3. More specifically, I agreed to and did in fact arrange for Recology to provide such payments and benefits at the request of NURU, who was then a public official with the City and County of San Francisco, knowing and intending that they were made to influence NURU to use his power and perform official acts to benefit Recology's business.

4. From in or around February 2012 until June 2020, I was the Group Government and Community Relations Manager for Recology Inc.'s San Francisco Group. I reported to Mark Arsenault, the Vice President and General Manager of Recology's San Francisco Group, from in or around 2014 to in or around the end of 2017. From in or around January 2018 to June 2020, I reported to John Porter, who replaced Arsenault as the Vice President and General Manager of Recology's San Francisco Group.

5. During the relevant time, NURU was the director of San Francisco Public Works, also known as the Department of Public Works (herein, "DPW") of the City and County of San Francisco, which regulated Recology. As Director of DPW, NURU was a powerful public official who had great influence over City business, including the City's relationship with Recology. For example, NURU presided over the process that governed the rates that Recology could charge in San Francisco for its residential solid waste collection services, and was responsible for making a recommendation as to whether any rate increase for Recology should

be approved.  I also understood that NURU was in a position to influence the rates, known as tipping fees, that Recology charged DPW when DPW dumped materials at a Recology facility called Sustainable Crushing.  NURU could also approve, deny, or otherwise affect operational changes that Recology wanted to make.  NURU's power and influence extended not only to business within the purview of DPW, but also to other City departments and agencies.

6.  An essential part of my job at Recology during this time period was to keep Mohammed NURU happy so that he would use his official position in Recology's favor.  Specifically, Recology wanted to keep NURU happy so that he would approve, or influence the approval of, Recology's various requests for price increases, access to funds for capital improvements that required NURU's approval, and operational changes.  Porter, Arsenault, and others would often ask me if NURU was happy.  Because of the power and influence he wielded in his official position, a happy NURU was good for Recology's business.  The converse was also true.  Recology understood that an unhappy NURU could be very bad for Recology's business.

7.  In order to ensure that NURU was happy with Recology and to influence him to act in Recology's favor as opportunities arose, I was one of the people that helped direct a stream of payments and benefits to NURU or his designees on Recology's behalf, including financial contributions to organizations at his direction, services, gifts, and other things of value.  In most instances, Nuru or his designee requested the money or benefit and directed where it would go.

8.  For example, at NURU's direction, I arranged for Recology to pay approximately $150,000 per year, in $30,000 installments, to the non-profit organization the San Francisco Clean City Coalition, which I believed to be serving as the fiscal sponsor for a DPW program called "Giant Sweep."  I arranged for these payments from no later than August 2014 through approximately the end of 2019 with the expectation that providing this significant sum of money, the largest scheduled contribution each year by Recology's San Francisco Group, would cause NURU to use his influence to benefit Recology, including in connection with Recology's lengthy rate increase process.  I expected that, as DPW's Director, NURU ultimately could control how

this money was used.

9. As was my practice, I sought approval from my supervisor, Arsenault or Porter, before arranging to pay the approximately $150,000 that Nuru requested each year. I did not have authority to approve payments this large and do not believe that either Arsenault or Porter had final authority to approve payments of this magnitude either. I understood that the money Recology sent to Clean City Coalition for Giant Sweep was important to NURU, which I communicated to Porter and Arsenault. NURU described these payments as "the big one" in our conversations. Because I understood the importance to NURU of these payments and the value to Recology of keeping NURU happy, I offered to write a personal check when NURU did not timely receive one of Recology's promised $30,000 Giant Sweep payments in May 2015.

10. At around the same time in 2015, NURU asked me for help finding his son a job. Understanding that Recology was at the time preparing to submit a rate increase application to the City for NURU's approval, I arranged for NURU's son to work at Recology Sunset Scavenger, for which he painted debris boxes. I expected that Recology's payments and benefits to NURU (like a job for his son) would influence NURU to use his official position to benefit Recology. I understood that NURU's son was the only high school student so employed by Recology in San Francisco. NURU's son continued to work at Recology during the school year and summers through approximately June 2017. I stipulate that Recology paid NURU's son a total of approximately $19,565 during that time.

11. In or around June 2017, Mark Arsenault advised me that NURU's son could no longer work for Recology because it would not look good for Recology to employ the Director of DPW's son. I then arranged, with Arsenault's knowledge and approval, for Recology to give a grant to a non-profit on whose board I served, the Asian Pacific American Community Center (APACC) in San Francisco, to create a summer program. I knew and discussed with Arsenault that the summer program would consist of NURU's son, and that Recology's money would be used to pay NURU's son's salary for the summer. I also arranged for Recology to fund NURU's son's salary for a second summer at the non-profit in 2018. By this time, John Porter was my

supervisor. As before with Arsenault, I would have needed Porter's authorization to pay for the second summer's salary for NURU's son. I stipulate that Recology gave approximately $9,600 to APACC in 2017 and approximately $14,000 to APACC in 2018 for the summer internship program that employed NURU's son.

12. Each year from at least 2016 through 2019, at NURU's request, I also coordinated Recology's monetary contributions for the DPW holiday party. I recall NURU first asking for a donation to the holiday party in or around December 2016 during a meeting I attended with Mark Arsenault. Recology needed NURU's support for certain operational changes relating to the 2017 rate application. During the meeting, NURU agreed to support Recology's operational changes and asked Recology for $5,000 to help pay for the DPW holiday party. Arsenault agreed. NURU frequently requested payments or "donations" from Recology, including during times that we were seeking official assistance from NURU. I understood – and believe it was understood within Recology management – that providing the payments that NURU requested would influence NURU to act favorably toward Recology, including supporting the operational changes Recology was seeking.

13. NURU subsequently requested that Recology contribute to the DPW holiday party every year through 2019. NURU advised me that Lefty O'Doul's Restaurant was catering the holiday parties and directed me to have Recology's checks made out to the Lefty O'Doul's Foundation for Kids, which I knew to be a charity for underprivileged children. I prepared at least one internal check request form for Recology and described the payment as a "holiday donation" to the Lefty O'Doul's Foundation. I knew that the money was not a holiday donation to the Foundation and would not be used for underprivileged children. I directed the money to the Lefty O'Doul's Foundation for Kids because NURU told me to, and I knew that the money would be used to pay for expenses associated with the DPW holiday party. I believed that NURU wanted Recology to give the money to the Lefty O'Doul's Foundation because Recology was not allowed to give the money to him or to DPW directly. It was my practice to advise my supervisor at the time, either Arsenault or Porter, that NURU had asked for money for the DPW

holiday party and seek their approval for these contributions. There is no one else within the San Francisco Group from whom I would have sought approval. Following approval from Arsenault or Porter, I would arrange for Recology to issue a check to the Lefty O'Doul's Foundation, and then mail or hand-deliver the check to NURU or to somebody from the Lefty O'Doul's Foundation. I stipulate that I arranged for Recology to give NURU the following amounts each year for the DPW holiday party, in the form of "holiday donations" to the Lefty O'Doul's Foundation: $5,000 (2016); $15,000 (2017); $20,000 (2018); $20,000 (2019). I understood that the holiday parties were very important to NURU because they showcased his power and importance in the City. I attended the parties each year; other executives from Recology also attended at various times, including Porter and Arsenault and the General Managers of the Recology San Francisco Group companies.

14. Recology also owned and operated a facility in San Francisco, Sustainable Crushing, which accepted material such as concrete and asphalt for a "tipping fee," or price per ton, and processed it into an aggregate. DPW was Sustainable Crushing's largest customer for dumping materials and Recology knew that the facility was important to NURU. By the summer of 2018, Sustainable Crushing was losing money; as a result, Recology wanted to raise the tipping fees that it charged DPW. I understood that Recology needed NURU's support for the price increase. The General Manager of the Recology company that owned Sustainable Crushing asked me to set up a meeting in the summer of 2018 between Recology and NURU to discuss Recology's desired price increase. I arranged and attended the meeting, which was attended by NURU, John Porter, and the Recology General Manager. At the meeting, NURU promised to assist Recology with the price increase.

15. I also participated in a meeting with NURU, John Porter, and others on November 21, 2018, in which Recology again sought NURU's assistance in obtaining its Sustainable Crushing price increase. On November 26, 2018, in a phone call, I had a conversation with NURU in which he again promised to assist with the Sustainable Crushing price increase and told me to send him Recology's bills with the new prices. In that same conversation, he told me

that he needed more money for the DPW holiday party and requested that Recology give him $20,000 for the party. I agreed that Recology would increase its contribution to the DPW holiday party to $20,000. Although NURU did not explicitly condition his assistance with Recology's price increase on Recology's agreement to give $20,000 to the DPW holiday party, I understood that this was what NURU wanted based on the phone conversation and my ongoing course of dealings with NURU over a period of years.

16. After NURU asked me for $20,000 for the DPW Holiday Party, I contacted my supervisor, John Porter, told him about the conversation, and sought his approval for the $20,000 payment. Porter approved. I then prepared a check request that, as before, described the payment as a "holiday donation" to the Lefty O'Doul's Foundation for Kids, even though I knew that this was not a holiday donation to the Foundation but was instead a payment for the DPW holiday party. Porter signed this check request and Recology then issued a $20,000 check to the Foundation. At NURU's instruction, when I received the check, I had someone at Recology mail it directly to NURU, rather than the Foundation.

17. Recology also gave NURU other gifts and benefits, which we expected would influence NURU to take official action that would benefit Recology. For example, in December 2017, Mark Arsenault and I traveled to New York with NURU and City Administrator Naomi Kelly to tour a trash collection system used on Roosevelt Island. I understand and believe that the City booked NURU and Kelly's airfare and hotel rooms. However, when Arsenault and I arrived at the hotel where we would all be staying, we agreed that it was not a nice hotel and that it would be embarrassing for NURU and Kelly to stay there. With Arsenault's knowledge and approval, I arranged for NURU and Kelly to stay at a Courtyard Marriott nearby. I paid for those hotel rooms using my Recology purchase card and submitted the expenses for reimbursement by Recology. The total cost of each room, paid for by Recology, was $865.34. Neither NURU nor Kelly paid me or, to my knowledge, Recology back for the cost of their hotel rooms. I also paid for meals for at least Kelly during the trip, again using my Recology purchase card. I also understood that Naomi Kelly was important to Recology because she sat on the Rate Board,

Case 3:21-cr-00204-WHO Document 1-1 Filed 08/11/21 Page 7 of 9

which ultimately approved Recology's rates in San Francisco.

18. In another example, in June 2016, Recology paid for the funeral of a DPW employee, describing the payment as a "donation for DPW Partnership" to the San Francisco Clean City Coalition. DPW employee Sandra Zuniga requested that Recology pay the mortuary bill of $3,500. However, rather than having Recology pay the mortuary bill directly, I coordinated having Recology send the funds to San Francisco Clean City Coalition to pay for it. With Mark Arsenault's knowledge and approval, I requested that the Clean City Coalition invoice Recology $3,500 for a "community service project." As with the other payments discussed here, we did this because we believed that keeping NURU happy by making these payments was good for business and that, in exchange, NURU would use his position as DPW director to take official actions that would help Recology's business. After the Clean City Coalition's Executive Director emailed me an invoice for $3,500 for "Donation for DPW Partnership," I arranged for Recology to issue a payment to the Clean City Coalition for that purpose. Mark Arsenault signed off on the payment.

19. I am not aware of Recology's San Francisco Group providing donations or financial benefits of this magnitude to any other elected or appointed public official in San Francisco during the period described herein.

20. I agree that when I played a role in directing this stream of payments and benefits to NURU or his designees, I was acting within the scope of my employment with Recology and for the purpose of benefitting the company. I was commended on multiple occasions by Arsenault and Porter for my role in maintaining Recology's relationship with NURU and DPW, including in performance reviews I received in my role as Government and Community Relations Manger. I received bonuses and salary increases reflective of my success.

21. As described above, this stream of payments and benefits to NURU or his designees was provided with the knowledge and approval of my supervisors, first Mark Arsenault, and then John Porter. We did this with the understanding and the expectation that in exchange for these payments and benefits, NURU would take official action or use his influence

as DPW Director to benefit Recology's business as opportunities arose, and refrain from taking actions adverse to Recology. When I received requests for donations or contributions, including requests from NURU, my practice was always to inform my supervisor of the request and who was making it. When Porter and Arsenault learned that NURU was the person making the request, they would always, or virtually always, agree to the payments and manually sign off on the check request forms indicating their approval of the payments requested by NURU.

22. Because providing these benefits and items of value to NURU on Recology's behalf in return for NURU's official assistance was the regular course of dealings between Recology and NURU over a period of years, I did not believe it was necessary for either of us to say this out loud. I knew that Recology was not allowed to give money to NURU or DPW directly, so Recology gave the money to non-profit organizations at NURU's direction.

23. I stipulate that the City of San Francisco received federal assistance in excess of $10,000 in a one-year period within twelve months before or after the conduct covered by this Plea Agreement. I further stipulate that the conduct described above was intended to influence or reward NURU in connection with a transaction or series of transactions of DPW that involved $5,000 or more.

24. I agree that at all relevant times described above, I acted knowingly and with the intent to defraud, that is, the intent to deprive the public of its right to the honest services of a public official, namely NURU, through bribery in breach of NURU's fiduciary duty. I further agree that my actions were material, that is they were capable of influencing NURU's actions. In addition, I stipulate and agree that the banking transactions generated by our scheme utilized numerous interstate wire communications, including the checks issued by Recology at NURU's direction to the San Francisco Clean City Coalition, the Lefty O'Doul's Foundation, and the Asian Pacific American Community Center. I further stipulate that on at least one occasion, in November 2018, I directed someone at Recology to utilize the United States mail to mail a check to NURU at his request for the DPW holiday party.

Other Relevant Conduct

25. After learning about NURU's arrest in January 2020, I deleted text messages and emails that I had exchanged with NURU.

***

The foregoing facts are set forth solely to assist the Court in determining whether a factual basis exists for my plea of guilty, and are not intended to be a complete or comprehensive statement of all the facts within my personal knowledge regarding the charged crimes and related conduct by NURU or others.