PATRICK D. ROBBINS (CABN 152288)
Attorney for the United States

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

DAVID J. WARD (CABN 239504)
ILHAM A. HOSSEINI (CABN 256274)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7230
    david.ward@usdoj.gov
    ilham.hosseini@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> JOHN FRANCIS PORTER, <br><br> Defendant. | CASE NO. CR 22-00270 WHO <br><br> **UNITED STATES' SENTENCING MEMORANDUM** |

# TABLE OF CONTENTS

BACKGROUND ...........................................................................................................................1

    I.      Offense Conduct………………………………………………………………………1

          a.   Recology Bribes Mohammed Nuru, then-Director of SF Department of Public Works …1

          b.   The Holiday Parties Bribery Scheme ………………………………………………….2

DISCUSSION ..............................................................................................................................5

    I.      The Defendant's Sentencing Guidelines…………………………………………………5

          a.   USSG Calculations…………………………………………………………….…..…5

          b.   The Value of the Payments Was the Total of the Bribes Paid ……………………….6

          c.   A Minor Role Adjustment for Porter is Not Warranted ……………………………….9

                1.     Porter Understood the Scope and Structure of the Criminal Activity . . . . . . . . . 10

                2.     Porter Participated to a Significant Degree in the Conspiracy ………………….11

                3.     Porter Exercised Significant Decision-Making Authority in the Conspiracy …...12

                4.     Porter Stood to Benefit Professionally From His Participation in the Conspiracy12

                5.     Defendant's Relative Culpability Does Not Entitle Him to a Minor Role……....12

    II. Sentencing Recommendation …………………………………………………………….13

          a.   Legal Standard ……………………………………………………………………..13

          b.   The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors ...............................................................................................13

                1.     Nature and circumstances of the offense and the need for the punishment to reflect its seriousness, promote respect for the law, and provide just punishment………14

                2.     Need for the sentence to afford adequate deterrence to criminal conduct ………15

                3.     Need to avoid unwarranted sentence disparities among similarly situated defendants ……………………………………………………………………………….15

CONCLUSION ……………………………………………………………………………….16

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Ajala v. U.S. Parole Commission*, 997 F.2d 651 (9th Cir. 1993) .......................................................... 9, 11

*Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 485, 497 (1985) ……………………………………………………………………………………………13

*United States v. Florence Kong,* 21-CR-0354 WHO, Dkt. 40…………………………………………...15

*Nixon v. Shrink Missouri Government*, 120 S. Ct. 897 ...................................................................... 13

*United States v. Nick Bovis, 20-CR-00204 WHO*……………………………………………....1, 2, 3

*United States v. Carty*, 520 F.3d 984 (9th Cir. 2008) ......................................................................... 12

*United States v. Christman*, 894 F.2d 339 (9th Cir. 1990) .................................................................. 9

*United States v. Choy,* 309 F.3d 602, 604 (9th Cir. 2002) …………………………………………..7

*United States v. Coleman*, 990 F.2d 419 (8th Cir. 1993) ................................................................ 11, 12

*United States v. Davis*, 36 F.3d 1424, 1437 (9th Cir. 1994)............................................................... 9, 10

*United States v. Paul Giusti, 21-CR-00494 WHO* ...…………………………………………….passim

*United States v. Harlan Kelly*, 21-CR-0402 RS ……………………………………………………...15

*United States v. Hoac*, 990 F.2d 1099 (9th Cir. 1993) ........................................................................ 9

*United States v. Kant*, 946 F.2d 267 (4th Cir. 1991) .......................................................................... 6, 7

*United States v. Kimbrough*, 522 U.S. 85 (2007) ............................................................................... 12

*United States v. Kipp*, 10 F.3d 1463 (9th Cir. 1993) ........................................................................... 9

*United States v. Recology Inc., Dkt. 2 (Recology Deferred Prosecution Agreement)*……………….passim

*United States v. Ring,* 811 F. Supp. 2d 359, 379-380 (D.D.C. 2011) ………………………………….8

*United States v. Robinson-Brady*, 221 F.3d 1349 (9th Cir. 2000) ........................................................ 9

*United States v. Santos*, 501 Fed. Appx. 630 (9th Cir. 2012) .............................................................. 14

*United States v. Spano*, 411 F.Supp.2d 923 (N.D. Ill. 2006) .............................................................. 14

*United States v. Zhaofa Wang*, 797 F.3d 911 (7th Cir. 2013) ............................................................. 11

*United States v. Alan Varela*, 21-CR-0192 WHO, Dkt 52 …………………………………………..1, 15

## FEDERAL STATUTES

18 U.S.C. § 3553 ................................................................................................................ 12, 13, 14

## FEDERAL SENTENCING GUIDELINES

U.S.S.G. § 2B1.1 ..................................................................................................................... 5, 6, 7

U.S.S.G. § 2C1.1 ........................................................................................................................ passim

U.S.S.G. § 3B1.2 ............................................................................................................................... 9

U.S.S.G. § 3E1.1 ............................................................................................................................... 5

# INTRODUCTION

Defendant John Porter comes before this Court for sentencing after pleading guilty to participating in a years-long honest services fraud conspiracy. Porter's crime involved tens of thousands of dollars of bribes paid to Mohammed Nuru, a high-ranking San Francisco public official. At the time of the conspiracy, Porter was a high-ranking executive at Recology, which had a multi-million a year monopoly contract with the City of San Francisco to provide trash hauling and waste disposal. Recology was a heavily-regulated entity in San Francisco, and no official had more sway over the company's finances and fortunes than Nuru, who was at the time the Director of the San Francisco Department of Public Works (DPW). Porter admits to personally approving over $56,000 in bribes for Nuru's benefit, and he admits to doing so to influence Nuru to take official acts in Recology's favor.

It was base corruption. By its very nature, Porter and his conspirators' crime sought to unfairly and illegally benefit Recology at the expense of the public. Their corruption undercuts open and honest governance and betrays the public trust. For this, the government asks the Court to sentence Porter to 24 months imprisonment and impose a fine of $100,000.

# BACKGROUND

I. **Offense Conduct**

    a. **Recology Bribes Mohammed Nuru, then-Director of SF Department of Public Works**

This case arises out of a large-scale federal investigation into public corruption in the City of San Francisco.[1] As its heart was Mohammed Nuru, a deeply corrupt grifter seeking to profit from his position of power as a high-ranking city official in San Francisco. Recology and its executives, including defendant Porter, knew this, and they fed Nuru's greed and avarice in an effort to boost their company's profits and benefit themselves and their company.[2]

---

[1] *See United States v. Mohammed Nuru*, 21-CR-0490 WHO; *United States v. Walter Wong*, 20-CR-0257 WHO; *United States v. Harlan Kelly*, 21-CR-0402 RS; *United States v. Nick Bovis*, 20-CR-0204 WHO; *United States v. Balmore Hernandez*, 20-CR-0353 WHO; *United States v. Alan Varela*, 21-CR-0192 WHO*; United States v. William Gilmartin*, 21-CR-0192 WHO; *United States v. Florence Kong*, 20-CR-0354 WHO; *United States v. Sandra Zuniga*, 21-CR-0096 WHO.

[2] *United States v. Recology Inc.* 21-CR-0356 WHO, *United States v. Paul Giusti*, 21-CR-0294 WHO; *United States v. John Porter*, 22-CR-0270 WHO.

U.S. SENTENCING MEMORANDUM     1
22-CR-00270 WHO

Recology, through defendant Porter and others, funneled tens of thousands of dollars in payments to Nuru and others, all at Nuru's direction and for Nuru's ultimate benefit. They did so because Nuru held enormous sway over Recology's business. Nuru was their regulator, oversaw their contracts with DPW, and had the power to "approve, deny, or otherwise affect other payments to Recology, as well as operational changes requested by Recology that would affect Recology's business." PSR ¶ 10.

As a monopoly, Recology's rates were set by the city approximately every five years, and it was Nuru who presided over this process and could recommend whether rate increases for Recology would be approved. PSR ¶ 10. In addition, Recology had other contracts with the City of San Francisco, and Nuru had sway over those as well, including a contract Recology had with DPW in which DPW paid Recology fees, known as "tipping fees" to accept and process truckloads of DPW waste products at a Recology recycling facility.[3] PSR ¶ 10.

The conspiracy involved a stream of benefits paid to Nuru directly, or paid at his direction and for his benefit, including meals, drinks, a hotel stay, the funeral costs for a DPW employee, an internship for Nuru's son, and annual contributions to a San Francisco non-profit in the form of donations made at Nuru's request. And, at the heart of this case, $60,000 in bribe payments so that Nuru could host a series of elaborate and lavish holiday parties for his friends, his political supporters, and favored DPW employees. *See United States v. Recology Inc.,* Dkt. 2 (Recology Deferred Prosecution Agreement); *United States v. Giusti*, 21-CR-00494 WHO, Dkt. 40 (Plea Agreement); *United States v. Porter*, Dkt. 109 (Plea Agreement).

**b. The Holiday Parties Bribery Scheme**

In December 2016, Recology made a $5,000 bribe payment to Nuru to fund an annual holiday party Nuru wanted to host. PSR ¶ 14. At the time, Recology, which has a monopoly for waste pickup and disposal services in San Francisco, was in the process of seeking a multi-million increase in the rates it could charge San Francisco residents for its services. As head of DPW, Nuru presided over this rate

---

[3] A "tipping fee" refers to the fees that Recology was paid by the Department of Public Works for each load of waste that was deposited into a Recology facility by DPW; so-labeled because it referred to a truck "tipping" its truck bed up and dumped the materials.

increase process, and had enormous sway over its outcome. *PSR* ¶ 10.

The holiday party bribes began during a meeting among Nuru and Recology executives to discuss the rate process, and Recology's efforts to increase what they charged city residents. *PSR* ¶ 14. At the meeting, Nuru pressed Recology's Head of Government Affairs, Paul Giusti, to give $5,000 so that Nuru could host a holiday party. *Id.* Giusti agreed, and Recology executives approved a $5,000 check falsely made out as a "holiday donation" to a non-profit, the Lefty O'Doul's Foundation for Kids. *Id.* In fact, the money was siphoned off from Lefty O'Doul's and given to Nuru to use to fund his party. *Id.* The Lefty O'Doul's Foundation for Kids was run by San Francisco restauranter Nick Bovis, a co-conspirator who has pled guilty and admitted to bribing Nuru to win city business for himself and his restaurants. *See United States v. Bovis,* 20-CR-00204 WHO.

Defendant Porter admits that he joined the conspiracy in October 2017. *PSR* ¶ 13. At the time, he was the Group Controller for Recology's San Francisco Group. *Recology*, Dkt. 2 (DPA ¶ 4). In December 2017, Porter was promoted to Vice President and Group Manager. *Id.* In this role, Porter reported to the Executive Vice President and Chief Operating Officer of Recology, who reported to Recology's Chief Executive Officer. During the conspiracy, Porter's co-conspirator Paul Giusti was the San Francisco Group Government Relations Manager. Giusti reported directly to Porter. *Id.*

In October 2017, months after Recology had secured from the City an increase in the rates they could charge residents of San Francisco (an increase approved by Nuru), Nuru met with Giusti and requested that Recology again contribute to his holiday party. *PSR* ¶ 15. This time, Nuru wanted $15,000. Giusti took this request to Porter, who approved the payment. *PSR* ¶ 15. Porter admits that he knew that the payment was going to Nuru to fund his holiday party. *Porter*, Dkt. 109 (Plea Agreement ¶ 2). ("I knew that the request was from Nuru, and I understood that the money would be used to fund a holiday party Nuru hosted." ).

As Giusti and others had done the year before, Porter concealed the nature of this and subsequent payments to Nuru by falsely labeling them as "holiday donations" to the Lefty O'Doul's Foundation for Kids. *See PSR* ¶ 13. Porter admits he knew of this concealment and subterfuge when he approved the $15,000 payment. *Porter,* Dkt. 109 (Plea Agreement, ¶ 2). ("I knew that the funds were not being by

U.S. SENTENCING MEMORANDUM         3
22-CR-00270 WHO

the Lefty O'Doul's Foundation for Kids to provide access to baseball and baseball equipment for underprivileged children. I signed the approval forms that labeled the three payments as 'holiday donations.").

In November 2018, Porter approved another bribe payment to Nuru, this time for $20,000, again knowing that it was for Nuru's annual holiday party. *Id.* Like the prior bribes, Nuru initially made his demand for payment to Giusti, who submitted the request for approval to pay the funds to Porter. Porter approved the payment, again falsely labeling the payment as a "holiday donation" to the Lefty O'Doul's Foundation, knowing that the payment was going to fund Nuru's lavish holiday party. *Id.; PSR* ¶ 15.

At the time Porter authorized this $20,000 payment in 2018, he was leading Recology's efforts to win Nuru's support in obtaining for Recology an increase for the "tipping fees" that DPW paid to Recology to dump waste at a Recology waste disposal facility. *Recology*, Dkt. 2 (DPA, ¶¶ 15-19). DPW was one of Recology's largest customers using a Recology waste disposal facility, and Recology was seeking an increase in the fees that DPW paid to Recology to dispose of DPW waste products. *Id.* The negotiations between Recology and DPW, including with Nuru, continued from June 2018 into 2019, and were led by Porter. In the midst of these negotiations, Porter and other Recology executives met for one of their regular coordination breakfasts with Nuru and DPW officials. *Id.* Porter paid $155.95 for everyone's meal. *Id.* It was a common practice; Recology had held, and paid for, regular monthly breakfasts for high-ranking DPW officials for years. *PSR* ¶ 18.

Five days later, Nuru spoke to Giusti by telephone, in a conversation recorded by the FBI. On that call, Nuru pressed Giusti for money for his holiday party. This time Nuru wanted $20,000. Nuru said to Giusti: "yeah, so if you could, if you could give me twenty, that would be nice." *Id.* ¶ 19. Giusti agreed, and Nuru immediately assured him that he was working with Porter on Recology's request to increase their tipping fees, saying that he "was working on that other thing for John [Porter]." *Id.*

Early the next morning, Giusti contacted Porter by phone, informed him that Nuru wanted $20,000 for his holiday party, and Porter agreed to approve the payment. *Id., PSR* ¶ 15; *Porter,* Dkt. 109 (Plea Agreement, ¶ 2). Porter again admits he knew the purpose of this payment: "[t]he object of these payments was to influence Nuru to take official action and exercise influence in Recology's favor as

opportunities arose, and to have Nuru take official action and exercise influence in Recology's favor in exchange for these payments." *Id.*

The 2018 Nuru holiday party took place on December 18, 2018, and was attended by Recology executive and others. *Recology*, Dkt. 2 (DPA, ¶ 19). Two nights later, Porter, Giusti and another Recology executive took Nuru and two other high-ranking DPW officials to Harris' Restaurant, a high-end San Francisco steakhouse. *Id.* ¶ 20. Porter used his Recology Group purchase card to pay the entire $1,182 bill. *Id., PSR* ¶ 15, *Porter,* Dkt. 109 (Plea Agreement, ¶ 2).

In December 2019, Porter approved a third payment to Nuru, another $20,000 "holiday donation" concealed and misrepresented as a donation to the Lefty O'Doul's Foundation, but in truth a slush fund for Nuru to draw from to host his annual holiday party. *Id.*

A month later, on the morning of January 28, 2020, Nuru was arrested by the Federal Bureau of Investigation, charged with participating in a sweeping honest services fraud scheme and conspiracy. The conspiracy was over.

## DISCUSSION

### I. The Defendant's Sentencing Guidelines

#### a. USSG Calculations

The government agrees with U.S. Probation's calculation of the Guidelines. Specifically, the government and Probation agree that the Guidelines for defendant Porter are as follows:

a. Base Offense Level, U.S.S.G. §2C1.1(a)(2): 12

b. Specific offense characteristics under U.S.S.G. Ch. 2:

  The offense involved more than one bribe; §2C1.1(b)(3) +2

  The value of the payments or benefits received was between $40,000 and $95,000; U.S.S.G §2C1.1(b)(2); U.S.S.G. §2B1.1(b)(1)(D): +6

  The offense involved a public official in a high-level or sensitive decision-making position. U.S.S.G. § 2C1.1(b)(3): +4

c. Acceptance of Responsibility, U.S.S.G. § 3E1.1(a), (b): - 3

d. Adjusted Offense Level: 21

U.S. SENTENCING MEMORANDUM   5
22-CR-00270 WHO

The government's understanding, based on the criminal history information in the Presentence Report, is that Porter is a Criminal History Category I. *PSR* ¶ 68. As a result, his Sentencing Guidelines range is 37-46 months. *PSR* ¶ 82. The government acknowledges that under the Zero-Point Offender amendments to the Guidelines, which take effect on November 1, 2023, Porter would qualify for a two-level departure from his current U.S.S.G. calculations, meaning his Guidelines range would be 30-37 months. The government does not oppose a defense request for an additional variance from the Guidelines, equivalent to a two-level U.S.S.G. reduction, to reflect the proposed changes.

The government and the defense disagree on two key aspects of the Guidelines calculations: 1) the value of the bribe payments for purposes of the Guidelines calculation, and; 2) whether Porter's conduct warrants a minor role reduction in his USSGs. In order to resolve disputes with the presentence report, the sentencing court "must – for any disputed portion of the presentence report or other controverted matter - rule on that dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed. R. Crim. P. 32(i)(3)(B). The sentencing Court's ruling must be express or explicit. *United States v. Houston*, 217. F.3 1204, 1208 (9th Cir. 2008).

The Court may order an evidentiary hearing and permit the parties to introduce evidence on the objections. Fed. R. Crim. P. 32(i)(2). If the Court deems it necessary, the government would be prepared to hold an evidentiary hearing and to call witnesses and present evidence.

**b. The Value of the Payments Was the Total of the Bribes Paid**

Under §2C1.1 (and by reference §2B1.1), the value to be used in calculating a defendant's Guidelines is "*the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government, **whichever is greatest**.*" §2C1.1(b)(2) (emphasis added).

The Commentary to §2C1.1 makes clear that in cases where the benefit cannot be reliably established, or the bribe is larger, that the USSG calculations should be based on the amount of the bribe. "In a case in which the value of the bribe exceeds the value of the benefit, or in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of

such as bribe expected something in return that would be worth more than the value of the bribe. §2C1.1 (Commentary). *See also United States v. Kant*, 946 F.2d 267, 269 (4th Cir. 1991) (in determining the amount of the bribes for Sentencing Guidelines purposes "the Guidelines could not be more explicit. The figure to be plugged into the [§2B1.1] table is 'the greater' of the value of the bribe or the value of the benefit received in return for the bribe.").

The defendant and the government agree that the proper measure of the value to be used in calculating Porter's Guidelines is the amount of the bribes, as neither side has calculated the amount of the benefits that flowed to Recology as a result of the bribery scheme. The government and U.S. Probation agree that, under this analysis, the conclusion is clear – the value of the bribes is the value of the bribes. For Porter, that means that his Guidelines calculation should be based on, at a minimum, the three bribe payments Porter admits to approving for Nuru to use for this holiday parties: $55,000, plus the value of the $1,182 dinner Porter expensed for dinner for Nuru and two other DPW officials.

Defendant Porter attempts to circumvent these facts and the clear language of the Guidelines by arguing that the "value of the bribe" should not be the bribes paid at Nuru's direction and for his ultimate benefit, but rather only that amount that went personally to Nuru. By this logic, of the $55,000 Porter approved to pay to Nuru for his holiday parties, only less than $6,500 should count towards his Guidelines calculation because all that went to him personally was presumably only what he ate and drank at his holiday parties. *See PSR*, Objections Addendum ¶ 8.

This argument runs counter to the facts of the case, the Guidelines and its accompanying commentary, relevant caselaw, and even Porter's own admissions. The true benefit of the holiday party bribes to Nuru were not the food and drink that he consumed. The benefit to Nuru was having $15,000 to $20,000 a year that he could use to throw elaborate holiday parties for his friends and political supporters. It was a means for Nuru to flaunt his power and prestige, provide largess to his political supporters, and to benefit from the esteem and adulation that came with hosting the events. Co-conspirator Giusti, in his plea agreement, clearly explained the benefit of the parties to Nuru: "I understood that the holiday parties were very important to Nuru because they showcased his power and importance in the City." *Giusti*, Dkt. 40 (Plea Agreement, Ex. A, ¶ 13). Even Nuru himself

acknowledged that all of the funds for the holiday parties were for him. In his telephone conversation with Giusti, he states clearly: ""yeah, so if you could, if you could give me twenty, that would be nice." *Recology,* Dkt. 2 (DPA ¶ 19). And Porter, despite his arguments here, admits in his Plea Agreement that he made the payments for Nuru's benefit." *Porter,* Dkt. 109 (Plea Agreement ¶ 2) ( "I and other employees of Recology Inc. approved and directed payments from Recology for the *benefit of Mohammed Nuru*. Porter admits that he knew exactly what the bribe payments were to be used for – a party for Nuru. *Id.* ("I understood that the money would be used to fund a holiday party Nuru hosted for friends, political supports, and select DPW employees."). Porter even admits that the purpose of the payments were bribe payments made "in order to induce [Nuru] to take official actions that would benefit Recology." *Id.* The entirety of the $55,000 holiday party bribes approved by Porter were made at Nuru's request. The entirety of the funds went to Nuru's parties, for his friends and supporters. Thus, the entirety of the $55,000 in payments were bribes to Nuru.

Porter cites to *United States v. Choy* for the legal proposition that payments made to a third-party should not be used in calculating the value of a bribe payment under §2C1.1 and §2B1.1 of the Sentencing Guidelines. 309 F.3d 602, 604 (9th Cir. 2002); *see also PSR*, Objections, ¶ 7. This reliance is misplaced. In *Choy*, the defendant and co-conspirators were charged with paying bribes to FDA officials to clear shipments of adulterated seafood through U.S. Customs. *Choy*, 309 F.3d at 604. The payments in Choy that the Ninth Circuit held should not be counted as part of the value of the bribe for U.S.S.G. purposes, however, were not bribes or payments to the corrupt FDA official, or even for the official's benefit. *Id.* Rather, the money went to a co-conspirator to buy computers that would interface with the FDA computers, facilitating the importation of the seafood. *Id.* Then the conspirators could pay bribes to allow the seafood to clear customs. *Id.* The Ninth Circuit held that payments for the computers could not be calculated as bribes because they were made independently to a third party, and there was no evidence of any benefit to the government official from the payment, or even that the government official was aware of the payment. *Id.* The computers were simply bought for a co-conspirator to help facilitate legitimate side of the import business. *Id.*

The facts of this case are far different. Here, the payments were made at Nuru's request, to fund lavish parties that Nuru hosted, and were intended to benefit Nuru. Porter admits all of this. "I participated in a conspiracy with Giusti, Nuru, and others . . . knowing that the object of the conspiracy was to make these payments for the benefit of Nuru." *Porter,* Dkt. 109 (Plea Agreement ¶2).

In his objections to the draft presentence report, Porter also cites to *United States v. Ring*, in which the District Court rejected the government's attempt to argue that all of a defendant's lobbying expenses were corrupt payments, including the costs of non-corrupt lobbying, in-kind campaign contributions, and payments for sporting and event tickets given, not to the public official as a bribe, but directly to other individuals. 811 F. Supp. 2d 359, 379-380 (D.D.C. 2011). For example, the Court held that the government could not count as bribe payments to the public official the costs of sporting tickets given directly by the lobbyist to his friends and family, as well as "non-corrupt lobbying" expenses. *Id.* The Court also criticized the government for its admission that "there was not an easy way to calculate what portion of the tickets and expenses were actually used for corrupt purposes." *Id.*

That is not the case in this instance. Here, there is no dispute that the bribe payments for the holiday parties were made at Nuru's personal request, so that Nuru could fund his annual holiday parties. *See Porter*, Dkt. 109 (Plea Agreement). Porter further *explicitly* admits that the payments were made "for the benefit of Mohammed Nuru." *Id.* And Porter admits that the purpose of the bribes was to influence Nuru to act in Recology's favor . *Id*.

Porter's actions, and those of his co-conspirators, show that they intended that the full amount of the payments were intended as bribes. Porter cannot credibly argue to the contrary here, that the only intended corrupt benefit to Nuru from the payments was the *de minimis* amount in food and drinks Nuru consumed. It defies common sense to believe that Porter and his co-conspirators had innocent motives in making the bulk of the payments, and that they only intended that a few hundred dollars (if that) of the payments were intended to be corrupt bribes to Nuru.

All of the $55,000 in Lefty O'Doul's "holiday donations" approved by Porter were bribes, and defendant Porter knew and intended that they were bribes. This full amount of the bribes is the appropriate figure when determining "the value of the bribes" for Porter's Guidelines calculation.

U.S. SENTENCING MEMORANDUM         9
22-CR-00270 WHO

### c. A Minor Role Adjustment for Porter is Not Warranted

Defendant Porter next argues that he should receive a reduction in his Guidelines calculation for minor role. Under §3B1.2, a defendant who was only a minimal or minor participant in a criminal offense may be entitled to a two- or four-point reduction in their total offense level. *U.S.S.G. §3B1.2.* According to the Commentary to U.S.S.G. §3B1.2, the determination of whether to apply the reduction is a fact-based one, and should be based on the following factors: 1) degree the defendant understood the scope and structure of the criminal activity; 2) the degree to which the defendant participated; 3) the degree to which the defendant exercised decision-making authority; 4) the nature and extent of the defendant's participation; and, 5) the degree to which the defendant stood to benefit. *U.S.S.G. §3B1.2, Commentary, Note C.* A defendant is not entitled to a minor role adjustment just because he is less culpable than other conspirators. *Ajala v. U.S. Parole Commission*, 997 F.2d 651, 656 (9th Cir. 1993) ("a defendant may be less culpable than other participants, but that does not necessarily entitle [him] to a minimal or minor role adjustment."). *See also United States v. Davis*, 36 F.3d 1424, 1437 (9th Cir. 1994). Rather, a defendant is only entitled to a minor or minimal role adjustment when his role is minimal or minor compared to other participants in the same offense or in relevant conduct. *United States v. Kipp*, 10 F.3d 1463, 1469 (9th Cir. 1993).

The Ninth Circuit has consistently held that a downward adjustment under §3B1.1 is to be used "infrequently and only in exceptional circumstances." *United States v. Robinson-Brady,* 221 F.3d 1349 (9th Cir. 2000), *quoting Davis*, 36 F.3d at 1436; *see also United States v. Hoac*, 990 F.2d 1099, 1106 (9th Cir. 1993); *United States v. Christman*, 894 F.2d 339, 341 (9th Cir. 1990).

The defendant has the burden of proving by a preponderance of the evidence that he is entitled to a downward adjustment based on his role in the offense. *Davis*, 36 F.3d at 1437. Porter cannot meet this burden. By the criteria set out in the Commentary and the caselaw, a minor role adjustment is not warranted for Porter given the facts and circumstances of this case.

#### 1. Porter Understood the Scope and Structure of the Criminal Activity

A minor role adjustment may be appropriate for a defendant who does not understand the scope and structure of the criminal activity. By his own admission, Porter clearly understood scope and

U.S. SENTENCING MEMORANDUM          10
22-CR-00270 WHO

structure of the conspiracy. Porter understood clearly the purpose of the payments. They were bribes intended to influence Nuru. *See Porter,* Dkt. 109 (Plea Agreement) ("I agree that I participated in a conspiracy with Giusti, Nuru, and others, from at least October 2017 to January 2020, knowing that the object of the conspiracy was to make these payments for the benefit of Nuru in order to induce him to take official actions that would benefit Recology."). Porter clearly understood the illicit structure of the bribes, because he admits he approved the payments knowing they were not holiday donations to the Lefty O'Doul's Foundation for Kids, but simply money for Nuru to host his holiday parties. *Id.*

Porter cannot now claim his knowledge and understanding of the conspiracy was so deficient as to warrant a minor role reduction.

### 2. *Porter Participated to a Significant Degree in the Conspiracy*

Porter joined the conspiracy in October 2017, and participated through the end of the conspiracy in January 2020 when Nuru was arrested by the FBI. During that time period, he approved three payments to fund Nuru's holiday parties, in 2017, 2018, and 2019. Each holiday party expenditure was a significant payment - $15,000 the first year, and $20,000 each year after. *PSR* ¶ 15. Porter approved each payment knowing they were going to benefit Nuru. And he made the payments at a time when Nuru had significant influence over Recology's business, including issues in which Porter was directly involved, and Porter admits that he approved the payments intending that they influence Nuru to act to Recology's benefit. Among other things, Porter approved a $20,000 payment to Nuru in 2018, at the very time that Porter was leading Recology's effort to pressure Nuru to approve an increase in the "tipping fees" Recology collected from disposing of DPW waste. *Recology,* Dkt. 2 (DPA, ¶ 19). Porter's participation is far too significant to warrant a minor-role adjustment.

### 3. *Porter Exercised Significant Decision-Making Authority in the Conspiracy*

While it was Giusti who Nuru pressured directly for the holiday party payments, Giusti could not act without Porter. Porter was his superior, and Giusti did not have the authority within Recology to approve the payments to Nuru. He needed Porter. *See Recology*, Dkt. 2 (DPA, ¶ 4) ("[a]s Controller, Porter had authority to approve payments by the SF Recology Group of $25,000 and under. As Vice President and Group Manager, Porter had authority to approve payments of $100,000 and under.").

U.S. SENTENCING MEMORANDUM          11
22-CR-00270 WHO

Given this authority, it was Porter that exercised significant decision-making authority in order to effectuate the conspiracy. Under this factor as well, a minor role for Porter is not warranted.

       *4. Porter Stood to Benefit Professionally From His Participation in the Conspiracy*

  Porter stood to benefit from the conspiracy. At the time of the payments, Porter was a Vice President and Group Manager at Recology, and as Recology benefitted financially, so too did Porter, both financially and professionally. More directly, Porter was personally involved in the negotiations for an increase in Recology's tipping fees, and would have benefitted professionally from the success of those negotiations, as well as his other interactions with Nuru.

       *5. Defendant's Relative Culpability Does Not Entitle Him to a Minor Role Reduction*

  Defendant Porter seeks to minimize his conduct in relation to others, both charged and uncharged, to argue that he deserves a minor role adjustment. As an initial matter, simply being somewhat less culpable than other participants is not grounds for a minor role adjustment. *Ajala*, 997 F.2d at 656; *see also United States v. Zhaofa Wang*, 797 F.3d 911, 916 (7th Cir. 2013); *United States v. Coleman,* 990 F.2d 419, 422 (8th Cir. 1993). And in this case, as Probation correctly notes, Porter was at least as culpable than some conspirators. *PSR,* Objections, ¶ 4 ("the defendant's involvement in the fraudulent scheme is not significantly lower than the average culpability of his co-conspirators.").

  Porter argues that co-defendant Giusti worked for Recology for longer, and while that is true, Porter nonetheless participated in the conspiracy with Giusti for over two years. *Porter*, Dkt. 109 (Plea Agreement). Moreover, Porter personally approved $55,000 in bribe payments over two-plus years, approved a $1,182 steak dinner, and paid for and attended regular monthly breakfasts for DPW officials. *Id.* The fact that co-conspirator Giusti may have been involved in some other corrupt payments to Nuru does not make Porter so significantly less culpable as to warrant a minor role reduction.

  Porter also seeks to shift blame to his predecessor as Vice President and Group Manager of the SF Recology Group. This executive, who was not charged, approved one $5,000 payment for the 2016 holiday party. *PSR* ¶ 14. Porter claims, without evidence, that he only approved the 2017 holiday party payment after he was told by this executive "it was okay to sign." *PSR* ¶ 18. Porter sites to no evidence

U.S. SENTENCING MEMORANDUM  12
22-CR-00270 WHO

that this was the case. This unsupported assertion is simply an effort to shirk responsibility for his actions. Porter approved the $15,000 payment in 2017, and then he approved two others, each for $20,000, in 2018 and 2019. In total, Porter personally approved $55,000 in payments, far more than his predecessor, and he did so knowing the purpose and intent of the payments. He cannot now claim that his former manager told him "it was okay" and that this somehow supports his argument for a minor role adjustment. It does not, nor does it mitigate his overall responsibility as the Recology executive who used his senior position at the company to facilitate this conspiracy to benefit himself and his company.

## II.    Sentencing Recommendation

### a.    Legal Standard

The U.S. Sentencing Guidelines serve as "the starting point and initial benchmark" of any sentencing process, and are to be kept in mind throughout the process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). The overarching goal of sentencing, as set forth by Congress, is for the Court is to "impose a sentence sufficient, but not greater than necessary." *Carty*, 520 F.3d at 991. In accomplishing that goal, the Court should consider the factors set forth under 18 U.S.C. § 3553(a), to include:

    (1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

    (2)    the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (3)    the need for the sentence imposed to afford adequate deterrence to criminal conduct, and;

    (4)    the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.

  **b.**  **The Government's Recommended Sentence Vindicates the 18 U.S.C. §3553(a) Sentencing Factors**

   **1.** **The nature and circumstances of the offense and the need for the punishment to reflect its seriousness, promote respect for the law, and provide just punishment**

Porter's crimes cuts at the heart of open, democratic governance, and warrant a significant custodial sentence. Bribery corrodes our public institutions. By its nature, it destroys the foundation of an open, accountable government. Honest services fraud schemes involving bribes to public officials place the greed and avarice of the few above the duty owed to the public by its elected officials and those who seek to draw from the public purse. Corrupt public officials and their enablers line their pockets at the expense of the taxpayers and the citizens. It is a fraud on the public, who rightly expect that their public officials will act in good faith in the public interest.

The Supreme Court has repeatedly noted the harm wrought by bribery schemes. As Justice Clarence Thomas explained, bribery is the "perversion or destruction of integrity in the discharge of public duties." *Nixon v. Shrink Missouri Government*, 120 S. Ct. 897, 923 (J. Thomas, dissent), quoting 3 Oxford English Dictionary 974 (1989). Chief Justice William Rehnquist echoed the same sentiment in *Federal Election Commission v. National Conservative Political Action Committee*:, writing: "corruption is the subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns. The hallmark of corruption is the financial *quid pro quo*: dollars for political favors." 470 U.S. 485, 497 (1985). Porter's conduct is exactly the sort of misconduct that the Court condemned, and it warrants a significant sentence from this Court.

Porter's plea agreement includes a four-point increase in his recommended Guidelines sentence to reflect the fact that the individual he bribed was a high-level public official. *U.S.S.G. § 2C1.1(b)(3)*. This enhancement is warranted because it reflects the increased severity of the conduct when it is targeted at those officials with the most power and influence. Mohammed Nuru fits this bill. He was one of the highest-ranking public officials in the City of San Francisco, appointed by and reporting directly to the Mayor. He oversaw a sprawling municipal public agency. As Porter admitted in his plea

U.S. SENTENCING MEMORANDUM  14
22-CR-00270 WHO

agreement, Nuru was in a position to exercise, and did exercise, significant authority and influence over the business of Recology." *Porter*, Dkt 109 (Plea Agreement ⁋ 2). The Ninth Circuit and others have upheld this enhancement for defendants involved in the corruption of high-level public officials, noting that the harm from bribery and corruption of these officials is a distinct and additional harm given those officials' roles. *See United States v. Santos*, 501 Fed. Appx. 630, 634 (9th Cir. 2012) ("the distinct harm at which § 2C1.1(b)(3) is aimed is the corruption of *high-level* public officials."). (Italics added)

### 2. Need for the sentence to afford adequate deterrence to criminal conduct

A substantial sentence in this case would send a clear message to others who would seek to bribe public officials for their personal or professional benefit: that such conduct will result in significant punishment. It also sends a message to the public that the courts and the government take this conduct seriously and simply will not accept this kind of criminal activity from their public officials and those who would seek to profit from bribing them. The District Court in *United States v. Spano* eloquently explained the deterrence role that courts must play in public corruption cases:

> "We need not resign ourselves to the fact that corruption exists in government. Unlike some criminal justice issues, the crime of public corruption can be deterred by significant penalties that hold all offenders properly accountable. The only way to protect the public from the ongoing problem of public corruption and to promote respect for the rule of law is to impose strict penalties on all defendants who engage in such conduct, many of whom have specialized legal training or experiences. Public corruption demoralizes and unfairly stigmatizes the dedicated work of honest public servants. It undermines the essential confidence in our democracy and must be deterred if our country and district is ever to achieve the point where the rule of law applies to all—not only to the average citizen, but to all elected and appointed officials."

*United States v. Spano*, 411 F.Supp.2d 923, 940 (N.D. Ill. 2006), *affirmed*, 477 F.3d 517 (7th Cir. 2006).

### 3. Need to avoid unwarranted sentence disparities among similarly situated defendants

Section 3553(a) identifies the need for the sentence imposed to afford adequate deterrence, as well as avoid sentencing disparities between similarly situated defendants. As described above, the conspiracy involving Nuru, Porter and Recology is a sprawling one, involving over a dozen defendants, both corporate and individual. Almost all have pled guilty or been convicted at trial. Several have been sentenced, but most, including the cooperators, will be sentenced by this Court in the coming months.

U.S. SENTENCING MEMORANDUM         15
22-CR-00270 WHO

Defendant Florence Kong, a wealthy business owner who pled guilty to bribing Nuru with a $36,000 Rolex, and meals and drinks, and then making false statements to the FBI when confronted, was sentenced by the Court to 12 months and one day of imprisonment, three years of supervised release, and fined $95,000. *See Kong,* 21-CR-0354 WHO, Dkt. 40. Kong did not cooperate. Defendant Alan Varela, a business executive who conspired with Balmore Hernandez and William Gilmartin to direct over $100,000 in bribes to Nuru to win contracts for their businesses was sentenced to 24 months imprisonment and fined $127,000. *Varela*, 21-CR-0192 WHO, Dkt 52. Varela likewise did not cooperate with the government.

Of the public officials charged, to date only Nuru has been sentenced. On August 25, 2022, Nuru was sentenced to 84 months in prison, three years of supervised release, and fined $35,000. *Nuru*, 21-CR-0490, Dkt. 130. Harlan Kelly, the head of the San Francisco Public Utilities Commission, was convicted at trial in July of bank fraud, false statements to a bank, conspiracy to commit bank fraud, conspiracy to make false statements to a bank, honest services fraud, and conspiracy to commit honest services fraud. *United States v. Harlan Kelly*, 21-CR-0402 RS. He has not yet been sentenced.

A sentence of 24 months for defendant Porter is proportionate to those imposed on other similarly-situated defendants in this case. Like Varela and Kong, Porter was a successful business executive. Like Varela and Kong, Porter bribed Nuru for benefits for his company. And like Varela and Kong, Porter did not cooperate. A 24-month sentence for Porter is proportionate and will avoid sentencing disparities with other similarly-situated defendants.

## CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence defendant Porter to 24 months' imprisonment to be followed by three years of Supervised Release, and a $100,000 fine.

PATRICK D. ROBBINS
Attorney for the United States

Dated: September 14, 2023

*/s/ David J. Ward*
DAVID J. WARD
Assistant United States Attorney

U.S. SENTENCING MEMORANDUM         16
22-CR-00270 WHO