Robb C. Adkins (SBN 194576)
Sam A. Camardo (*Admitted Pro Hac Vice*)
Chardaie C. Charlemagne (*Admitted Pro Hac Vice*)
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA  94111
Telephone: 415.659.2600
Facsimile: 415.659.2601
Email: radkins@bakerlaw.com
scamardo@bakerlaw.com
ccharlemagne@bakerlaw.com

*Attorneys for Defendant John Porter*

# IN THE UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| United States, | Case No.: **22-cr-270-WHO** |
| Plaintiff, | |
| v. | **JOHN PORTER'S SENTENCING MEMORANDUM** |
| John Porter, | |
| Defendant. | |

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

JOHN PORTER .....................................................................................................................2

I.      John Is Dedicated To His Family and the San Francisco Community where He Has Lived His Entire Life. ................................................................2

II.     John Worked Hard to Develop His Professional Skills and Advance with Employment Opportunities ............................................................................4

III.    John's Struggles with Mental Health and To Find Employment............................7

IV.    John Accepts Responsibility for His Failure in Judgment at Recology .................9

AN APPROPRIATE SENTENCE FOR JOHN ..........................................................................9

I.      The Nature and Circumstances of John's Conduct and His History and Characteristics Support a Non-Custodial Sentence. ..............................................11

II.     The Purposes of Punishment in § 3553 Do Not Support a Custodial Sentence. ...14

III.    John's Guidelines Range Supports a Noncustodial Sentence. ..............................16

      A.     Guidelines agreed to in the plea agreement. ............................................16

      B.     The parties' views on the remaining applicable guidelines. .....................17

           1.     A two-level reduction is appropriate under the forthcoming rules for zero-point offenders........................................................18

           2.     John's conduct warrants a four, or at least a two, level downward adjustment for his minimal role in the conspiracy.......18

           3.     No increase for value is appropriate. ...............................................22

           4.     John's Guidelines level does not warrant a custodial sentence. ....28

IV.    A Noncustodial Sentence Avoids Unwarranted Sentencing Disparities ..............28

CONCLUSION.....................................................................................................................31

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Gall v. United States*,
    552 U.S. 38 (2007)..............................................................................................10, 14

*Kimbrough v. United States*,
    552 U.S. 85 (1997)......................................................................................................9

*Koon v. United States*,
    518 U.S. 81 (1996)....................................................................................................10

*United States v. Bohuchot*,
    625 F.3d 892 (5th Cir.2010)......................................................................................26

*United States v. Bovis*,
    3:20-cr-204-WHO, Doc. 36 (N.D. Cal.)....................................................................20

*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ......................................................................................9

*United States v. Choy*,
    309 F.3d 602 (9th Cir. 2002)................................................................................24, 25

*United States v. Dominguez-Caicedo*,
    40 F.4th 938 (9th Cir. 2022)......................................................................................21

*United States v. Edwards*,
    595 F.3d 1004 (9th Cir. 2010) ..................................................................................15

*United States v. Gillam*,
    167 F.3d 1273 (9th Cir. 1999) ..................................................................................23

*United States v. Giusti*,
    3:21-cr-294-WHO, Doc. 40-1 (N.D. Cal.)............................................................20, 29

*United States v. Gupta*,
    463 F.3d 1182 (11th Cir. 2006) ................................................................................27

*United States v. Khan*,
    701 F. App'x 592 (9th Cir. 2017) ........................................................................25, 27

*United States v. Mohamed*,
    459 F.3d 979 (9th Cir. 2006) ....................................................................................10

*United States v. Nikfar*,
    4:12-cr-660-CW, Doc. 246 (N.D. Cal.) ....................................................................29

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*United States v. Nuru*,
  Case No. 3:21-cv-490-WHO, Dkt. No. 112.................................................... *passim*

*United States v. Ring*,
  811 F. Supp. 2d 359 (D.D.C. 2011) ........................................................... 26, 27

*United States v. Steiber*,
  4:12-cr-660-CW, Doc. 200, 201 (N.D. Cal.) .................................................. 29

*United States v. Steiber*,
  4:12-cr-660-CW, Doc. 206 (N.D. Cal.) ......................................................... 29

*United States v. Sullivan*,
  3:20-cr-00337, Doc. 269 (N.D. Cal.) ........................................................... 31

*United States v. Sweet*,
  3:15-cr-360-WHO, Doc. 17 (N.D. Cal.) ........................................................ 29

*United States v. Tan*,
  4:12-cr-660-CW, Doc. 223 (N.D. Cal.) ......................................................... 29

*United States v. Vonner*,
  516 F.3d 382 (6th Cir. 2008) (en banc) ....................................................... 10

*United States v. Whitehead*,
  532 F.3d 991 (9th Cir. 2008) ....................................................................... 10

**Statutes**

18 U.S.C. §§ 201(b)(1) and 2 ........................................................................ 24

18 U.S.C. § 1349 ............................................................................... 9, 16, 25

18 U.S.C. § 3553 ..................................................................................... *passim*

18 U.S.C. § 3553(a) ............................................................................... 10, 31

18 U.S.C. § 3553(a)(1)-(7) ............................................................................ 10

28 U.S.C. 994(j) ........................................................................................... 18

San Francisco Ordinance No. 204-22 ........................................................... 15

U.S.S.G. Ch. 1, Pt. A .................................................................................. 10

U.S.S.G. § 2B1.1 cmt. n. 3(c) ...................................................................... 27

U.S.S.G. § 2C1.1 ................................................................................... 22, 23

U.S.S.G. § 2C1.1(b)(2) ........................................................................... 22, 23

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- iii -

U.S.S.G. § 3B1.2 .................................................................................................17, 18, 19

U.S.S.G. § 3B1.2 Note 3(A) ............................................................................................19

U.S.S.G. § 3B1.2, Note 3(C) ...............................................................................19, 21, 22

**Other Authorities**

88 Fed. Reg. 28254-01 (May 3, 2023), 2023 WL 3199918 .....................................18, 28

88 Fed. Reg. 28272 (May 3, 2023), 2023 WL 3199918 ..................................................28

88 Fed. Reg. 28273 (May 3, 2023), 2023 WL 3199918 ..............................................16, 18

Average, Black's Law Dictionary (11th ed. 2019) ..........................................................21

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Sentencing Memorandum

Case No.: 22-cr-270-WHO

**INTRODUCTION**

John Porter comes before the Court for sentencing, having pleaded guilty to participating in a conspiracy to provide payments from Recology for the benefit of Mohammed Nuru, a public official that could affect Recology's business.  John, as head of Recology's San Francisco Group at the time, had the position to approve, or disapprove, payment requests brought to him by Recology employees.  He made the wrong choice one morning in October 2017.  Despite knowing that the funds were requested by Mr. Nuru for a holiday party for Mr. Nuru's employees, John signed his name.  Having agreed, John signed his name again in 2018 and 2019.

John Porter has spent the past three years regretting this lapse in judgment.  It has haunted him and cost him, his family, his friends, and his community so much.  John wishes more than anything in his life that he could go back in time and make a different decision; that when he was presented with the request for Recology to donate to the DPW holiday party that he had simply said no.  But he cannot, and he accepts full responsibility for his actions and acknowledges and apologizes for the harm he has caused to the public, the city he loves, and those who have always supported him.

John apologizes to the public for his actions which deprived the public of the honest services of Mr. Nuru and violated public trust.  He also apologizes to his family: his mother and father, who have walked beside him throughout this entire process; Alexis Hager, his partner who has supported him and given him the strength to bare the consequences of his actions while navigating the impact these proceedings have had on his mental health; and his other family members, relatives, and friends who have provided John the familial and community ties necessary to sustain him during this difficult period of time.

As described below, John's lapse in judgment is a singular failing in John's lifetime of commitment to integrity and helping others, and is not representative of who John is as a son, brother, friend, colleague, and person.  Prior to this one incident, both professionally and personally, John has spent his entire life committed to his family and community.  John participated in volunteer opportunities, served others in the community with compassion, and has

remained committed to the values of integrity and honesty which his parents and Catholic upbringing instilled in him at a young age.

The Court has not been able to get to know John during this process.  We hope this brief—and the outpouring of support that John has received by those who know and love him—provides the Court a glimpse into John's character of integrity and honesty, and that he is not defined by his lapse in professional judgement at Recology.

## JOHN PORTER

**I.      John Is Dedicated To His Family and the San Francisco Community where He Has Lived His Entire Life.**

John Francis Porter was born on August 17, 1983, in San Francisco, California.  John is a homegrown native of the city and has lived in the San Francisco Bay Area his whole life with thirty-two relatives residing in the San Francisco Bay Area.  Growing up, John was the oldest of three—an older brother to his two younger sisters and, at times, the consoling figure to his parents.  John, his family, and the generations which came before him have deep ties to San Francisco and have witnessed the city's highs and the city's pitfalls but continue to be proud of their hometown and devoted to their community.  As a family friend recounted: "Family is everything to John – never missing bi-weekly family dinners, outings and family get-a-ways.  He includes his family in every aspect of his life[.]"  Dennis Sartori Ltr.[1]  John's closeness and the importance of his family is illustrated by the fact that they all live less than one mile from each other in the same community and parish where they were raised.

John was raised in a devout Catholic household where he attended Saint Brendan's School for grammar school, Sacred Heart Cathedral for high school, and Saint Mary's College of California, Moraga, where he obtained a Bachelor of Science in Finance and Economics.  John's parents emphasized "morality, honesty and faith in God" and "that the only path to true happiness lies in doing what is right."  Jeffrey Porter Ltr.  Both in his household and through his education, honesty and integrity were the two key values instilled in him.

---

[1] All letters in support of Mr. Porter have been submitted to the Court by Probation.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

As illustrated in the letters submitted on John's behalf, John cares deeply about the people in his life.  There are numerous examples of John helping and supporting those in their time of need.  He is the godfather of his nephew Liam O'Neill and a huge part of the extended Porter family in San Francisco.  Whether family or friend, John is there for you.  Here are some examples (and there are many more):

> "When I got honest and asked for help with my substance abuse and drinking almost a decade ago, [John] was there for me the entire time. He visited me in rehab every Sunday when they allowed visitors. He wrote me emails. He picked up every call. He encouraged me to stay involved in AA, and hearing how much he respected that program made me appreciate it, too. I'm not sure I would have stayed on track if he hadn't been so supportive.
>
> . . .
>
> I remember when I achieved one year of sobriety, after struggling quite a bit to get there, my brother John came by my apartment to give me a gift. It wasn't the price that made the gift so meaningful; it was the fact that he had listened to me, remembered the day, and went out of his way to celebrate me. What meant even more… was when he told me how proud he was of me and how much he loved me."
>
> – Victoria Porter Garcia, John's Sister
>
> "John was also the first one to reach out when my aunt passed unexpectedly, when my mother was diagnosed with an aggressive cancer . . . . I truly am not sure where I would be if it weren't for my friendship with John Porter."
>
> – Dante Jordan, Friend

From an early age, John demonstrated a commitment to service and community development.  His engagement with the Boy Scouts for six years, during which he earned the prestigious "Arrow of Light" award, stands testament to this.  His efforts extended to environmental initiatives, participating actively in regular cleanup events at Ocean Beach and Golden Gate Park.  And his service as an altar boy at Saint Brendan's Church further exemplifies his foundational commitment to faith and the community.

During his high school years, John manifested a strong commitment to his community, volunteering as a teacher at public schools and as a youth sports coach at Grattan Park.  His engagement in athletics was substantial, participating in cross country, basketball, track and field, and representing the Golden Gate Rugby Football Club.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

In college, he continued to foster his commitment to service.  He mentored many students at Saint Mary's College of California and returned each winter to San Francisco to help his cousin coach youth basketball at their old grammar school, Saint Brendan's School.

For over a decade, he actively engaged in at least three volunteer events a year for the charitable and nonprofit organizations he was involved in.  John participated in developing young professionals to be the future leaders through the Leadership San Francisco (LSF) program.  The LSF program develops future community leaders who are both knowledgeable about the city and concerned with its well-being.

And as an audit committee member for The Olympic Club, John volunteered his time in overseeing financial reporting and related internal controls, risks, ethics, and compliance.  The Olympic Club boasts a 163-year history as one of the oldest athletic clubs in the United States, developing many local, regional, national, and international champions.  Through his extensive volunteer work, John demonstrates the level of care he puts into everything he participates in.

His commitment to the City of San Francisco is undeniable as he supports its youth, young professionals, and institutional organizations.  As one family friend wrote:

> l have always admired John for making a commitment to the City by staying in San Francisco, and developing into an outstanding member of the West of Twin Peaks community, where he has engaged in multiple volunteer and organizational endeavors.
>
> – Tony Hall, Former San Francisco Supervisor for District Seven

## II. John Worked Hard to Develop His Professional Skills and Advance with Employment Opportunities

John began his professional CPA career at PricewaterhouseCoopers (PwC) in September 2006.  He worked his way up in the ranks, beginning as a summer intern and eventually working as an associate, senior associate, and manager.  Ultimately, John worked at PwC for seven years, receiving early promotions and playing pivotal roles in significant projects.  Additionally, John was recognized with numerous awards and entrusted with pivotal roles in training and development.  His dedication and skill led him to work with esteemed organizations such as Wilbur-Ellis, Gallo Winery, and Beringer, affirming his professional capabilities.

As a former colleague and board member of Recology explain:

John's integrity, work ethic, and commitment to excellence have had a profound impact on me. He is a person of exceptional moral character and has consistently demonstrated compassion and kindness toward others.

– Jeff Moir, Former Co-worker at PwC, Controller of Pebble Beach Resorts

Over the years, through mutual friends and respected colleagues like Don Wen, the Managing Partner at PwC, I consistently heard commendations of John's exceptional performance, respectful demeanor, tireless work ethic, and unyielding integrity. These testimonials were not mere platitudes but were corroborated by my own interactions with him over the years.

– Dennis Wu, Former Chairman of Recology Board of Directors

While working at PwC, John met his partner, Alexis Hager, who continues to support him throughout this difficult time.  Ms. Hager explains that John has always demonstrated a commitment to honesty and integrity in his work, once preventing an attempt to dishonestly submit extra hours on a timecard because it was "just not right."  Alexis Hager Ltr.  And as his father notes, while working at PwC, John "thrived" at a firm where his co-workers and clients had the "highest ethical standards" which were consistent with the values his parents emphasized in his upbringing.  Jeffrey Porter Ltr.

In pursuit of an opportunity to serve his beloved San Francisco community more directly, John transitioned to a role at Recology, a company aligned with his values of environmental sustainability and, as an employee-owned company, the welfare of the people that work there. Given his passion for service and the community, John was immediately selected to be on Recology's volunteer committee.  The volunteer committee was responsible for coordinating more than four events per year and that included over 200 employee-volunteers at each event to clean, landscape, paint, and beautify organizations like the Willie Mays Boys & Girls Club in San Francisco.  John remained on the volunteer committee during his entire seven-year tenure while at Recology.

John's journey at Recology saw a rapid ascent from the role of Assistant Corporate Controller to Group Controller for San Francisco, a testament to his focus on internal controls, process improvement, and adherence to best practices, which were highlighted in his annual performance reviews.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Two years into his role as Group Controller, John was asked to take the position as Group Manager for Recology in San Francisco in mid-2017, effective at the end of 2018.  This was John's first role in operations and less than five years into his tenure at Recology.  At that time, John depended on the experience of individuals such as Mark Arsenault and Paul Giusti, who had worked for Recology for approximately 20 and 40 years, respectively.

John took his responsibilities towards the care of his employees including their safety, diversity of backgrounds, equity, and inclusion very seriously.  After the killings of George Floyd and Breanna Taylor, John on his own initiative organized "listening sessions" with all Recology's 1,200 employees in San Francisco.

John realized that his background as a white man, who has been afforded many opportunities in life did not put him in a position to understand the issues that his workforce of 80% minorities was facing daily.  He attended over two dozen meetings and hired Spanish and Cantonese translators to ensure everyone's voice was heard.  He personally took inventory of the issues raised and created a plan to address his employees' concerns. *See* Dennis Wu Ltr.

John approached any issue that affected Recology employees similarly, as his former Recology colleagues explain:

> "I witnessed John work tirelessly and selflessly at Recology. He often worked to the point of exhaustion and to the detriment of his own health. John knew every employee at Recology … John has always self-reflected … If one can reflect on who they are, they can understand how their actions may affect their own life and those around them."

> – Tim Caulfield, Former Project Manager for Recology

> " … John had the respect of the working men and women; the people on the trucks or in the shops. For example, drivers would tell me that John would show up at driver's meetings at 4 or 5am to listen to their concerns. These men and women were not used to someone from upper management taking the time to do this and they really appreciated it."

> – Robert Borella, retired Mechanic after 39 years at Recology

After the tragic death of one of the drivers at Recology, "John stepped up to support the grieving family.  Given how sudden and unexpected the death was, the family did not have the ability to handle all the planning for the funeral.  Once [John]

learned this [he] offered to host the memorial service at the Recology meeting hall which included hundreds of attendees."

– Dennis Wu, Former Chairman of Recology Board of Directors

In addition to his extensive service record, John exhibited a strong dedication to understanding and addressing the complex issues facing San Francisco by being selected to participate the class of 2016 for San Francisco Chamber of Commerce's Leadership San Francisco program.  This initiative, designed to foster the next generation of civic leaders, equipped John with a deep understanding of the pressing challenges confronting the city including homelessness, education deficits, governance intricacies, infrastructure development, and sustainability concerns.  This is a testament to his genuine commitment to being a part of solutions that seek to enhance the quality of life for all San Franciscans, highlighting his readiness to engage proactively in initiatives targeted at San Francisco's betterment.  In former colleague Minna Tao's words:

"[I]n my ten years of knowing John, he has consistently demonstrated his commitment to the San Francisco community wanting the best for the city and its citizens."

– Minna Tao, Former General Manager of Recology who worked for John

### III.    John's Struggles with Mental Health and To Find Employment.

For over a decade, John has struggled with several diagnosed mental health conditions, undertaking regular therapy sessions to manage the symptoms that have, at times, been severely debilitating.  John was first diagnosed with these disorders in 2011 when he suffered what was initially believed to be a heart attack but was later determined to be a severe panic attack.  The panic attack was so severe that John believed he was going to die.  To mitigate the disorders, John takes three different medications per day (which he has taken for years) and regularly attends therapy sessions at least one to four times a month.  His offense has only heightened the effects of his disorders, resulting in bouts of depression, debilitating and severe panic attacks, and physical deterioration.

John believes strongly that this is a topic that should not be taboo or left undiscussed. Mental health is a foundational issue that drives many of our society's ills, whether it's

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

homelessness, drug addiction, school shootings, or suicide.  Despite personal hardships, he has remained a pillar of support for others in similar situations, consistently advocating for a more open dialogue around mental health issues in society.

John's friend, Salvatore Rizzo, is one beneficiary of John's support:

> "[In 2002], I started experiencing some serious battles with mental health… [when] mental health was more of a mystery than a diagnosis. My struggles changed my behavior, I would withdraw socially, became confrontational, or simply go off the map. … when we were in Tahoe together and I left in the middle of the night and drove all the way home without a word. Who was the first person to check in on me and see me? John."

> – Salvatore Rizzo, Friend

The past three years have also been characterized by resilient attempts to rebuild his professional life amidst the adversities stemming from the publicity surrounding his legal circumstances.  John persevered despite the challenges, by consistently taking his medication, attending his therapy sessions, confiding in his family, and rebuilding his career.  John has overcome significant challenges to secure employment—a feat that "is a testament to his resilience and commitment to being a contributing member to society," as recounted by his therapist.  Chad LeJeune Ltr.

And this was no small feat.  After applying for nearly 100 jobs, and despite being rejected each time, he proactively leveraged his expertise to support small businesses for free.  As John was seeking roles in accounting and finance, he was turned down each time due to the publicity and nature of his crime.  This did not stop John from pushing forward.  John provided free consulting services to small businesses and leveraged his network to find companies that could use his help.  *See* Chris Barrango Ltr. (noting that John worked as "an informal consultant . . . for nearly six months" until he was brought on "as a paid consultant").

His determination has led to a paid consulting role at Rossi Builders, Inc., with the potential for full-time employment.  John's current employer explains:

> I wish to emphasize our intentions regarding John's future with our company. Despite the impending sentencing, it is our sincere plan to offer John a full-time position at Rossi Builders following the resolution of his legal proceedings. We

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

strongly believe in his potential and are committed to providing him with an opportunity to contribute to our team in a more substantial capacity.

– Craig Rossi, Owner & President of Rossi Builders

**IV.    John Accepts Responsibility for His Failure in Judgment at Recology.**

In April 2021 and July 21, 2022, respectively, the government originally filed a criminal complaint and indictment, which included conduct in which John was not involved and to which he could not plead guilty.  At the end of last year, the government filed a narrower superseding indictment focused on the few items in which John was involved, and John has pleaded guilty and accepted full responsibility for his conduct.

The superseding indictment charges John with approving payments for the benefit of Mr. Nuru from Recology that were used by a nonprofit organization, Lefty O'Doul's Foundation for Kids, to pay for annual DPW holiday parties.  John should not have approved these payments, and he understands doing so was wrong.  He takes full responsibility for his actions.  John also takes responsibility for paying for a dinner and a series of breakfasts that Mr. Nuru attended, along with others from DPW and Recology.  John thus pleaded guilty to conspiracy to commit honest services fraud in violation of 18 U.S.C. § 1349.  *See* Doc. 109.

\* \* \*

We respectfully submit that the comprehensive narrative of John's life shows a life marked not only by professional diligence and a commitment to societal betterment but also characterized by personal resilience and an unwavering dedication to his community and the people around him.  This life shows a person of integrity.  As the court deliberates on this case, we ask the Court to consider the full narrative—not just John's one failure in professional judgment at Recology.

## AN APPROPRIATE SENTENCE FOR JOHN

The "overarching statutory charge" under 18 U.S.C. § 3553 to courts is to "impose a sentence sufficient, but not greater than necessary" to accomplish the statutory objectives of federal sentencing.  *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (quoting 18 U.S.C. § 3553(a)); *see also Kimbrough v. United States*, 552 U.S. 85, 101 (1997).  And the Supreme

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Court has directed sentencing judges, in doing so, to "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quoting *Koon v. United States*, 518 U.S. 81, 113 (1996)).

To determine the appropriate sentence, the Court is directed to consider all the factors listed in 18 U.S.C. § 3553(a). These include the nature and circumstances of the offense and the history and characteristics of the defendant, the need for the sentence imposed to provide just punishment and afford adequate deterrence, the need to provide medical treatment, the avoidance of sentencing disparities, and the applicable range set forth in the Federal Sentencing Guidelines (the "Guidelines"). *See* 18 U.S.C. §3553(a).

The applicable Guidelines range is merely one of the several factors for the Court to consider and the Court "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S.at 49-50. The Supreme Court's decisions in *Gall* and its progeny have "breathed life into the authority of district court judges to engage in individualized sentencing," *United States v. Whitehead*, 532 F.3d 991, 993 (9th Cir. 2008) (quoting *United States v. Vonner*, 516 F.3d 382, 392 (6th Cir. 2008) (en banc)), and confirmed the power of district courts to depart from the Guidelines in appropriate cases. *See United States v. Mohamed*, 459 F.3d 979, 987 (9th Cir. 2006) ("any deviation from the applicable advisory guidelines range [is] viewed as an exercise of the district court's post-Booker discretion and reviewed only for reasonableness."). And as explained in the Policy Statement that introduces the Guidelines, the § 3553(a) factors provide an important check on the sometimes arbitrary math of the Guidelines, permitting courts to ensure "proportionality in sentencing" by imposing "appropriately different sentences for criminal conduct of differing severity." U.S.S.G. Ch. 1, Pt. A, at 2.

As explained below, the factors identified in 18 U.S.C. § 3553(a)(1)-(7) establish that a sentence of probation or home confinement, coupled with community service, would be more than sufficient.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**I.      The Nature and Circumstances of John's Conduct and His History and
         Characteristics Support a Non-Custodial Sentence.**

John made mistakes at Recology. Serious mistakes. He pled guilty to a felony that will
forever change his life because he acknowledges those mistakes.

In sentencing John, the Court should consider who he is and what he has given and still
has to give society. Other than his mistakes at Recology, John has lived a law-abiding and
productive life.

As discussed above, John was born and raised in San Francisco and is a proud, native San
Franciscan. PSR ¶ 42.  To John, family is everything.  He was raised in a tight-knit family by
two loving parents. John, his two sisters and their families, and his parents all live within a
couple miles of each other and still get together at least weekly, if not more, for family dinners.

As demonstrated by the letters of those who know John, he is a loving and giving person
of integrity.  From befriending and including the shiest kid in the class who was physically
disabled, to helping his loved ones who struggled with addiction and other issues in their lives, to
helping his friends and acquaintances fix any manner of issues or problems they are dealing with
in their lives, to mentoring young accountants, John is a person who gives as much as he has to
give to those around him.  *See, e.g.*, Sharon Porter Ltr., Victoria Porter Ltr., Salvatore Rizzo Ltr.,
Pat Hager Ltr., Michelle Marbella Ltr., Joseph Shasky Ltr.  John grew up a Scout, attaining the
Arrow of Light, and was and is immersed in his Catholic faith.  As Reverend Michael Quinn
attests, John is "a diligent young man who cares deeply about his family and faith more than
anything else."  Michael Quinn Ltr.

John extended his loving and giving character to his work at Recology.  John chose to
work at Recology because he loved his city, and garbage collection was a way to have a tangible,
positive impact on San Francisco.  As explained by Dennis Wu, former Chairman of Recology's
Board of Directors, John chose to work at Recology in 2013, "despite having numerous other
opportunities," so that he could "work for an organization that had and can have a continuing
positive impact on the community he loves, San Francisco."  Dennis Wu Ltr.

At Recology, John respected and listened to, in the words of a Recology employee, "the
working men and women," that is, the "people on the trucks and in the shops."  Robert Borella

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

Ltr.  John cared deeply about his colleagues at Recology, and his actions there speak for themselves.  For example, he supported the grieving family of a driver who was killed tragically in an accident, hosting the memorial service at a Recology meeting hall.  Dennis Wu Ltr.

John has never been in trouble with the law until now.  When issues related to Mr. Nuru arose, John was open with Recology and did not hide or lie about the payments he approved to fund the DPW holiday party.  As his former colleague Eric Potashner noted, "I worked with John during Recology's internal investigation, and he answered every question and cooperated throughout the inquiry."  Eric Potashner Ltr.

Ultimately, John was charged.  When that happened, and unlike others who lied to the FBI or destroyed evidence, John never obstructed justice or lied to anyone.

Critically, the Court should consider what John has to offer society going forward.  After a tireless effort that included over 100 attempts at securing employment and freely giving away his time, John has secured employment with Rossi Builders.  Jeffrey Porter Ltr.; Craig Rossi Ltr. John, not yet 40 years old, still has much to give society.  A custodial sentence would prevent John from working, which would not only further destroy his life but would also "have a detrimental impact on [Rossi Builders] and its employees."  Craig Rossi Ltr.

In addition to his job, John also has a desire to devote himself to helping others avoid the same mistakes he made.  John is active in the community and will continue to be for years to come.  John is a better use to society giving back and helping others not make the same mistakes. Specifically, John is interested in working with groups to increase awareness of mental health and how best to manage these disorders.  Also, John is interested in speaking to those in business regarding his own failings at Recology and helping others to avoid making the same mistakes he made. A sentence of community service focused on these topics, under the supervision of Probation, is far more use to society than incarcerating John.

The Court should also consider what happened here and the differences between John's conduct and that of others who have come before Court in cases related to Mohammed Nuru.

After four years in the accounting side of Recology, John was asked to join operations and head up the San Francisco Group, taking over for Mark Arsenault.  John had no experience

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

in operations and learned from those around him, including Paul Giusti and Mark Arsenault, who became John's direct supervisor.

When John assumed the Group Manager role, he entered a position to approve, or disapprove, donation and sponsorship payments (of which Recology made hundreds a year). Here is where he made mistakes.  When Mr. Giusti first submitted a form to John for approval, John asked Mr. Arsenault, John's supervisor, whether the payment should be approved.  Mr. Arsenault said yes.  PSR ¶ 18(i).  And John approved the same payment for the next two years.

Pointing this out is not an effort to shift blame or deny responsibility.  John could and should have stepped back and said, no, we cannot pay for a holiday party at the request of Mr. Nuru, a public official who can affect our business.  But the circumstances in which John made this decision—taking on a new role and learning from those far older than he with decades of experience—paints the full picture of his conduct.

The nature of the payments is also different than a typical bribe.  Here, no money or other thing of value was given to Mr. Nuru that only Mr. Nuru could personally use.  Unlike the other defendants caught up in Mr. Nuru's corruption, John did not provide an envelope of cash.  He did not give a Rolex watch.  He did not arrange for work on to be done at Mr. Nuru's home. Instead, Recology provided donations for an annual holiday party Mr. Nuru hosted.  Hundreds of people attended these events, including many DPW and GSA employees, Recology employees, and other sponsors of the event, and Recology's sponsorship of the party was publicly announced.  *See United States v. Nuru*, Case No. 3:21-cv-490-WHO, Dkt. No. 112, p. 16 (N.D. Cal.) ("at the holiday parties, on multiple occasions, Mohammed openly announced Recology's sponsorship in order to give them public recognition").

Thus, while there is no question approving these payments at Mr. Nuru's request and for his benefit was improper, funding a holiday party for city employees and others in the community is very different from giving things like a Rolex or envelopes of cash to Nuru.  Mr. Nuru himself viewed these payments as distinct from payments he himself received from other city contractors.  His sentencing memorandum explains that he "sought the payments from Recology primarily to benefit city programs and support employees."  *Id.* at 15.  Mr. Nuru

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1   explained that these payments "should not be viewed as part of the remuneration received

2   directly by [him] *for his own personal benefit*."  *Id.* (emphasis added).

3        Nor did John benefit in any way from Recology's support of the annual holiday parties.

4   The PSR notes that while John "may not have personally benefitted from the payments to Nuru,

5   Recology . . .  stood to benefit from Nuru acting favorably toward Recology."  PSR, Addendum

6   ¶ 6.  This is true and why approving the holiday party sponsorship payments was wrong.  But

7   "unlike the payments from other city contractors, [Mr. Nuru] did not take any specific steps to

8   influence the rates paid by the City to Recology."  *UNITED STATES v. Nuru*, Case No. 3:21-cv-

9   490-WHO, Dkt. No. 112, p. 15 (N.D. Cal.).

10        The Court should consider the unique aspects of this case and set a punishment

11   commensurate with who John is, what he has to give, and what is just.

12   **II.     The Purposes of Punishment in § 3553 Do Not Support a Custodial Sentence.**

13        Under § 3553, the Court must impose a sentence that is not greater than necessary: "(A)

14   to reflect the seriousness of the offense, to promote respect for the law, and to provide just

15   punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect

16   the public from further crimes of the defendant; and (D) to provide the defendant with needed

17   educational or vocational training, medical care, or other correctional treatment in the most

18   effective manner."

19        The Court has stated in sentencing other individuals related to Mr. Nuru that bribery

20   erodes trust in government and is a serious offense.  John shares this view and words cannot

21   describe how ashamed he is that he is about to be sentenced for having been part of a group of

22   people who committed this crime.  But as the Supreme Court has directed, every convicted

23   person must be considered individually at sentencing, and consider each sentencing

24   determination as "a unique study in the human failings that sometimes mitigate, sometimes

25   magnify, the crime and the punishment to ensue."  *Gall*, 552 U.S. at 52.  Here, this

26   individualized analysis does not support placing John in custody.

27        First, the prosecution of John for approving a payment to a nonprofit for a holiday party

28   is unique.  As the San Francisco Controller noted in September 2020, dozens of organizations

- 14 -

supported city functions, including the DPW.[2]  And Department Heads like Mr. Nuru solicited

donations from these organizations routinely.  Of course, John should have known that a party

hosted by Mr. Nuru—who he knew had the ability to affect his employer's business—was not

permitted.  But that is not as immediately obvious as, for example, giving Mr. Nuru an envelope

of money or a Gold Rolex.

In many ways, this prosecution indicts the overarching pay-to-play atmosphere that

existed in San Francisco while John was working at Recology.  It, along with the deferred

prosecution agreement entered into by Recology and the updating of many local laws (*see, e.g.*,

San Francisco Ordinance No. 204-22), will go a long way to fix that culture—something that

absolutely needs fixing.

Specific to John and his conduct, the felony conviction, along with non-custodial

punishments of probation and community service, is sufficient to deter future criminal conduct.

The Ninth Circuit has recognized that § 3553 "does not require the goal of general deterrence be

met through a period of incarceration."  *United States v. Edwards*, 595 F.3d 1004, 1016 (9th Cir.

2010) (affirming variance from a Guideline range of 27-33 months to seven months of home

confinement and five years of probation).

This is particularly true where, as here, the defendant has already suffered a great deal

mentally and reputationally.  Unlike many cases, this matter has received significant public and

media attention.  What is more, John was originally charged with a variety of conduct with

which he had nothing to do, which was in turn picked up by the news media and widely reported.

Suffice it to say, John's reputation—a reputation he worked tirelessly to build—is in tatters.

John's mental health has also suffered dramatically since this case started.  His pre-

existing mental health conditions worsened, and he is medicated and in therapy for anxiety and

panic attacks.  Chad LeJeune Ltr.  The letters of John's loved ones further reflect the suffering he

---

[2] This report, titled Public Integrity Review, Preliminary Assessment: Gifts to Departments through Non-City Organizations Lack Transparency and Create "Pay-to-Play" Risk, is available here: https://sfcontroller.org/sites/default/files/Documents/Auditing/Public%20Integrity%20Review%20-%20Non-City%20Organizations%2009.24.20.pdf.

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

has gone through over the past several years—that suffering is real and severe.  *See, e.g.*, Alexis Hager Ltr.

John will also lose his professional license as a CPA as a result of his plea.  This collateral consequence is significant to John, not only because it limits his employment opportunities, but based on the family history of being a third-generation CPA in San Francisco. Jeff Porter Ltr.

Finally, there is no need to protect the public from future crimes of John.  As the recent amendments to the Guidelines make clear, Zero Point Offenders like John "have considerably lower recidivism rates than other offenders, including offenders with one criminal history point." 88 Fed. Reg. 28254-01, 28273 (May 3, 2023), 2023 WL 3199918.  John, in particular, will not be before the Court ever again.  John's entire life outside this incident and deep community support speaks to this assurance, as does his work on rehabilitating himself since charges were filed, including working with a clinical psychologist, who discusses John's "considerable efforts to reflect on and learn from this experience."  Chad LeJeune Ltr.

Putting John in custody is not necessary to reflect the purposes of punishment in § 3553.

**III.    John's Guidelines Range Supports a Noncustodial Sentence.**

    **A.    Guidelines agreed to in the plea agreement.**

In coming to a plea agreement, the parties did not agree on how the guidelines should apply to these unique facts.  The government agreed in the plea agreement that it and John would each make their arguments on the guidelines to the Court with respect to two specific guideline provisions discussed below.  The government further understands that our position is that John's conduct in approving payments for a holiday party does not justify imposing a custodial sentence, and that John will argue for non-custodial punishment.

The parties have agreed to the following guidelines calculations for the violation of 18 U.S.C. §1349:

- Base offense level under § 2C1.1(a)(1) of 12.

- Addition of a 2-level increase for more than one payment under § 2C1.1(b)(1)

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

- Addition of a 4-level increase because the offense involved a high-ranking public official under § 2C1.1(b)(3).

- Reduction of 3 levels for acceptance of responsibility under § 3E1.1(a).

This would result in an offense level of 15.

The plea agreement expressly leaves open to argument the calculation of value under § 2C1.1(c)(1) and 2B1.1 and the calculation of role under § 3B1.2. *See* Doc. 109 ¶ 7. In addition, the government does not oppose a variance equivalent to a 2-level reduction under the forthcoming § 4C1.1 to the Guidelines because John is a zero-point offender. *Id.* ¶ 15.

**B.    The parties' views on the remaining applicable guidelines.**

John respectfully submits that the following Guidelines adjustments should apply to his total offense level:

- **Reduction of 2 to 4** levels under § 3B1.2 for John's minor to minimal role in the offense.

- **No increase** under §§ 2C1.1(c)(1) and 2B1.1 because the value of the payments made to Nuru is less than $6,500.

- **Reduction of 2** levels because John is a zero-point offender under the forthcoming § 4C1.1.

These adjustments equal an offense level of **9, 10, or 11** (depending on the reduction applied for role).

The government does not agree to a role reduction under § 3B1.2 and believes that a 6-level increase is warranted under §§ 2C1.1(c)(1) and 2B1.1. The government does not oppose a variance equivalent to a 2-level reduction under § 4C1.1 because John is a zero-point offender. Probation does not apply any role reduction and applies a six-level increase for value but notes the parties' reserved these issues in the plea agreement for argument at sentencing and leaves them to "the sound discretion of the court." PSR, Addendum ¶ 5-7. Probation ultimately recommends a downward variance to a sentence of 15 months, which would be the equivalent of a mid-range sentence at offense level 13 in Zone C under the advisory Guidelines, although without including the additional two-level reduction for zero-point offenders in the forthcoming

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

§ 4C1.1.  On behalf of John, defense counsel believes, for the reasons stated below, that an offense level of 9, 10, or 11 (depending on the adjustment for role) is warranted.

### 1.   A two-level reduction is appropriate under the forthcoming rules for zero-point offenders.

The U.S. Sentencing Commission has promulgated amendments to the guidelines that will, absent congressional action, take effect on November 1, 2023.  *See* 88 Fed. Reg. 28254-01 (May 3, 2023), 2023 WL 3199918.  The amendments include a new § 4C1.1, titled "Adjustment for Zero-Point Offenders."  The reason for these amendments is based on the U.S. Sentencing Commission's continuing study of recidivism data.  "Recidivism data analyzed by the Commission shows . . . that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."  88 Fed. Reg. 28254-01, at 28273.

The inclusion of this reduction, as well as the corresponding changes to the Commentary on § 5C1.1 directing courts to consider non-custodial sentences for non-violent, first-time offenders, "respond to Congress's directive to the Commission at 28 U.S.C. 994(j), directing the Commission to ensure that the guidelines reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."  88 Fed. Reg. 28254-01, at 28274.

Here, John is the exact type of person for whom these amendments were passed.  He has no criminal history, and this will be the only time he is before the courts on a criminal matter.  There is no dispute that John qualifies for this adjustment and the government does not oppose its incorporation as a variance.  *See* PSR, Addendum ¶ 10.

### 2.   John's conduct warrants a four, or at least a two, level downward adjustment for his minimal role in the conspiracy.

John has pleaded guilty and accepts full responsibility for his actions.  In reaching the plea agreement, the government agreed that John may argue for a downward adjustment based on his role in the charged conspiracy, under the Guidelines § 3B1.2.  For the reasons below, John

respectfully submits that his offense level should be reduced by 2-4 levels based on his role in the scheme.

The notes accompanying § 3B1.2 of the Guidelines explain that this section provides "a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 Note 3(A). The guideline requires a four-level decrease if the defendant was a "minimal participant," a two-level decrease if the defendant was a "minor participant," and a three-level decrease "[i]n cases falling between" minimal and minor participant. U.S.S.G. § 3B1.2.

The "determination whether to apply [this adjustment] is based on the totality of the circumstances and involves a determination that is heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, Note 3(C). To determine where a defendants falls on this spectrum, courts are to consider the non-exhaustive factors listed in § 3B1.2 Note 3(C), which include (1) knowledge of the scope of the criminal activity; (2) the degree to which the defendant participate in planning; (3) the degree to which the defendant exercised decision-making authority; (4) the nature and extent of the defendant's involvement; and (5) the degree to which the defendant benefited from the criminal activity. U.S.S.G. § 3B1.2 Note 3(C).

Other participants in the activity alleged in the Superseding Indictment include Mr. Nuru, Paul Giusti, Mark Arsenault, and Nick Bovis. John's culpability is substantially less than the average culpability of these individuals.

It is well established that Mr. Nuru was by far the most culpable and played the largest role in seeking and obtaining benefits from all of the co-conspirators, for many years prior to John's involvement, and included conduct completely unknown to John and extending far beyond any role that John played. The Court will no doubt recall the extensive corrupt behavior relevant to the sentencing of Mr. Nuru, and the PSR concedes that Mr. Nuru appears to be the most culpable. PSR, Addendum ¶ 6. Mr. Nuru's plea agreement details a wide variety of personal benefits he received while he was Director of San Francisco Department of Public Works. For Recology specifically, Mr. Nuru's plea agreement describes extensive direct benefits, some personally received by Mr. Nuru, such as "a significant amount of free soil to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

[his] private ranch," in which John was not involved.  *United States v. Nuru*, Case No. 3:21-cv-490-WHO, Dkt. No. 87-1, pp. 7-8 (N.D. Cal.).

And yet the government and Mr. Nuru have both determined, and the Court so found, that no aggravating role adjustment should be applied to Mr. Nuru for this extensive conduct.  *Id.* at 14.  So to fail to recognize John's more limited role in the offense in comparison to Mr. Nuru, his charged co-conspirator, would equate John's role to the much more extensive role played by Mr. Nuru.  This alone warrants some role reduction for John to reflect his role relative to Mr. Nuru—they cannot be equated in terms of their respective roles in the conduct charged in the Superseding Indictment or the established conduct.

Mr. Giusti's plea agreement, similarly, details benefits that were provided from Recology to Mr. Nuru in which he and Mr. Arsenault—but not John—were involved.  *See United States v. Giusti*, 3:21-cr-294-WHO, Doc. 40-1 (N.D. Cal.).  These benefits included trips to New York, hotels and other travel expenses.  And Mr. Giusti also admits to destroying evidence after learning of the federal charges against Mohammed Nuru.  Mr. Bovis's plea agreement, too, details serious bribery involving personal benefits provided directly to Nuru in exchange for personal benefits received by Mr. Bovis.  *See United States v. Bovis*, 3:20-cr-204-WHO, Doc. 36 (N.D. Cal.).  Mr. Arsenault is perhaps the closest to John regarding culpability.  And although both Mr. Arsenault and John similarly approved payments to finance DPW holiday parties, Mr. Arsenault was never even charged with bribery for such approval.

Averaging the culpability of these four other participants, and comparing John's participation, shows his substantially lower level of culpability.

In contrast, as discussed above, John, who had only been with Recology for five years, was new to operations and was told by his predecessor Mark Arsenault, who at that time was John's boss as the COO at Recology, to continue approving the payments that Mr. Arsenault had made prior to John's involvement.  PSR ¶ 18(i), Addendum, ¶ 6.  Mr. Giusti had been with Recology for over 40 years and was the point person in interactions with Mr. Nuru.  Mr. Nuru did not discuss these payments with John, John did not initiate these payments, and he did not

understand the scope of other payments that others at Recology were making for the benefit of Mr. Nuru. Moreover, John never gained anything from the conduct.

John approved payments, as he was the person at Recology that such approvals went to once he assumed Mr. Arsenault's position. Similarly, he continued the periodic breakfast meetings with Mr. Nuru and other DPW officials to address DPW concerns—this practice had been going on for me than a decade prior to John attending the breakfasts, and the receipts for the breakfasts were submitted to Recology and reimbursed. Of course, he should have put a stop to it, should not have approved the DPW holiday party payments, knowing they were at the request of and for the benefit of a public official. That is why he is here, having taken responsibility for approving those payments, having pleaded guilty to the felony count. But that does not make him as culpable as people like Mohammed Nuru, Nick Bovis, and Paul Giusti, but more akin to his boss and alleged co-conspirator Mark Arsenault, who was never charged for the same conduct.

The Ninth Circuit recently addressed how this adjustment should be applied in *United States v. Dominguez-Caicedo*, 40 F.4th 938, 960 (9th Cir. 2022). The question is whether the defendant is "substantially less culpable than the average participant." To determine this, "the court must calculate a rough average level of culpability for" all the individuals involved, "taking into consideration the five factors in comment 3(C) to the Mitigating Role Guideline," and then "compare the defendant's culpability to that average." *Id.* Importantly, this average "is not referring to the actual level of culpability of any single participant" but "is instead referring to the mathematical average, i.e., a 'single value that represents the midpoint of a broad sample of subjects.'" *Id.* (quoting Average, Black's Law Dictionary (11th ed. 2019)). And "all likely participants in the criminal scheme must be included in calculating the average." *Id.*

Moreover, a defendant who "performs an essential or indispensable role in the criminal activity" may be eligible for this adjustment—depending on his relative culpability to the average. U.S.S.G. § 3B1.2, Note 3(C). The United States Sentencing Commission enacted amendment 794 adding this commentary on November 1, 2015, because a study found the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

mitigating role was "applied inconsistently and more sparingly than the Commission intended."[3] The Sentencing Commission found that in economic cases, courts often improperly denied the mitigating role to otherwise eligible defendants if the defendant was considered "integral" to the successful commission of the offense.  Thus, the amendment revised the commentary to the guidelines "to emphasize that 'the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative' and that such a defendant may receive a mitigating role adjustment, if he or she is otherwise eligible."  *Id.*

Applying that analysis to the participants in the charged scheme and the level of their relevant conduct, as discussed above, shows that John should receive a reduction for his minor to minimal role in the conspiracy.

### 3.    No increase for value is appropriate.

Again, in reaching the plea agreement, the government agreed that John may argue that no increase for value is appropriate when calculating his offense level under §§ 2C1.1(b)(2) and 2B1.1.  The government believes that John's offense level should be increased by 6 levels based on its assessment of "the value of the payments."  In determining the value of the payments, the government identifies three payments approved by John and provided to Lefty O'Doul's to fund three annual DPW holiday parties: (1) a payment of $15,000 in 2017; (2) a payment of $20,000 in 2018; and (3) a payment of $20,000 in 2019.  The government also argues that John is responsible for a $1,182 payment for a dinner at Harris Steakhouse that was attended by Mr. Nuru and five others.  In total the government has totaled the value of the payments under U.S.S.G. § 2C1.1(b)(2) to be $56,182 resulting in a six-level increase to John's total offense level.  Probation similarly calculates loss for purposes of sentencing, stating in the PSR Addendum that "the total value of the payments made to Nuru for his benefit ($56,182) is greater than the estimate of the benefit Nuru may have personally received pursuant to defense counsel's argument. As such, the greater amount must be used pursuant to USSG §2C1.1."  PSR, Addendum ¶ 8.

---

[3] *See Amendment 794*, United States Sentencing Commission, https://www.ussc.gov/guidelines/amendment/794#:~:text=Accordingly%2C%20the%20amendment%20revises%20the,or%20she%20is%20otherwise%20eligible.

Guideline § 2C1.1(b)(2) provides for an increase of the offense level for bribery on the basis of: (1) "the value of the payment;"(2) "the benefit received or to be received in return for the payment;" (3) "the value of anything obtained or to be obtained;" or (4) "the loss to the government from the offense, whichever is greatest." U.S.S.G. § 2C1.1(b)(2). Accordingly, and as is relevant here, under the plain language and commentary of § 2C1.1(b)(2), the guidelines calculate value as either the value to the payer ("the benefit received or to be received in return for the payment") or the value to the recipient ("the value of the payment" and "payment" is defined as anything of value that "need not be monetary"). Here, there was no value to John and the value of the payment and bribe to Mr. Nuru should be calculated by apportioning the total amount of the parties based on Mr. Nuru's attendance at the holiday parties and the dinner. *See, e.g.*, *United States v. Nuru*, Case No. 3:21-cv-490-WHO, Dkt. No. 87-1, p. 10 (N.D. Cal.) (apportioning value of $7,000 to the value for Nuru where the total payments for the meals were $20,000).

Both the government and probation rely on *United States v. Gillam*, 167 F.3d 1273, 1279 (9th Cir. 1999) and commentary in USSG §2C1.1, respectively, for the proposition that "[w]here the value of the bribe exceeds the value of the benefit or the value of the benefit cannot be determined, the value of the bribe is used." But this proposition does not speak to how the "value of the bribe" is determined. Section 2C1.1 specifically provides that:

> In determining the net value of the benefit received or to be received, the value of the bribe is not deducted from the gross value of such benefit; the harm is the same regardless of value of the bribe paid to receive the benefit. In a case in which the value of the bribe exceeds the value of the benefit, or in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe. Moreover, for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater.

The "value of the bribe" referred to in the commentary refers to the "value of the payment" under § 2C1.1(b)(2). As discussed above, this value refers to the value to the recipient—here, Mr. Nuru. Thus, the commentary indicates that where the value of the bribe or the value of the payment to Mr. Nuru (the recipient of the bribe) exceeds the value of the benefit (i.e. the benefit received or to be received by the payer—here, John), or where the value of the

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  benefit (again, the benefit received or to be received by the payer—i.e. John) cannot be

2  determined, the value of the bribe is used.  But, importantly, the commentary does *not* speak to

3  how such "value of the bribe" is to be determined or calculated.  Thus the commentary relied on

4  by probation and the government in advocating for the 6-level increase misses the mark and does

5  not address the substantive argument made by defense counsel—which is that the value of the

6  payment or the value of the bribe should be calculated by apportioning relevant amounts utilized

7  by Mr. Nuru—as well as all the other people that the payments benefited—for purposes of

8  John's sentencing.  We have found no case law using the value of a payment made to a private

9  third-party as the "value of the bribe" where the money was given to the third-party for a specific

10  purpose that benefited a large group of people unrelated to the scheme, and the public official

11  never received any of the money personally.

12  John admits he approved the donations at issue for Mr. Nuru's benefit.  But it is

13  undisputed that all of this money went to Lefty O'Doul's to fund DPW holiday parties.  And the

14  dinners were bills for meals where Mr. Nuru consumed food and drink comprising only a portion

15  of the total bill.

16  The facts in this case are unique to say the least.  While unable to identify precedent that

17  addresses identical facts, we have identified cases that speak to similar issues and the policies

18  underpinning those cases support our position that value of the payment or bribe should not be

19  calculated as the face amount of the holiday party donations or dinners, but rather the value of

20  the benefit *that Mr. Nuru received*.

21  For example, the Ninth Circuit has rejected the argument that expenses made to support a

22  bribery scheme—but that were not the payments themselves to the public official—are sufficient

23  to support a bribery conviction.  In *United States v. Choy*, 309 F.3d 602, 604 (9th Cir. 2002), the

24  defendant was convicted of bribing a public official under 18 U.S.C. §§ 201(b)(1) and 2.  The

25  defendant entered into an agreement with a corrupt customs broker (who was also a government

26  confidential informant) where the defendant would pay the informant a fee if the informant used

27  his contacts with a corrupt Food and Drug Administration ("FDA") official to see that the

28  defendant's imports of potentially adulterated food were admitted into the country without FDA

- 24 -

inspection.  The defendant would provide the informant a separate payment to be used to bribe the FDA official.  The defendant delivered two checks to the informant so the informant could purchase a computer to be used in the scheme.  The government charged the defendant with bribing the FDA official but only based on the amount of the two checks delivered to the private third-party to purchase the computer used to facilitate the bribery scheme.

The Ninth Circuit reversed the defendant's conviction for bribery finding that there was no evidence that the money or computer was given to the FDA official.  Similar to the facts here, the checks were instead given to a private individual to purchase the computer equipment that would facilitate clearing food shipments through customs, enabling the defendant to bribe the FDA official.  The court held that because the FDA official "himself did not use or receive either $5,000 or the computers" and "the money stayed with [the private third-party]," "the payments and the computers enabled [the private third-party] to process shipments, but they did nothing for the FDA official."  *Id*. at 606.

Similarly, the Ninth Circuit has held that value is not necessarily the face value of a payment and there may be legitimate reasons to apportion the total value of a payment to those amounts relevant to the defendant's charges.  In *United States v. Khan*, 701 F. App'x 592, 594 (9th Cir. 2017), the defendant pled guilty to conspiracy to commit mail fraud in violation of 18 U.S.C. § 1349.  Specifically, the defendant "pled guilty to devising and participating in a fictitious wage scheme to defraud the State of California Employment Development Department ('EDD'') into paying unemployment and disability benefits to many individuals who either did not work for the Khans' farm labor contractor companies or did not do so for the number of hours that they reported to EDD."  *Id*. at 594.  The court held that the government failed to meet its burden of demonstrating the loss amount enhancement by a preponderance of the evidence because there was "[n]o explanation or analysis of how those estimates were calculated, what proportion of those estimates were attributable to legitimate payments made by EDD for legitimate benefits claims, and why those payments were included in the estimates."  *Id.* at 595.

Courts addressing the value of "in kind" bribes similarly explain that the relevant value for purposes of sentencing is the value *to the recipient*.  "When calculating the value of an in-

kind bribe, courts have held the appropriate "value" to employ is value to the *recipient* of the bribe, not the cost to the one who pays the bribe." *United States v. Ring*, 811 F. Supp. 2d 359, 379 (D.D.C. 2011) (emphasis in original); *see also United States v. Bohuchot*, 625 F.3d 892, 904-05 (5th Cir.2010) (evaluating value of bribe as the value "received" by the bribed official).

All of these principles show that the face amount of a payment that is not personally received by a public official is not necessarily the appropriate amount to include in the value calculation at sentencing.

John approved the payments to Lefty O'Doul's. And those payments were requested by and of value to Mr. Nuru, to perhaps increase his standing or reputation or to be looked upon with favor by DPW employees. But the payments were used by Lefty O'Doul's entirely to fund holiday parties attended by hundreds of participants.

Indeed, this is how Mr. Nuru himself viewed the payments. In his sentencing brief, Mr. Nuru explained in detail why the holiday payments were unlike the other payments in his case, and stated that while he "acknowledges the impropriety of facilitating payments from Recology without transparent disclosure to the public, *these payments are distinct from the renumeration that went to him for his own personal benefit*." *United States v. Nuru*, Case No. 3:21-cv-490-WHO, Dkt. No. 112, pp. 15-17 (N.D. Cal.) (emphasis added). Despite the holiday party payments having no impact on his sentencing guidelines calculation, Mr. Nuru took the position at sentencing that these exact payments should not be included along with the other benefits he received because they actually went to the intended purpose, a holiday party, and not to him. The holiday party payments would not have changed Mr. Nuru's sentencing guidelines calculation and so it was not relevant to resolve for his sentencing; but it is highly relevant to John's.[4]

The parties may have conferred some intangible value to Mr. Nuru and also conferred direct value in the form of food and drink he consumed—either of which is sufficient to support a conviction here. But the value calculation at sentencing must focus on these benefits to Mr.

---

[4] Other entities also sponsored the holiday party besides Recology and persons from these entities who made the sponsorship payments have not been prosecuted. *See* SF Controllers Report referenced in note 1, pp. 30-31.

Nuru, not the total face value of the payments which indisputably benefited hundreds of public employees, contractors, and others who attended the event. Attributing the entire value of this donation to Mohammed Nuru would infer that Mohammed Nuru was the only attendee or that it was for his sole personal benefit, which is contrary to the facts and nature of the event.

This is how the San Francisco City Controller viewed the payments in assessing whether they amounted to a prohibited "non-cash gift." The Controller explained that "[t]he holiday party was limited to 350 attendees, including both city staff and contractor representatives, leading to a total benefit per person in excess of the $25 non-cash gift threshold[.]"[5]

The district court in *Ring* viewed matters similarly. There, the court recognized that the calculation of the "value of the payment" required the subtraction of amounts that were "associated with the non-public officials who went on [certain] trips, including friends, family, and the lobbyists [defendants] themselves." 811 F. Supp. 2d at 380. Similarly, here, where the "value of the payment" includes amounts that were used to pay vendors for holiday parties which were attended by DPW employees, individuals who had nothing to do with City government, and John himself, the "value of the payment" should be apportioned to subtract such amounts associated with non-public officials and others. Similarly, the government has provided the total cost of the Harris Steakhouse dinner without subtracting the costs associated with five other people who attended the dinner—including John himself. *See id.*

Loss calculations under § 2B1.1 "require only that the Court 'make a reasonable estimate' of these values. But the government 'bears the burden of supporting its loss calculation with reliable and specific evidence,' and it may not simply guess where such evidence is unavailable." *Ring*, 811 F. Supp. 2d at 380 (quoting U.S.S.G. § 2B1.1 cmt. n. 3(c) and *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006)); *see also Khan*, 701 F. App'x at 595 ("The government bears the burden of proof when it seeks sentencing enhancements . . . and must demonstrate the basis for a loss amount enhancement by a preponderance of the evidence. . . . The district court need no calculate loss amount with 'absolute precision' but rather only needs to make a 'reasonable estimate' of loss amount.") (citations omitted).

---

[5] *See* SF Controllers Report referenced in note 1, p. 31.

Where, as here, the value attributable to Mr. Nuru personally is less than $6,500, there should be no increase for the value of the payment at sentencing.  Specifically, six people attended the approximately $1,200 Harris meal, yielding a value of approximately $200 to Mr. Nuru.  And hundreds of people attended the DPW holiday party, and $55,000 divided by 300 people is approximately $184 to Mr. Nuru himself.  Accordingly, defense counsel respectfully submits that no increase for value is appropriate here.

### 4.      John's Guidelines level does not warrant a custodial sentence.

As discussed above, with proper evaluation of John's role and the value of the payment, as well as incorporating a two-level variance for the Zero Point Offender amendment, the Guidelines should be calculated between Level 9 to 11.  The higher end of that range, Level 11, provides an advisory sentencing range of 8 to 14 months imprisonment.  Importantly, however, the forthcoming amendments to the Guidelines provide that "a sentence other than a sentence of imprisonment . . . is generally appropriate" for a Zero Point Offender in Zones A or B. 88 Fed. Reg. 28254-01, 28272 (May 3, 2023), 2023 WL 3199918.

Even if the Court disagrees with one or more of the arguments on the Guideline calculations, and identifies a level in Zones C or D, the Zero Point Offender amendments provide that "[a] departure, *including a departure to a sentence other than a sentence of imprisonment*, may be appropriate if the defendant received an adjustment under § 4C1.1 (Adjustment for Certain Zero-Point Offenders) and the defendant's applicable guideline range overstates the gravity of the offense because the offense of conviction is not a crime of violence or an otherwise serious offense."  *Id.* (emphasis added).

Accordingly, even under the Guidelines without consideration of § 3553, imprisonment is neither necessary nor appropriate.  Those factors, however, confirm that a custodial sentence in not appropriate here.

## IV.     A Noncustodial Sentence Avoids Unwarranted Sentencing Disparities

Sentencing John to prison also is inconsistent with how other similarly situated individuals have been treated. First, the most similarly situated individual to John is his former supervisor, Mark Arsenault. PSR ¶ 14, Addendum ¶ 5. In fact, as detailed in Paul Giusti's factual

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

basis, Mr. Arsenault was involved in providing many benefits to Mr. Nuru. *See United States v. Giusti*, 3:21-cr-294-WHO, Doc. 40-1 (N.D. Cal.).  Mr. Arsenault made the same holiday party donation prior to John taking over his position.  Moreover, while serving as John's then-supervisor, Mr. Arsenault told John to approve the same holiday donations when John was first presented with the request, attended the dinner with Mr. Nuru and asked John to pay for it, and attended the breakfast meetings with Nuru and other DPW officials for many years prior to John assuming those duties.  PSR ¶¶ 14, 18(i).  Mr. Arsenault, however, was not charged with any crime.

Zhang Li is a real estate developer charged with bribing "Nuru by providing him with food, drinks, luxury lodging, and transportation during a trip Nuru took to China in 2018" in exchange for approvals needed to construct a development project at 555 Fulton Street. https://www.justice.gov/usao-ndca/pr/chinese-national-real-estate-developer-appears-court-face-charges-bribing-prominent.  Mr. Li is avoiding any custodial sentence through a deferred prosecution agreement and a $1 million fine, announced by the U.S. Attorney's Office for the Northern District of California on July 19, 2023.

Thomas Angelo Steiber pled guilty to one count of conspiracy to commit honest services wire fraud related to a scheme in which Mr. Steiber paid kickbacks to an individual who gave him confidential information, making Mr. Steiber a substantial amount of money through the scheme. *See United States v. Steiber*, 4:12-cr-660-CW, Doc. 200, 201 (N.D. Cal). Mr. Steiber's offense level was 18 with a Guidelines range of 27-33 months.  *Id.*  Mr. Steiber was sentenced to six months of home confinement, three years' probation, a $6,500 fine, and $370,303 in restitution payments. *United States v. Steiber*, 4:12-cr-660-CW, Doc. 206 (N.D. Cal.).  Co-conspirators Reza Nikfar and Ming Tan were similarly sentenced to non-custodial sentences. *See United States v. Nikfar*, 4:12-cr-660-CW, Doc. 246 (N.D. Cal.); *United States v. Tan*, 4:12-cr-660-CW, Doc. 223 (N.D. Cal.).

James Nathan Sweet pled guilty to stealing $160,095 from the Social Security Office. *United States v. Sweet*, 3:15-cr-360-WHO, Doc. 17 (N.D. Cal.).  Despite Mr. Sweet having a prior criminal history of perjury (which resulted in a sixty-day jail sentence), he was sentenced to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12 months of location monitoring, three years of probation, and ordered to pay restitution in the amount of $155,665.

Marilyn Louise Flynn is former dean of the University of Southern California's school of social work.  She pled guilty to bribing Los Angeles city councilmember Mark Ridley-Thomas by facilitating a $100,000 payment for the benefit of Ridley-Thomas's son so that Flynn could obtain a lucrative city contract.  https://www.justice.gov/usao-cdca/pr/former-dean-usc-s-social-work-school-agrees-plead-guilty-bribery-funneling-100000.  Ms. Flynn was sentenced to 18 months of location monitoring, probation, and a $150,000 fine. *United States v. Flynn*, 2:21-cr-485, Doc. No. 394 (C.D. Cal.).

All of these cases demonstrate that someone like John should not be sentenced to prison time.  The government will likely point to the Court's sentence of Florence Kong to a year and a day of custody as evidence that John should likewise receive a custodial sentence.  But Ms. Kong's sentence supports *not* sentencing John to a custodial sentence.  Unlike John, Ms. Kong "showered Nuru with gifts, including the $35,550 gold watch that Kong gave Nuru in return for official actions on Nuru's behalf."  https://www.justice.gov/usao-ndca/pr/public-contractor-sentenced-prison-bribing-san-francisco-public-official-and-making.  Then, Ms. Kong lied to the FBI when questioned about her conduct, despite being told that doing so was a crime. *Id.*

As noted above, even Mr. Nuru distinguished between contractors like Ms. Kong and employees of Recology.  With Ms. Kong, Mr. Nuru accepted work on his ranch, "envelopes of cash" supposedly for his children, and a Rolex—benefits that Mr. Nuru described as "personal gifts" or "purely extras for himself."  In contrast, Mr. Nuru has been clear that the Recology payments for the DPW party was not "remuneration received directly by [him] for his own personal benefit."  *United States v. Nuru*, Case No. 3:21-cv-490-WHO, Dkt. No. 112, pp. 11-17 (N.D. Cal.).

Again, to be clear, this does not mean John approving payments for the holiday party was appropriate.  It was not.  Nor, however, is it the same as paying direct cash payments or an expensive watch for personal benefit in return.  John approved payments from his employer to

BAKER & HOSTETLER LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1  holiday parties that occurred, none of that money was misdirected to Mr. Nuru himself, and John

2  received no personal benefit.

3        The individuality of sentencing allows for distinctions, particularly in a case as unique as

4  this one.  *See, e.g.*, *United States v. Sullivan*, 3:20-cr-00337, Doc. 269 (N.D. Cal.) (sentencing

5  defendant to noncustodial sentence in light of uniqueness of prosecution).

6                                  **CONCLUSION**

7        Under § 3553(a), the Court must impose a sentence that is "sufficient, but not greater

8  than necessary."  We ask the Court to impose a sentence of probation for John, or at most a

9  sentence involving home detention, as well as an obligation of community service that would

10 allow John to serve society in ways that help those struggling with mental health and to help

11 others not make the same mistakes he did.  Such a sentence would be consistent with the

12 sentence imposed on other defendants with similar conduct, and would allow John to continue to

13 be a positive contributor to his community and maintain his hard-fought employment, and

14 importantly have access to his specialized care for his longstanding mental health issues.  This

15 sentence would provide just punishment given the conduct at issue here and the loss of John's

16 CPA license and the severe toll that this matter has already taken on his mental health for three

17 years.

18

19 Dated:    September 14, 2023          Respectfully submitted,

20

21                                      BAKER & HOSTETLER LLP

22                                      By:    */s/Robb C. Adkins*
                                              Robb C. Adkins
23

24                                      *Attorneys for Defendant John Porter*

25

26

27

28