Robb C. Adkins (SBN 194576)
Chardaie C. Charlemagne (*Admitted Pro Hac Vice*)
Sam A. Camardo (*Admitted Pro Hac Vice*)
BAKER & HOSTETLER LLP
Transamerica Pyramid Center
600 Montgomery Street, Suite 3100
San Francisco, CA  94111
Telephone:   415.659.2600
Facsimile:    415.659.2601
Email:          radkins@bakerlaw.com
                    ccharlemagne@bakerlaw.com
                    scamardo@bakerlaw.com

*Attorneys for Defendant John Porter*

**IN THE UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| United States, | **CASE NO.: 22-CR-270-WHO** |
| Plaintiff, | **HON. WILLIAM H. ORRICK** |
| v. | **RESPONSE TO GOVERNMENT'S SENTENCING BRIEF** |
| John Porter, | |
| Defendant. | |

**NO MATERIAL FACTS ARE IN DISPUTE**

John Porter pled guilty to one count of the Superseding Indictment charging him with conspiracy to commit honest services wire and mail fraud in violation of 18 U.S.C. § 1349. Specifically, as stated in the plea agreement, John "approved and directed payments from Recology for the benefit of Mohammed Nuru," (Plea Agreement 2:13-14); "he understood that one purpose and object of the payments was to influence Nuru to use his position with DPW to act for Recology's benefit," (Plea Agreement 2:18-19); he knew the money approved would go "from Recology to the Lefty O'Doul's Foundation for Kids," (*Id.* at 2:25-26; 3:2-3; 3:6-7); he knew "that the request was from Nuru," (*Id.* at 2:26-27; 3:3-4; 3:8); and that "the money would be used to fund a holiday party Nuru hosted" (*Id.* at 2:27-3:1; 3:4-5; 3:8-10). John agreed further that at the time he approved the payments, he "understood that the money would be used to fund a holiday party Nuru hosted for friends, political supporters, and select DPW Employees," (*Id.* at 2:27-3:1; 3:4-5; 3:8-10).

The government makes several characterizations of these undisputed and agreed-upon facts in its sentencing brief. But beyond the characterizations, review of the government's brief shows that the underlying facts themselves are not in dispute.[1]

First, the government states that the Recology donation funds approved by John were "siphoned off from Lefty O'Doul's and given to Nuru to use to fund his party." (Govt Br. at 3:7.) Contrary to this characterization, the payments John approved were "from Recology to the Lefty O'Doul's Foundation for Kids," (Plea Agreement 2:25-26; 3:2-3; 3:6-7), and were used to fund the DPW holiday parties, as intended. They were not siphoned off and sent to Nuru; they went entirely from Recology to the caterer Lefty O'Doul's to pay for the holiday party.

Second, the government also states that John "concealed the nature of this and subsequent payments to Nuru by falsely labeling them as 'holiday donations' to the Lefty O'Doul's Foundation for Kids." (Govt Br. at 3:24-26.) The parties agreed in the plea agreement that John "knew that the funds were not being used by Lefty O'Doul's Foundation or Kids to provide access to baseball and baseball equipment for underprivileged children;" "understood the money

---

[1] If the government disagrees with any of these established facts or wishes to offer additional evidence beyond the agreed-upon facts or facts in the PSR, it is of course entitled to do so through an evidentiary hearing.

would be used to fund a holiday party Nuru hosted for friends, political supporters, and select DPW Employees;" and "signed the approval forms that labeled the three payments as 'holiday donations.'"  Contrary to the government's characterization of these facts, John did not fill out or label the approval forms "holiday donations"—he merely signed approval forms that were prepared by another Recology employee, Paul Giusti, which had been previously approved by John's predecessor Mark Arsenault.

Third, the government points to a list of benefits that were provided to Nuru including "a hotel stay, the funeral costs for a DPW employee, an internship for Nuru's son, and annual contributions to a San Francisco non-profit in the form of donations made at Nuru's request." (Govt. Br. at 2:13-16.)  It is undisputed that John played no role in any of these other actions. That is indeed why the Guidelines support a role adjustment for John: he played a relatively minor role in approving three donations to a holiday party and had no role in the many pre-existing and wide-ranging benefits that others engaged in with Nuru.

Again, it appears that the government does not dispute any of the facts stated above. Defense counsel believes that, characterizations aside, there are no material factual disputes in this matter.

## RESPONSE TO THE GOVERNMENT'S GUIDELINES ARGUMENTS

### I.   The Value of the Bribe to Nuru is Less Than $6,500

The government is correct that the parties agree that the proper measure of the value to be used in calculating John's guidelines is the value of the bribe.  The parties dispute how that value is to be calculated.  As discussed in defendant's sentencing brief, the value of the bribe refers to the value to the recipient.   Yet, the government argues that the full $56,182 paid to fund DPW holiday parties, attended by hundreds of individuals, should be attributed as the value of the bribe *to* Nuru alone.

The government argues that *United States v. Choy*, 309 F.3d 602 (2002), is distinguishable because the payments there "were not bribes or payments to the corrupt FDA official, or even for the official's benefit," but that the "money went to a co-conspirator to buy computers that would interface with the FDA computers, facilitating the importation of the

seafood." (Govt. Br. at 8.) The government further states that the "computers were simply bought for a co-conspirator to help facilitate legitimate side of the import business." (*Id.*) The government is incorrect.

Choy, a co-conspirator with others, "owned Pacific Rim Seafood, which imported frozen seafood and other edibles from overseas." *Choy*, 309 F.3d at 604. Similarly, here, Bovis, a co-conspirator, owned and operated the Lefty O'Doul's restaurant and the nonprofit Lefty O'Doul's Foundation for Kids. The Foundation had a mission to provide access to baseball and baseball equipment for underprivileged children and the restaurant often served as a caterer for both DPW and Recology sponsored events.

Choy gave Clopp, a corrupt customs broker, $5,000 to purchase computers necessary to facilitate the *corrupt*, not legitimate, import business because the "[c]orrupt import process . . . [had been made] more difficult because the government's processing of paperwork was now largely electronic." *Id.* Contrary to the government's contentions, the money in *Choy* was not used to facilitate the "legitimate side of the import business." (Govt. Br. at 8.) Similarly here, the $55,000 was given to Lefty O'Doul's Foundation for Kids to pay for vendors, food and drink to facilitate annual holiday parties attended by hundreds of people and public employees. And the $1,182 for the Harris' dinner was attended by other Recology and DPW employees.

The court in *Choy* held that the "$5,000 refers to two checks Choy gave to Clopp, a private individual, to purchase ABI computer equipment that would facilitate clearing food shipments through customs, thereby enabling Choy and Lai to bribe the FDA official. There was no evidence anywhere in the record that either the money or the computer was given to the FDA official, or that Choy intended them to be so given." *Choy*, 309 F.3d at 605.

The same is true here. $55,000 refers to three checks that were given to the Lefty O'Doul's Foundation for Kids, a nonprofit organization, to purchase food, drink and other vendor services for annual DPW holiday parties. By the government's own assertion, the bribes Nuru received were the parties which served as "a means for Nuru to flaunt his power and prestige, provide largess to his political supporters, and to benefit from the esteem and adulation that came with hosting the events." (Govt. Br. at 7.) But that does not mean that the value of the

bribe is equivalent to the payment supporting the event. And the government provides no other support or valuation for its assertion of an undefined, intangible "esteem" that was conferred to Nuru by the holiday parties, which were attended by hundreds of DPW employees and others in celebration of the holidays.

The government's dismissal of *Ring* is likewise flawed. The issue there was not only that some of the payments were for noncorrupt purposes. The court also took issue with the government's failure to deduct from the value received the value to other people who are not the person being bribed. *See United States v. Ring*, 811 F. Supp. 2d 359, 380 (D.D.C. 2011) ("Similarly, while the government has provided the total cost of trips to the Super Bowl, Scotland, and Puerto Rico, they make no attempt to subtract the costs associated with the non-public officials who went on these trips, including friends, family, and the lobbyists themselves.").

Accordingly, the value of the bribe here should be apportioned to include only the portions of the party which can be attributed to Nuru himself, which is less than $6,500.

## II.   A 2-4 Level Adjustment is Appropriate for Role

Contrary to the government's assertions, a downward adjustment under § 3B1.1 is not to be used infrequently and only in exceptional circumstances. (Govt. Br. at 10.) The Sentencing Commission specifically passed amendments to change this view. The cases cited by the government in support of its assertion were decided prior to Amendment 794 enacted in 2015.

Under that amendment, a defendant who "performs an essential or indispensable role in the criminal activity" may be eligible for an adjustment under § 3B1.1 depending on his relative culpability to the average. U.S.S.G. § 3B1.2, Note 3(C). The United States Sentencing Commission enacted Amendment 794 adding this commentary on November 1, 2015, because a study found the mitigating role was "applied inconsistently and more sparingly than the Commission intended."[2] The Sentencing Commission found that in economic cases, courts often improperly denied the mitigating role to otherwise eligible defendants if the defendant was

---

[2] *See Amendment 794*, United States Sentencing Commission, https://www.ussc.gov/guidelines/amendment/794#:~:text=Accordingly%2C%20the%20amendment%20revises%20the,or%20she%20is%20otherwise%20eligible

considered "integral" to the successful commission of the offense. Thus, the amendment revised the commentary to the guidelines "to emphasize that 'the fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative' and that such a defendant may receive a mitigating role adjustment, if he or she is otherwise eligible." *Id.*

And the Ninth Circuit has held "the assessment of a defendant's eligibility for a minor-role adjustment must include consideration of the factors identified by the Amendment, not merely the benchmarks established by our case law that pre-dates Amendment 794's effective date." *United States v. Diaz*, 884 F.3d 911, 916 (9th Cir. 2018). Thus, the government's assertions about the infrequency and exceptional nature of a downward adjustment based on case law that pre-dates Amendment 794 is misplaced.

Moreover, here, the factors to be considered demonstrate that a downward adjustment based on John's role in the offense is appropriate. John understood the purpose of the payments was to fund holiday parties in the hopes that Nuru would act favorably towards Recology should the opportunity arise. But John did not know or play a role in the scope and structure of the greater DPW scheme involving Nuru and others outside of Recology. The Ninth Circuit has held that district courts must "assess the defendant's knowledge of the scope and structure of the 'criminal enterprise,' not just his knowledge of his own conduct that led to his conviction." *United States v. Rodriguez*, 44 F.4th 1229, 1235 (9th Cir. 2022) (citing *United States v. Diaz*, 884 F.3d 911, 917 (9th Cir. 2018)).

As the government noted in its sentencing brief, the greater conspiracy involving Mohammed Nuru included "meals, drinks, a hotel stay, the funeral costs for a DPW employee, an internship for Nuru's son, and annual contributions to a San Francisco non-profit in the form of donations made at Nuru's request," (Govt Br. at 2:13-16.) John only had knowledge of and was only involved in the approval of payments for three annual DPW holiday parties and the payment of meals (one dinner and some breakfasts), which were later reimbursed by Recology. Nor was John an "organizer" of the scheme. *Rodriguez*, 44 F.4th at 1236. To the contrary, as the government notes in its sentencing brief, Nuru initiated numerous requests for benefits to himself, and Giusti served as Nuru's point of contact; it was Giusti who planned and arranged

RESPONSE TO GOVERNMENT'S SENTENCING BRIEF     CASE NO.: 22-CR-270-WHO

the donations for the holiday parties – including the amounts and how they would be delivered. And John has never even met or spoken with Bovis.

The nature and extent of John's participation in the commission of the criminal activity is minimal relative to the other co-conspirators. John only signed the Recology approval forms allowing for the payments to be made to Lefty O'Doul's—he did not create the approval forms nor did he discuss the funding of the holiday parties with Nuru. Contrary to the government's assertions, the fact that Giusti "could not act without John" is no longer the correct analysis in light of Amendment 794. And despite the government's conclusory statement to the contrary, John did not benefit in any tangible or material way from the conspiracy.

For the foregoing reasons and those stated in defendant's sentencing brief (Porter Sentencing Br. 18-22), John's relative actions and knowledge warrants a minor role reduction.

## RESPONSE TO THE GOVERNMENT'S SECTION 3553 ARGUMENTS

There being, from the defense view, no disputed facts once stripped of government characterization, and with the advisory guidelines having been left to the sound discretion of the court, we respectfully submit that the Court is prepared to provide the appropriate sentencing for John under these unique facts. We will not repeat our sentencing factors here, as they do not appear to have been meaningfully contested by the government, with one exception. In its discussion of the need to avoid sentencing disparities, the government makes a false equivalence to Florence Kong and Alan Varela. These individuals personally enriched Mohammed Nuru in the form of cash gifts, a Rolex watch, a John Deere tractor, and free construction labor and improvements to Nuru's ranch.

The government asserts: "Like Varela and Kong, Porter was a successful business executive." (Govt. Br. at 16.) In truth, *unlike* Varela and Kong, John is not a multimillionaire business owner who personally obtained profits from lucrative contracts. In the government's sentencing memorandum for Kong, the government included a paragraph outlining her substantial wealth: "Kong's assets include five properties in San Francisco, worth in total $15 million… Kong has a net worth of $9.8 million". *See USA v. Kong*, 3:20-cr-354-WHO, Doc. 34, pp. 6-7 (N.D. Cal.). This same theme runs through the sentencing memorandum that the

government filed in Varela's case. *See USA v. Varela*, 3:21-cr-192-WHO, Doc. 49, p. 8 ("As noted in the PSR, Varela owns two homes in "upper class areas of California," including a residence on more than 50 acres in Napa, several luxury vehicles and other significant assets."), *id.* p. 10 ("What is more galling is the fact that at the time the conspiracy began, Varela had already achieved great success and accumulated significant wealth."). This theme is noticeably absent from the government's memorandum here. As one of John's close friends said in their letter of support: "John has never lived a lavish lifestyle," which is supported by the PSR.

John was an employee of a large company, who was promoted to management at the age of 35. He worked in this large organization, learning from others like Paul Giusti and Mark Arsenault, and it was in this context that he made the mistakes for which he will be sentenced. Unlike Kong, who was sentenced to a year and a day incarceration, John was not a business owner who personally benefitted from her conduct, he never lied to the FBI, and he never provided a gold Rolex and cash to Nuru to secure return benefits to himself. Unlike Nuru, John never obstructed justice, and unlike Giusti, John never deleted text messages. Instead, John cooperated with Recology's internal investigation and never tried to hide the fact that he approved the donations to the holiday party. He should be sentenced for that error in judgment, but his conduct is objectively far different from that of Kong, Giusti, and Varela.

## CONCLUSION

The Court should sentence John as a unique individual whose conduct is based on a unique set of facts. Here, we respectfully submit that who John is and what he did does not support imprisoning him. Other than his lapse in judgment at Recology, John has lived a life of hard work, honesty, and integrity. He has suffered dramatically, both professionally and mentally, over the last three years and this suffering will continue, regardless of sentence.

John, who just turned 40, has finally overcome significant hurdles to secure gainful employment, and through hard work with mental health professionals he is addressing his longstanding anxiety and depression disorders. We respectfully ask that the Court order a sentence for John that will allow him to continue working, and that will enable him to help others

in society overcome their own struggles with mental health and learn from the mistakes that John made at Recology.

Dated:   September 18, 2023         Respectfully submitted,

BAKER & HOSTETLER LLP

By:   */s/ Robb C. Adkins*
      Robb C. Adkins

Attorneys for Defendant John Porter